**23-1814, 23-748**

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

HOANG XUAN LE AND SHEILA MARIE RITZE,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the Central District of California
Hon. Judge David O. Carter, District Judge
D.C. No. 8:20-cr-0002-DOC

# APPELLANTS' JOINT OPENING BRIEF

DAVINA T. CHEN
LAW OFFICE OF DAVINA T. CHEN
1751 Colorado Blvd., No. 190
Los Angeles, California 90041
(213) 446 8791
Davina@DavinaChen.com

CRAIG WILKE
LAW OFFICE OF CRAIG WILKE
305 N Harbor Blvd., Ste. 216
Fullerton, California 92832
(714) 870 2278
Craig@CraigWilkeLaw.com

*Counsel for Defendant-Appellant Hoang Xuan Le*

DAVID W. WIECHERT
WIECHERT, MUNK & GOLDSTEIN, PC
4000 MacArthur Blvd., Ste. 600
Newport Beach, California 92660
(949) 361 5722
DWiechert@aol.com

COURTNEY L.C. CEFALI
CEFALI & CEFALI, APC
27136 Paseo Espada, Ste. 1123
San Juan Capistrano, California 92675
(949) 203 3332
Courtney@CallCefali.com

*Counsel for Defendant-Appellant Sheila Marie Ritze*

## Table of Contents

**Page**

Table of Authorities ........ iv

Statement of the Issue ........ 1

Introduction ........ 2

Statement of Jurisdiction and Detention Status ........ 3

Statement of the Case ........ 4

Summary of Argument ........ 9

Standard of Review ........ 11

Argument ........ 11

The convictions stemming from Counts One, Two, and Three of the indictment must be vacated because the charged conduct could not be proved to have occurred within the special maritime and territorial jurisdiction of the United States. ........ 11

A. The district court was correct that the "high seas," for the purpose of defining the SMTJUS, do not include State territorial waters. ........ 11

1. Consistent with its established meaning and Congress' use of the term in contemporaneous legislation, the "high seas" in 18 U.S.C. § 7(1) do not include the territorial waters of the United States or any State ........ 13

2. This Court's interpretation of Article I's High Seas Clause, the reach of murder-on-the-high-seas statutes since the Founding, and principles of federalism corroborate this interpretation. ........ 22

B. The government's "second theory"—that AEDPA § 901(a) expanded the SMTJUS to ocean waters within the States' jurisdiction—is wrong. .......... 27

1. The text, context, and history of AEDPA § 901 reflect that it plugged a potential jurisdictional gap under international law between three and twelve miles offshore. .......... 28

2. The clear statement rule does not permit Congress to expand federal jurisdiction in this way. .......... 36

C. If there were any doubt, the doctrine of constitutional avoidance and the rule of lenity would require the Court to reject the notion that SMTJUS covers a State's ocean waters. .......... 38

Conclusion .......... 41

Certificate of Word Count .......... 42

Statutory Addendum

# Table of Authorities

## Cases

*The Abby Dodge v. United States*, 223 U.S. 166 (1912) .......................... 38

*American Banana Boat Co. v. United Fruit Co.*, 213 U.S. 347 (1909) ... 16

*Blanchette v. Connecticut General Ins. Corporations*,
419 U.S. 102 (1974) ............................................................. 32

*Bond v. United States*, 572 U.S. 844 (2014) ............................... 22, 24, 37

*Clark v. Martinez*, 543 U.S. 371 (2005) ........................................... 18

*Cunard S.S. Co. v. Mellon*, 262 U.S. 100 (1923) ................................... 16

*Cyan, Inc. v. Beaver County Employees Retirement Fund*,
583 U.S. 416 (2018) ............................................................ 10, 38

*Fischer v. United States*, ___S. Ct. ___, 2024 WL 3208034 (2024) ......... 17

*Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561 (1985)................................. 18

*The Hamilton*, 207 U.S. 398 (1907) ...................................................... 16

*Jones v. United States*, 529 U.S. 848 (2000)........................................... 37

*Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013) .................... 15

*Ledezma-Galicia v. Holder*, 636 F.3d 1059 (9th Cir. 2010) .................... 31

*McCulloch v. Maryland*, 17 U.S. 316 (1819) .......................................... 22

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
551 U.S. 644 (2007) ............................................................. 32

*People v. Weeren*, 26 Cal. 3d 654 (1980)................................................. 5

*Radzanower v. Touche Ross & Co.*, 426 U.S. 148 (1976) ........................ 33

*Rewis v. United States*, 401 U.S. 808 (1970) .......................................... 37

*Ross v. Blake*, 578 U.S. 632 (2016)......................................................... 13

*Scotland*, 105 U.S. 24 (1881)................................................................. 15

*Smith v. United States*, 599 U.S. 236 (2023)........................................... 18

*Snyder v. United States*, ___ S. Ct. ___, 2024 WL 3165518 (2024)......... 26

*Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Eng'rs*, 531 U.S. 159 (2001) .................... 39

*United States v. Alaska*, 503 U.S. 569 (1992) .................... 29

*United States v. Bass*, 404 U.S. 336 (1971) .................... 9, 26, 37

*United States v. Bevans*, 16 U.S. 336 (1818) .................... 24

*United States v. California*, 381 U.S. 139 (1965) .................... 5

*United States v. Corey*, 232 F.3d 1166 (9th Cir. 2000) .................... 11, 12

*United States v. Cortes*, 757 F.3d 850 (9th Cir. 2014) .................... 11

*United States v. Davis*, 905 F.2d 245 (9th Cir. 1990) .................... 15, 23, 39

*United States v. Fortenberry*, 89 F.4th 702 (9th Cir. 2023) .................... 18

*United States v. Hansen*, 599 U.S. 762 (2023) .................... 15

*United States v. Holmes*, 18 U.S. 412 (1820) .................... 24

*United States v. Lei Shi*, 525 F.3d 709 (9th Cir. 2008) .................... 15, 23

*United States v. Lopez*, 514 U.S. 549 (1995) .................... 22

*United States v. Louisiana*, 394 U.S. 11 (1969) .................... 15

*United States v. Maine*, 475 U.S. 89 (1986) .................... 16

*United States v. Marin*, 90 F.4th 1235 (9th Cir. 2024) .................... 15

*United States v. Morrison*, 529 U.S. 598 (2000) .................... 22

*United States v. Rubies*, 612 F.2d 397 (9th Cir. 1979) .................... 15

*United States v. Santos*, 553 U.S. 507 (2008) .................... 41

*United States v. Smith*, 18 U.S. 153 (1820) .................... 23

*United States v. Wiltberger*, 18 U.S. 76 (1820) .................... 40, 41

**Statutes**

15 U.S.C. § 1243 .................... 37

16 U.S.C. § 3372 .................... 37

18 U.S.C. § 7 .................... passim

18 U.S.C. § 924(c) .................... 3

18 U.S.C. § 1111 ........ 3
18 U.S.C. § 1117 ........ 3
18 U.S.C. § 3231 ........ 3
18 U.S.C. § 3238 ........ 17, 18, 25
24 U.S.C. § 1175 ........ 37
28 U.S.C. § 1291 ........ 3
Act of April 30, 1790, ch. 9, § 8, 1 Stat. 112 ........ 24
Act of July 12, 1952, Pub. L. No. 82-514, 66 Stat. 589 ........ 31
Act of June 25, 1948, Pub. L. No. 80-772, 62 Stat. 683 ........ passim
Act of March 3, 1825, ch. 65, § 4, 4 Stat. 115 ........ 24
Act of March 4, 1909, ch. 11, §§ 272, 273, 35 Stat. 1088 ........ 24
Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, Title IX, §§ 901 (1996) ........ passim
Assimilative Crimes Act, 18 U.S.C. § 13(a) ........ 30, 34, 35, 36
Federal Judiciary Act of 1789, ch. 20, § 8, 1 Stat. 73 ........ 25
National Aeronautics and Space Administration Authorization Act of 1982, § 6, Pub. L. No. 97-96, 95 Stat. 1207 (1981) ........ 31
Outer Continental Shelf Lands Act, Pub. L. No. 83-212, 67 Stat. 462 §§ 2(a)-4(a)(2) (1953) ........ 19, 21
Submerged Land Act, Pub. L. No. 83-31, 67 Stat. 29 §§ 2(a)-6 (1953) ........ 5, 19, 20, 21
USA Patriot Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 ........ 32
Violent Crime Control and Law Enforcement Act of 1994, § 120002, Pub. L. No. 103-322, 108 Stat. 1796 ........ 31

**Constitutional Provisions**

Cal. Const. art XII (1849) ........ 5
Cal. Const. art. III, § 2 (1972) ........ 6

Cal. Const. art. XXI, § 1 (1879) .......... 6

U.S. Const. amend. 6 .......... 18

U.S. Const. amend. X .......... 22

U.S. Const. art. I § 8, cl. 10 .......... 23

U.S. Const. art. III, § 2, cl. 1 .......... 40

U.S. Const. art. III, § 2, cl. 3 .......... 17, 25

## Other Authorities

Convention on the High Seas, art. 1, *opened for signature* Apr. 29, 1958, 450 U.N.T.S. 82 .......... 14

Convention on the Territorial Sea and the Contiguous Zone, art. 1, *opened for signature* Apr. 29, 1958, 516 U.N.T.S. 205 .......... 14

H.R. Rep. 104-518 (1996) .......... 29, 34-35

Jarrod Shobe, *Codification and the Hidden Work of Congress*, 67 UCLA L. Rev. 640 (2020) .......... 32

Legal Issues Raised by Proposed Presidential Proclamation To Extend the Territorial Sea, 12 Op. O.L.C. 238 (1988) .......... 28, 34

Proclamation No. 2667, 10 Fed. Reg. 12303 (Sept. 28, 1945) .......... 19

Proclamation No. 5928, 54 Fed. Reg. 777 (Dec. 27, 1988) .......... 28, 29, 33, 35, 36

## Statement of the Issue

Whether offenses committed in California's territorial waters are committed in the "special maritime and territorial jurisdiction of the United States" for the purpose of federal criminal law.[1]

[1] Pursuant to Ninth Circuit Rule 28-2.7, pertinent authorities are in a statutory addendum at the end of this brief.

## Introduction

This case presents the question whether an alleged murder committed within California's territorial ocean waters occurs within the special maritime and territorial jurisdiction of the United States (SMTJUS) and is thus subject to federal criminal prosecution based solely on where it is committed.

In this case the government did not—and stipulated that it could not—prove that the alleged offenses occurred outside the three-mile boundary of California's waters. But, after several rounds of briefing, the district court held that, since 1996, all ocean waters past the low-tide mark on all the nation's coasts now fall within the SMTJUS. This holding was based on a little-noted Congressional "declaration" contained in a miscellaneous section of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). If upheld, it would confer federal jurisdiction on all murders, assaults, thefts—even petty offenses—that occur seaward of the low-tide mark. And it would assume that Congress in the AEDPA stealthily but dramatically altered the federal-state balance over crimes within State waters.

This Court must reverse.

## Statement of Jurisdiction and Detention Status

This brief raises a joint challenge to Hoang Xuan Le and Sheila Marie Ritze's convictions stemming from Counts One, Two, and Three of the second superseding indictment. (JER-103). Le and Ritze were tried in separate trials, each defendant was convicted of additional counts, and each will file a brief raising individual challenges.

Le was convicted of Counts One through Three: first-degree murder (18 U.S.C. § 1111), conspiracy to commit murder (18 U.S.C. § 1117), and possession of a firearm in furtherance of a crime of violence (18 U.S.C. § 924(c)), all within the special maritime and territorial jurisdiction of the United States. (JER-280). Ritze was convicted of a lesser-included offense of Count One, second-degree murder (18 U.S.C. § 1111). (JER-265).

The district court asserted jurisdiction pursuant to 18 U.S.C. § 3231. Ritze's judgment was entered on April 17, 2023; she filed a timely notice of appeal on April 20, 2023. (JER-265, 272). Le's judgment was entered on August 7, 2023; he filed a timely notice of appeal on August 11, 2023. (JER-280, 286). This Court has jurisdiction under 28 U.S.C. § 1291.

Appellants are in the custody of the Bureau of Prisons. Le is serving a sentence of life imprisonment. (JER-280). Ritze is serving a sentence of 262 months. (JER-265).

## Statement of the Case

On October 16, 2019, recreational fishermen saw a body floating in the water northwest of Oceanside, California. Two days later, the girlfriend of the deceased reported that he had gone fishing on October 14, 2019, and had been missing since then. After an investigation, which revealed that the deceased was the brother of a paid FBI criminal informant, the U.S. Attorney's Office for the Central District of California charged Hoang Xuan Le and Sheila Marie Ritze in a multi-count federal indictment. Only Counts One, Two, and Three of the Second Superseding Indictment are relevant here. (JER-103).

Counts One through Three charged murder, conspiracy to murder, and possession, use, and discharge of a firearm in relation to a crime of violence "in the Pacific Ocean off the coast of Orange County, California." (JER-103). As their jurisdictional basis, all three counts alleged that they occurred within the special maritime and territorial jurisdiction of the United States. (JER-104, 107, 110). The original and

first superseding indictments cited 18 U.S.C. § 7(1), Title 18's definition of SMTJUS that applies to ocean waters. (JER-5, 6, 14, 15, 17). But after the defendants moved to dismiss the indictment because the crimes charged were not committed within any of the locations described in § 7(1), the government filed a second superseding indictment, from which it removed the citation to § 7(1) and instead alleged the offense occurred "within the special maritime and territorial jurisdiction of the United States, that is, the high seas and the territorial sea of the United States." (JER-104, 107).

The government conceded pretrial that it could not prove beyond a reasonable doubt that the conduct charged in Counts One through Three occurred outside of California's territorial waters, that is, further than three nautical miles offshore. (JER-153, 170–178).[2] This is because

---

[2] In this brief, "mile" refers to a nautical, marine, or geographical mile. One land mile equals approximately .87 geographical, marine, or nautical miles. *United States v. California*, 381 U.S. 139, 148 n. 8 (1965).

It is undisputed that California's territorial waters extend three nautical miles from its shore. *See People v. Weeren*, 26 Cal. 3d 654, 663, 669 (1980) (California criminal jurisdiction set by state boundaries as defined by State Constitution and statute, or when there is conflict with federal law, the three-mile limit established by the Submerged Land Act of 1953); Cal. Const. art XII (1849) (defining State boundary as

location data from the cell phones mostly fell within three nautical miles of the shore and, although two data points fell outside three nautical miles, those fell within the location data margin of error. (JER-172–174).

Nevertheless, the government offered two theories why California waters fell within SMTJUS. First, it argued that "the high seas," as used in § 7(1), meant all waters seaward of the low-tide mark. (JER-64–73). Under this definition, California waters would be the "high seas" and thus within SMTJUS. As a "second theory," the government argued that a miscellaneous declaration in § 901(a) of the Antiterrorism and Effective Death Penalty Act of 1996 expanded SMTJUS to include *all* waters within the "territorial sea of the United States," defined as waters twelve nautical miles seaward of the low-tide mark—irrespective of whether these waters met the requirements of § 7, and even if they fell within a State's jurisdiction. (JER-73–75 (citing AEDPA, Pub. L. No. 104-132, Title IX, § 901(a)). Notably, the

---

"running west . . . to the Pacific Ocean, and extending three English miles . . .[a]lso including all the islands, harbors, and bays along and adjacent to the coast"); Cal. Const. art. XXI, § 1 (1879) (readopting language); Cal. Const. art. III, § 2 (1972) (readopting language "as modified pursuant to statute")..

government's second theory contradicted its first one. If the "high seas" for purposes of SMTJUS already meant *all* waters seaward of the low-tide mark, Congress would have had no reason separately to declare that waters *twelve miles* seaward of the low-tide mark fell within SMTJUS.

The defendants disputed both theories. (JER-31, 82, 131, 135, 146, 260). For the Title 18 offenses charged here, SMTJUS is defined at 18 U.S.C. § 7. As used in § 7(1), the "high seas" refer not to all waters past the low-tide mark, but rather those waters beyond the U.S. and California's territorial waters. As for the "territorial sea of the United States," it's true that the U.S. now claims sovereignty over waters out to the twelve-mile mark, whereas it previously claimed only a three-mile territorial sea. But AEDPA § 901(a) did not expand SMTJUS inward to include State waters. Rather, it plugged a jurisdictional gap between the three-mile mark where State waters end and the twelve-mile mark where the high seas now begin. The government's contrary interpretation of § 901(a) would require Congress—in a barely noticed declaration in the AEDPA and without expressly amending 18 U.S.C.

§ 7—to have worked a dramatic change in the balance between state and federal criminal jurisdiction. (JER-82–101, 146–148).

The district court declined several times to resolve the issue pretrial. (JER-102, 155). But the government ultimately prevailed upon the court to rule—explaining that if the court waited until the Rule 29 stage to rule against the government, the government would have no ability to appeal that decision. (JER-157).

In its pretrial ruling, the district court agreed with the defendants that the "high seas" as used in § 7(1) refer to waters outside the territorial sea. (JER-246–248). But it accepted the government's second theory, that AEDPA § 901(a) brought the United States' entire territorial sea into SMTJUS. (JER-248–249). By ruling that the SMTJUS includes all waters seaward of the low-tide mark, the district court relieved the government of the burden of proving that the charged offenses occurred outside California's territorial waters—a burden the government stipulated it could not meet.

After separate trials, Le was convicted of Counts One through Three, and Ritze was convicted of second-degree murder, a lesser-included offense of Count One. (JER-265, 280). Consistent with the

court's pretrial ruling, both juries were instructed that the "special maritime and territorial jurisdiction of the United States includes the territorial sea of the United States, from the mean low tide point on the shore extending seaward to twelve miles offshore." (JER-256, 264).

This joint brief addresses whether the district court erred in ruling that California's ocean waters fall within SMTJUS.

## Summary of Argument

"Congress has traditionally been reluctant to define as a federal crime conduct readily denounced as criminal by the States." *United States v. Bass*, 404 U.S. 336, 349 (1971). In this case, the government made two arguments why the essentially local offenses it charged fell within the special maritime and territorial jurisdiction of the United States, and thus constituted federal crimes.

Its primary argument was that the charged offenses were committed on the "high seas," and thus fell within SMTJUS as defined in 18 U.S.C. § 7. To support this argument, the government asked the court to define the "high seas" as all ocean waters seaward of the low-tide mark, thus including California's territorial waters. The district court properly rejected this claim: It is contradicted by the established

meaning of the term "high seas" in the period leading up to and following the enactment of 18 U.S.C. § 7, Congress' contemporaneous usage, this Court's definition of "high seas" under Article I of the U.S. Constitution, the reach of high-seas offenses since the Founding, and principles of federalism inherent in our constitutional structure.

The government's second theory was that the charged offenses could be committed within SMTJUS even if they did not occur in any of the locations described in 18 U.S.C. § 7, Title 18's definition of SMTJUS. This theory was based on the notion that a Congressional declaration in the Antiterrorism and Effective Death Penalty Act of 1996 vastly expanded the reach of SMTJUS to include the United States' entire territorial sea—even State waters excluded by 18 U.S.C. § 7. But "Congress does not hide elephants in mouseholes." *Cyan, Inc. v. Beaver County Employees Retirement Fund*, 583 U.S. 416, 431 (2018) (internal quotation marks and citation omitted). The government's claim that, in a barely noticed declaration, Congress departed *sub silentio* from its 200-year-old exclusion of State ocean waters from SMTJUS is belied by the text, context, and history of AEDPA § 901(a),

and precluded by clear statement rules where the expansion of federal police powers is concerned.

Finally, if there were any remaining doubt that SMTJUS does not include a State's ocean waters, the canons of constitutional avoidance and lenity would require this interpretation.

## Standard of Review

This Court reviews questions of statutory interpretation, including the assertion of jurisdiction, de novo. *United States v. Corey*, 232 F.3d 1166, 1170 (9th Cir. 2000). Review of jury instructions' interpretation of the law is also de novo. *United States v. Cortes*, 757 F.3d 850, 857 (9th Cir. 2014).

## Argument

**The convictions stemming from Counts One, Two, and Three of the indictment must be vacated because the charged conduct could not be proved to have occurred within the special maritime and territorial jurisdiction of the United States.**

### A. The district court was correct that the "high seas," for the purpose of defining the SMTJUS, do not include State territorial waters.

For some federal crimes, including murder in violation of 18 U.S.C. § 1111, the only federal nexus is their commission within the "special maritime and territorial jurisdiction of the United States." The

SMTJUS statutes "extend[] the jurisdiction of the federal criminal laws to areas where American citizens and property need protection, yet no other government effectively safeguards those interests." *Corey*, 232 F.3d at 1171. For the purpose of Title 18, SMTJUS is defined at 18 U.S.C. § 7 and includes:

> [1] The high seas, [2] any other waters within the admiralty and maritime jurisdiction of the United States and *out of the jurisdiction of any particular State*, and [3] any vessel belonging in whole or in part to the United States or any citizen thereof, or to any corporation created by or under the laws of the United States, or any State, Territory, District, or possession thereof, when such a vessel is within the admiralty and maritime jurisdiction of the United States and *out of the jurisdiction of any particular State*.

18 U.S.C. § 7(1) (emphasis added).

The government could not prove the charged offenses occurred "out of the jurisdiction of any particular State," and thus could not fit the charges within categories [2] or [3]. Instead, it proposed to define category [1], "the high seas," as "all waters seaward of the mean low water line along the coast of the United States"—including waters within the jurisdiction of a particular State, California. (JER-64–73).

The district court properly rejected this argument. (JER-246–248). Interpreting "high seas" to include State waters contradicts the

established meaning of "high seas" in 1948, when 18 U.S.C. § 7(1) was enacted; Congress' use of "high seas" in contemporaneous enactments; this Court's interpretation of "high seas" in Title I's High Seas Clause; and the reach of "high seas" offenses since the Founding. It also conflicts with fundamental principles of American federalism.

**1. Consistent with its established meaning and Congress' use of the term in contemporaneous legislation, the "high seas" in 18 U.S.C. § 7(1) do not include the territorial waters of the United States or any State.**

As with all questions of statutory interpretation, we begin with the text. *Ross v. Blake*, 578 U.S. 632, 638 (2016). The latter two portions of 18 U.S.C. § 7(1) undisputedly exclude State waters. The "high seas" portion does also. Section 7(1) includes the *high* seas, not all the seas. Today, unless expressly defined to mean something else, the "high seas" mean ocean waters that are beyond a country's territorial sea. Although we are specifically concerned here with waters within a particular *State's* territorial waters, waters beyond the United States' territorial waters are perforce beyond any of its States' territorial waters.[3]

---

[3] To decide this case, this Court need not decide whether "high seas" begins three, twelve, or 200 miles from the U.S's shore. Nor need it decide how far from a foreign nation's shore the "high seas" begin.

The United Nations (U.N.) Convention on the Territorial Sea and the Contiguous Zone, which the United States signed in 1958, provided that "the sovereignty of a State extends, beyond its land territory and its internal waters, to a belt of sea adjacent to its coast, described as the territorial sea."[4] Convention on the Territorial Sea and the Contiguous Zone, art. 1, *opened for signature* Apr. 29, 1958, 516 U.N.T.S. 205 (entered into force Sept. 10, 1964). And the U.N. Convention on the High Seas, also signed by the United States in 1958, declared as an established principle of international law that "[t]he term 'high seas' means all parts of the sea that are not included in the territorial sea or in the internal waters of a State." Convention on the High Seas, art. 1, *opened for signature* Apr. 29, 1958, 450 U.N.T.S. 82 (entered into force Sept. 30, 1962). That is to say, there is a belt of sea over which the sovereignty of a Nation State extends, called the "territorial sea"; the waters beyond the territorial sea are the "high seas."

Subsequent to the United States signing these Conventions, the Supreme Court has consistently used "high seas" to refer to waters past the territorial sea. *See, e.g., Kiobel v. Royal Dutch Petroleum Co.*, 569

---

[4] In this context, State means Nation State.

U.S. 108, 121 (2013) ("the high seas, beyond the territorial jurisdiction of the United States"); *United States v. Louisiana*, 394 U.S. 11, 23 (1969) ("Outside the territorial sea are the high seas."). This Court, likewise, has held for decades that the "high seas" lie beyond territorial sea. *See, e.g., United States v. Marin*, 90 F.4th 1235, 1242 (9th Cir. 2024); *United States v. Lei Shi*, 525 F.3d 709, 720 (9th Cir. 2008); *United States v. Davis*, 905 F.2d 245, 248 (9th Cir. 1990); *United States v. Rubies*, 612 F.2d 397, 402 n. 2 (9th Cir. 1979).

Congress enacted 18 U.S.C. § 7(1) into positive law in 1948. Act of June 25, 1948, Pub. L. No. 80-772, 62 Stat. 683, 685. When Congress uses a legal term with an established meaning, we presume Congress to have adopted that meaning. *United States v. Hansen*, 599 U.S. 762, 774 (2023). By 1948, the principle that the "high seas" lie beyond the territorial sea, declared as an "established principle[] of international law" in the U.N. Conventions, was well-established as a matter of U.S. law. The Supreme Court had long recognized the "high seas" as those waters "where the law of no particular State has exclusive force, but all are equal[.]" *The Scotland*, 105 U.S. 24, 29 (1881). Indeed, the concept of the "freedom of the high seas became part of international law . . .no

later than the latter half of the 18th century." *United States v. Maine*, 475 U.S. 89, 96 & n. 11 (1986).

During the years leading to the 1948 enactment of § 7(1), the Supreme Court regularly used "high seas" to mean non-territorial waters. *Cunard S.S. Co. v. Mellon*, 262 U.S. 100, 123 (1923) (flag ship sovereignty "is chiefly applicable to ships on the high seas, where there is no territorial sovereign"); *American Banana Boat Co. v. United Fruit Co.*, 213 U.S. 347, 355 (1909) (U.S. law may govern outside the jurisdiction of the U.S. in "regions subject to no sovereign, like the high seas"); *The Hamilton*, 207 U.S. 398, 403 (1907) (describing the high seas as "being outside the territory in a place belonging to no other sovereign").

That Congress used "high seas" in this established manner in 18 U.S.C. § 7(1) is confirmed by other portions of the 1948 codification of the criminal law and by other contemporaneous legislation. For example, the Act of June 25, 1948, also enacted into positive law 18 U.S.C. § 3238, a special venue provision for "Offenses not committed in any district." This section provided that "[t]he trial of all offenses begun or committed upon the high seas, *or elsewhere* out of the jurisdiction of

any particular State or district, shall be in the district where the offender is found, or into which he is first brought." 62 Stat. at 826 (emphasis added). The use of the words "or elsewhere" makes clear that Congress understood the "high seas" to be out of the jurisdiction of any particular State or district. If the "high seas" included waters within a particular State or district, the word "elsewhere" would be superfluous. *Cf. Fischer v. United States*, ___S. Ct. ___, 2024 WL 3208034, *5 (2024) (explaining the word "otherwise" requires courts to interpret the words following it in relation to the words preceding it).

Indeed, interpreting the "high seas" in § 3238 to include a State's territorial waters would violate Article III's Venue Clause and the Sixth Amendment's Vicinage Clause. The Venue Clause mandates that the "Trial of all Crimes . . . shall be held in the State where the . . . Crimes shall have been committed." U.S. Const. art. III, § 2, cl. 3. The Vicinage Clause guarantees in criminal case the right to trial "by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. 6. Thus, if a crime is committed in a State, our Constitution requires that it be tried within that State, by a jury of that State and that judicial district where it was committed.

*Smith v. United States*, 599 U.S. 236, 242-45 (2023); *United States v. Fortenberry*, 89 F.4th 702, 705 (9th Cir. 2023). But, under the government's interpretation of "high seas," a crime committed in California's territorial waters could be tried in Hawaii, if that is where the offender is found or is first brought. 18 U.S.C. § 3238.[5] Because this interpretation, even if plausible, would raise a host of constitutional problems, it cannot be right. *Clark v. Martinez*, 543 U.S. 371, 380-81 (2005). Surely, then, "high seas" in the venue provision does not include State waters. *Id.* And, because "identical words used in different parts of the same act are intended to have the same meaning," *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 570 (1985), "high seas" in § 7(1) likewise does not include State waters.

Another mid-20th century example of Congress' use of "high seas" to refer to non-sovereign waters, and its distinction between the high

[5] In the Second Superseding Indictment, the government alleged a variety of bases for venue in the Central District of California. (JER-104). One of these bases was that the crime had been committed upon the "high seas," after which Le and Ritze were arrested and first brought to Orange County, within the Central District of California. Pursuant to the government's jurisdictional argument, the offense could have been committed in California waters (the "high seas") and venue would have been proper in any district where Le and Ritze were arrested and first brought.

seas and State territorial waters, can be seen in statutes Congress enacted in 1953, which had their foundations set in a 1945 Presidential Proclamation. In 1945, President Truman claimed United States jurisdiction over the natural resources of the subsoil and seabed of the outer Continental Shelf. Proclamation No. 2667, 10 Fed. Reg. 12303 (Sept. 28, 1945). In the Proclamation, the President assured the international community: "The character as high seas of the waters above the continental shelf and the right to their free and unimpeded navigation are in no way thus affected." 10 Fed. Reg. at 12303. By 1945, the U.S. President used the term "high seas" to refer to the area of free navigation outside the United States' territory.

Congress enacted the Submerged Lands Act of 1953, Pub. L. No. 83-31, 67 Stat. 29 (1953) (SLA) and the Outer Continental Shelf Lands Act, Pub. L. No. 83-212, 67 Stat. 462 (1953) (OCSLA), which reflect Congress' understanding that the high seas fall outside the United States' and individual States' territorial waters. SLA granted States ownership of the submerged "lands beneath navigable waters" within the boundaries of the respective States, defined as either three geographical miles from the low-water mark, or further if the State's

seaward boundary extended further at the time such State became a member of the Union. SLA §§ 2(a)(2), 3, 4. Although the 1945 Proclamation had promised that it would not affect the freedom of navigation on the high seas, SLA made no mention of the high seas—which makes sense because waters within State boundaries are not the high seas. Nor did SLA purport to establish federal criminal jurisdiction over these submerged lands. Rather, it provided that the States had the "right and power to manage, administer, lease, develop, and use the said lands and natural resources all in accordance with applicable State law." *Id.* at § 3(a). Congress did retain the powers of regulation and control for the constitutionally enumerated purposes of commerce, navigation, national defense, and international affairs. *Id.* at § 6.

By contrast, SLA's companion legislation, OCSLA established *federal* jurisdiction over the outer Continental Shelf, that is "all submerged lands lying seaward and outside of the area of lands beneath navigable waters as defined in section 2 of the Submerged Lands Act." OCSLA §§ 2(a), 3. Recall that § 2 of the SLA defined "lands beneath navigable waters" as lands within boundaries of the States. SLA § 2(a). Thus, federal jurisdiction began where State jurisdiction ended. Unlike

the SLA, which was silent on the high seas, OCSLA provided: "This Act shall be construed in such manner that the character of the high seas of the waters above the outer Continental Shelf and the right to navigation and fishing therein shall not be affected." *Id.* at § 3(b). Also, unlike the SLA, the OCSLA provided for federal criminal jurisdiction, stating that the law of the U.S. extended to the outer Continental Shelf and that the criminal laws of each adjacent State were to be the law of the United States for that portion of the outer Continental Shelf that would be within the area of the State if its boundaries were extended seaward. OCSLA §§ 4(a)(1), (2).

In sum, by 1948, when § 7(1) was enacted, the established meaning of "high seas" was waters outside the territorial waters of the United States and, likewise, out of State waters. Contemporaneous Congressional enactments reflect that, consistent with its established meaning, Congress used "high seas" to mean non-territorial waters. They also reflect that Congress distinguished State territorial waters from the high seas and expected State law to provide the criminal law in State territorial waters.

**2. This Court's interpretation of Article I's High Seas Clause, the reach of murder-on-the-high-seas statutes since the Founding, and principles of federalism corroborate this interpretation.**

Fundamental principles of American federalism confirm this interpretation. Congress has no general police power. *United States v. Lopez*, 514 U.S. 549, 552 (1995). Whereas the States have broad authority to enact legislation for the public good—the so-called "police power"—the Federal Government has no such authority and can exercise only the powers granted to it. *Id.* at 567; *McCulloch v. Maryland*, 17 U.S. 316, 405 (1819). Thus, every federal criminal law must be based on a power enumerated in the U.S. Constitution. *United States v. Morrison*, 529 U.S. 598, 607 (2000). "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. "Because our constitutional structure leaves local criminal activity primarily to the States, [courts] have generally declined to read federal law as intruding on that responsibility, unless Congress has clearly indicated that the law should have such reach." *Bond v. United States*, 572 U.S. 844, 848 (2014).

Among Congress' enumerated powers are the powers "[t]o define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations[.]" U.S. Const. art. I § 8, cl. 10. This constitutional provision contains three distinct grants of power: (1) to define and punish piracies, (2) to define and punish felonies committed on the high seas (High Seas Clause), and (3) to define and punish offenses against the law of nations. *See United States v. Smith*, 18 U.S. 153, 158-59 (1820). For Article I's High Seas Clause, this Court has held that "[t]he high seas lie seaward of the territorial sea, defined as the three mile belt of sea measured from the low water mark." *Davis*, 905 F.2d at 248 (holding that High Seas Clause authorized Congress to give extraterritorial effect to Maritime Drug Law Enforcement Act); *see also Lei Shi*, 525 F.3d at 720-21 ("Because the high seas, by definition, lie outside United States territory, . . . the [High Seas] Clause grants Congress the authority to apply federal law beyond the borders of the United States."). Of course, because State territory could never extend beyond U.S. territory, the "high seas" lie outside State waters as well.

The High Seas Clause authorizes Congress to define and punish at least some felonies committed on the "high seas," where consistent

with international law. *United States v. Holmes*, 18 U.S. 412, 417-18 (1820) (affirming murder conviction on the high seas where the vessel was stateless). Beginning with the First Congress, Congress has always made murder on the "high seas" a federal offense. *See* Act of April 30, 1790, ch. 9, § 8, 1 Stat. 112, 113-14; Act of March 3, 1825, ch. 65, § 4, 4 Stat. 115, 115; Act of March 4, 1909, ch. 11, §§ 272, 273, 35 Stat. 1088, 1142-43; Act of June 25, 1948, ch. 645, §§ 7, 1111, 62 Stat. 683, 685, 756. And, consistent with "the Constitution's division of responsibility between sovereigns and leaving the prosecution of purely local crimes to the States," Congress has never suggested that, for this purpose, the "high seas" reaches into State waters. *Bond*, 572 U.S. at 856. To the contrary, in each iteration, like 18 U.S.C. § 7(1) itself in 1948, murder on the "high seas" was paired with murder in other waters "out of the jurisdiction of any particular State." 1 Stat. at 113-14; 4 Stat. at 115; 35 Stat. at 1143. Thus, even murders committed on U.S. war ships were not federal murders, if they were committed in State waters. *United States v. Bevans*, 16 U.S. 336, 389 (1818).

Indeed, the very first murder-on-the-high-seas statute confirms that Congress well understood the "high seas" to lie outside of State

waters. Not only did the First Congress make murder "upon the high seas, or in any river, basin, or bay, out of the jurisdiction of any particular state" a federal crime, 1 Stat. at 113-114, but like 18 U.S.C. § 3238 discussed above, it also provided in the same section that "the trial of crimes committed on the high seas, or in any place out of the jurisdiction of any particular state, shall be in the district where the offender is apprehended, or into which he first may be brought." *Id.* at 114. As noted, the Venue Clause of the just-ratified Constitution mandated that, if a federal crime was committed in a State, the trial must be held in that State. U.S. Const. art. III, § 2, cl. 3. Surely, the First Congress did not enact a venue provision that violated the Constitution before the ink had dried.[6] Thus, both this Court's definition of "high seas" under Article I, and the reach of high-seas offenses since the Founding, support interpreting "high seas" to exclude State territorial waters.

[6] The Federal Judiciary Act of 1789 likewise gave district courts jurisdiction of all petty crimes and offenses "committed within their respective districts, *or* upon the high seas[.]" Federal Judiciary Act of 1789, ch. 20, § 8, 1 Stat. 73, 76-77 (emphasis added).

Indeed, "Congress has traditionally been reluctant to define as a federal crime conduct readily denounced as criminal by the States." *Bass*, 404 U.S. at 349. In *Bass*, which addressed the question whether Congress had criminalized the possession of firearms that had not traveled in interstate commerce, the Supreme Court explained it would not lightly presume that Congress intended to intrude on traditional state criminal jurisdiction and refused to interpret federal gun offenses to reach purely intrastate conduct absent a clear statement of Congress' intent. *Id.* at 350; *cf. Snyder v. United States*, ___ S. Ct. ___, 2024 WL 3165518, *8 (2024) (federalism counsels against interpreting a federal statute to trump state law). Here, too, this Court should not lightly presume that Congress intended to intrude on traditional state criminal jurisdiction by interpreting "high seas" to reach into State waters. Just as surely here as in *Bass*, "the broad construction [of high seas] urged by the Government renders traditionally local criminal conduct a matter for federal enforcement and would also involve a substantial extension of federal police resources." 404 U.S. at 350.

### B. The government's "second theory"—that AEDPA § 901(a) expanded the SMTJUS to ocean waters within the States' jurisdiction—is wrong.

As of 1948, then, federal criminal jurisdiction under 18 U.S.C. § 7(1) began where State jurisdiction ended. On the "high seas," this was a function of the definition of high seas. And for "any other waters within the admiralty and maritime jurisdiction of the United States," this was a function of § 7(1)'s express limitation to waters "out of the jurisdiction of any particular State." As discussed, this limitation was consistent with the principles of federalism inherent in our Constitutional structure and the reach of high-seas offenses since the Founding.

But, according to the government's "second theory," Congress undid all this in § 901(a) of the Antiterrorism and Effective Death Penalty Act of 1996, without even amending 18 U.S.C. § 7. (JER-73). This Court should reject the notion that, in a barely noticed "declaration" in the AEDPA, Congress stealthily but dramatically expanded federal criminal jurisdiction well beyond its previous boundaries—and just as dramatically intruded on traditional State police powers. The government's alternate theory is belied by the text,

context, and history of AEDPA § 901. It also runs counter to the background principles of federalism discussed above.

### 1. The text, context, and history of AEDPA § 901 reflect that it plugged a potential jurisdictional gap under international law between three and twelve miles offshore.

Section 901 of the AEPDA responded to a 1988 Presidential Proclamation extending the U.S. territorial sea out to the twelve-mile mark for international law purposes. Prior to 1988, and since 1793, the U.S. had generally claimed a three-mile territorial sea.[7] In 1988, consistent with emerging international norms and as permitted by the 1982 U.N. Convention on the Law of the Sea, President Reagan issued a proclamation extending the U.S. territorial sea from its prior breadth of three miles to "the 12 nautical miles from the baselines of the United States determined in accordance with international law." Proclamation No. 5928, 54 Fed. Reg. 777 (Dec. 27, 1988) (1988 Presidential Proclamation).

---

[7] *See* Legal Issues Raised by Proposed Presidential Proclamation To Extend the Territorial Sea, 12 Op. O.L.C. 238, 238-239 & n. 2 (1988) (OLC Op.) (describing U.S.'s historical claim to three-mile territorial sea).

Prior to the Proclamation, the United States' international, federal, and state boundaries generally coincided at three miles seaward of the low-water mark. But the 1988 Presidential Proclamation "functionally established a distinction between the international and the federal-state boundaries. . . ." *United States v. Alaska*, 503 U.S. 569, 589 n. 11 (1992). This is because, following the Proclamation, the United States' boundary with international waters was at twelve miles, but the federal boundary with the states was still three miles. Because the Proclamation did not "extend[] or otherwise alter[] existing Federal or State law or any jurisdiction, rights, legal interests, or obligations derived therefrom," it arguably created a jurisdictional gap in the extended portion of the territorial sea. Proclamation No. 5928, 54 Fed. Reg. 777.

Congress plugged this jurisdictional gap for criminal law purposes eight years later in § 901 of the AEDPA. Titled "Expansion of Territorial Sea," § 901 "codifie[d] the extension of United States territorial sea, as defined by a 1988 Presidential Proclamation." H.R. Rep. 104-518, at 127 (1996), *as reprinted in* 1996 U.S.C.C.A.N. 944. It declared the extended territorial sea subject to U.S. sovereignty for

criminal purposes, clarified that the area within the three-to-twelve-mile gap fell within the SMTJUS, and amended the Assimilative Crimes Act (ACA) to include this same area within U.S. federal enclave jurisdiction.[8]

The government argued below, and the district court agreed, that AEDPA § 901(a) extended SMTJUS *inward* to include State waters previously excluded from 18 U.S.C. § 7(1). As explained below, it did not. Rather, § 901(a) recognized the extension *outward* of the U.S. territorial sea, ensuring that the nine-mile gap between the three-mile boundary of State waters and the twelve-mile boundary of the U.S.'s extended territorial sea was included within U.S. criminal jurisdiction. For SMTJUS purposes, this meant that waters within the three-to-twelve-mile gap, which were previously the "high seas" because beyond the U.S. territorial waters, and thus within category [1] of 18 U.S.C. § 7(1), were now "any other waters within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any

[8] The entire text of AEDPA § 901 is set forth in the statutory addendum.

particular State," and thus within category [2] or [3]. But the reach of SMTJUS overall remained the same.

One sure sign that § 901(a) did not expand SMTJUS to the shore in abrogation of § 7(1)'s exclusion of ocean waters within a State is that it did not amend 18 U.S.C. § 7, the statutory definition of SMTJUS.[9] As explained above, Congress enacted 18 U.S.C. § 7 as positive law in 1948. 62 Stat. at 683. Since 1948, Congress has expanded the reach of SMTJUS four times—three times before the AEDPA, and once after. Act of July 12, 1952, Pub. L. No. 82-514, 66 Stat. 589; National Aeronautics and Space Administration Authorization Act of 1982, § 6, Pub. L. No. 97-96, 95 Stat. 1207, 1210 (1981); Violent Crime Control and Law Enforcement Act of 1994, § 120002, Pub. L. No. 103-322, 108 Stat. 1796, 2021; USA Patriot Act of 2001, Pub. L. No. 107-56, 115 Stat. 272, 377. And every single time it did so, Congress *expressly* amended

[9]The government suggested below that Congress enacted subsection 901(a) as a statutory note to 18 U.S.C. § 7. (JER-73). It did not. Marginal notes in statutes are added by codifiers, not by Congress, *Ledezma-Galicia v. Holder*, 636 F.3d 1059, 1068 n. 10 (9th Cir. 2010), and it is likewise the codifiers who determine whether and where to add statutory notes. Jarrod Shobe, *Codification and the Hidden Work of Congress*, 67 UCLA L. Rev. 640, 666 (2020).

§ 7. If AEDPA § 901(a) had expanded the reach of SMTJUS, it surely would have expressly amended § 7.

Nor did § 901(a) *implicitly* amend 18 U.S.C. § 7. While a later-enacted statute can sometimes operate to amend or even repeal an earlier statutory provision, amendments by implication are not favored and will not be presumed unless the intention of the legislature is clear and manifest. *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 663-64 & n. 8 (2007). This principle rests on the presumption that "Congress had given serious thought to the earlier statute"; thus, "[b]efore holding that the result of the earlier consideration has been repealed or qualified, it is reasonable for a court to insist on the legislature's using language showing that it has made a considered determination to that end." *Blanchette v. Connecticut General Ins. Corporations*, 419 U.S. 102, 134 (1974) (internal quotation marks and citation omitted). That is, § 901(a) cannot be said to have undone § 7(1)'s exclusion of State waters unless there's no other way to read it or Congress clearly indicated that intention.

If § 7(1) did not exist, AEDPA § 901(a) would appear to declare that the U.S.'s entire territorial sea, including State waters, fell within

SMTJUS. But to show implicit repeal, "[i]t is not enough to show that [§ 7(1) and AEDPA § 901(a)] produce differing results when applied to the same factual situation, for that no more than states the problem." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155 (1976). "Repeal is to be regarded as implied only if necessary to make the [later enacted law] work, and even then only to the minimum extent necessary." *Id.* (internal quotation marks and citation omitted).

To make AEDPA § 901(a) work, it need not have amended § 7(1) or repealed § 7(1)'s exclusion of State waters. Rather, to implement the 1988 Presidential Proclamation extending the U.S. territorial sea out to the twelve-mile mark, AEDPA § 901(a) extended the SMTJUS outward to the new international boundary; it did not expand the SMTJUS inward to the shore. "[W]hen two statutes are capable of coexistence, it is the duty of the courts . . .to regard each as effective." *Radzanower*, 426 U.S. at 155 (internal quotation marks and citation omitted).

Congress also did not clearly express an intention to abrogate § 7(1)'s exclusion of State waters. The House Conference Report states:

> This section codifies the extension of United States territorial sea as defined by a 1988 Presidential Proclamation. This area would then be included within the special maritime and territorial

> jurisdiction of the U.S. for purposes of the criminal law. This section also adopts non-conflicting state law in the territorial sea.

H.R. Rep. 104-518, at 127 (1996), *as reprinted in* 1996 U.S.C.C.A.N. 944. In this Report, the "extension of [United States] territorial sea" refers to the extension from three miles to twelve. OLC Op. at 238-39 n. 2. "This area," included in SMTJUS, is that three-to-twelve-mile gap. AEDPA § 901(b), discussed below, confirms that the Report's reference to adopting non-conflicting state law "in the territorial sea" did not mean the entire territorial sea, but only those areas "on, above, or below any portion of the territorial sea of the United States *not within the jurisdiction of any State* . . . ." AEDPA § 901(b) (emphasis added).

AEDPA § 901(b) confirms that AEDPA § 901 did not expand federal jurisdiction inward to the shore, but rather plugged the three-to-twelve-mile gap between the State and international boundaries. AEDPA § 901(b) amended the Assimilative Crimes Act to include within federal enclave jurisdiction the same three-to-twelve-mile gap addressed in § 901(a). Unlike § 901(a), however, § 901(b) *did* extend the reach of federal jurisdiction. Thus, unlike § 901(a), § 901(b) did amend the relevant portion of Title 18, 18 U.S.C. § 13.

The ACA provides, generally, that for federal enclaves, if conduct is not punishable by an enactment of Congress, the law of the State in which the enclave is situated is assimilated as the applicable federal law. 18 U.S.C. § 13(a). The 1988 Presidential Proclamation extended the U.S. territorial sea to twelve miles, but it did not explain what criminal law would apply in the extended portion of the territorial sea. Section 901(b) provided that ACA would extend to those portions of the U.S.'s newly expanded territorial sea that were not within the jurisdiction of any State, and that the law of the adjacent State would provide the applicable federal law. AEDPA § 901(b). It did *not* extend the ACA to the entire territorial sea—only to those portions not within the jurisdiction of any State. That is, § 901(b) asserted federal criminal jurisdiction in the same three-to-twelve-mile gap that § 901(a) did.

Comparing § 901(a) to § 901(b) reflects that Congress knows how to amend its jurisdictional statutes when it needs to. Because with respect to ACA, § 901 expanded federal criminal jurisdiction, § 901(b) amended 18 U.S.C. § 13. Because with respect to SMTJUS, § 901 did not expand federal criminal jurisdiction, § 901(a) did not amend 18 U.S.C. § 7. The government's interpretation collapses this distinction.

The government's interpretation of § 901(a) as expanding SMTJUS without amending 18 U.S.C. § 7 would also have the perverse effect of defining SMTJUS more broadly for Title 18 than for other SMTJUS offenses. Offenses in other titles reference 18 U.S.C. § 7's definition of SMTJUS. *See, e.g.*, 15 U.S.C. § 1243 (criminalizing possession of switchblade knives in the SMTJUS "as defined in section 7 of title 18"); 16 U.S.C. § 3372 (same for possession of protected wildlife); 24 U.S.C. § 1175 (same with conduct involving gambling devices). Because § 7 was not amended by AEDPA § 901(a), § 7 remains the definition of SMTJUS for non-Title 18 offenses. But, under the government's theory, for Title 18 offenses—and only for Title 18 offenses—SMTJUS would also include ocean waters within a State's jurisdiction. This anomaly is another reason to reject the government's suggestion that § 901(a) *sub silentio* expanded the reach of SMTJUS for Title 18 offenses.

**2. The clear statement rule does not permit Congress to expand federal jurisdiction in this way.**

This Court should not read AEDPA § 901(a) to extend SMTJUS to ocean waters within a State's jurisdiction for the same reason it cannot

read "high seas" to include State waters. "Because our constitutional structure leaves local criminal activity primarily to the States," courts "have generally declined to read federal law as intruding on that responsibility, unless Congress has clearly indicated that the law should have such reach." *Bond*, 572 U.S. at 848. Adhering to this clear statement rule, the Supreme Court has narrowly construed statutes that would otherwise intrude on state criminal responsibility. *See, e.g., id.*; *Jones v. United States*, 529 U.S. 848, 858 (2000); *Bass*, 404 U.S. at 349-350; *Rewis v. United States*, 401 U.S. 808, 812 (1970).

As described above, since the Founding, Congress has left the prosecution of murders in State ocean waters to the police powers of the States. "[I]f the Federal government would radically readjust the balance of state and national authority, those charged with the duty of legislating must be reasonably explicit about it." *Bond*, 572 U.S. at 858 (cleaned up). It is likewise "incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides the usual constitutional balance of federal and state powers." *Id.* (cleaned up).

Congress showed no intent to implicitly, stealthily, but dramatically expand federal criminal jurisdiction in AEDPA § 901(a). Under the government's interpretation, a little-noted Congressional "declaration" would have extended federal criminal law to include murders, assaults, even thefts, on the beach below the low-tide mark. (18 U.S.C. §§ 1111, 113, 661). Fisticuffs between surfers erupting over wave ownership would be a federal crime if their feet were in the water. Congress does not hide elephants in mouseholes. *Cyan*, 582 U.S. at 431.

### C. If there were any doubt, the doctrine of constitutional avoidance and the rule of lenity would require the Court to reject the notion that SMTJUS covers a State's ocean waters.

Interpreting SMTJUS to reach into ocean waters within a State would raise serious questions about its constitutionality. It is "the elementary rule of construction that where two interpretations of a statute are in reason admissible, one of which creates repugnancy with the Constitution and the other avoids such repugnancy, the one which makes the statute harmonize with the Constitution must be adopted." *The Abby Dodge v. United States*, 223 U.S. 166, 175 (1912). The Supreme Court has long invoked this doctrine to avoid significant constitutional and federalism questions. *Id.* (interpreting Act regulating

the taking of sponges off Florida's coast to reach only sponges outside Florida's territorial limits); *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001) (interpreting navigable waters to exclude intrastate waters used as habitat by migratory birds).

The district court held that Congress could exercise a general police power in ocean waters within a State under the High Seas Clause and Article III's extension of the judicial power of the United States to all cases of admiralty and maritime jurisdiction, U.S. Const. art. III, § 2, cl. 1 (Admiralty and Maritime Jurisdiction Clause). (JER-249–250). The High Seas Clause provides no basis because, as this Court has held, for Title I purposes, "[t]he high seas lie seaward of the territorial sea." *Davis*, 905 F.2d at 248.

As for the Admiralty and Maritime Jurisdiction Clause, 18 U.S.C. § 7(1) itself includes only those "waters within the admiralty and maritime jurisdiction of the United States" that fall "out of the jurisdiction of any particular State." For the Admiralty and Maritime Jurisdiction Clause to provide the constitutional basis for the extension of federal jurisdiction to the shore, this Court would have to assume

that Congress relied on the Admiralty and Maritime Jurisdiction Clause to extend its police power to State waters on the "high seas" or within the U.S. "territorial sea," even while it carefully excluded State waters that were expressly defined as those "waters within the admiralty and maritime jurisdiction of the United States." This assumption runs headlong into the constitutional principles of federalism discussed above.

It also runs headlong into the rule of lenity. "The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself." *United States v. Wiltberger*, 18 U.S. 76, 95 (1820). In *Wiltberger*, the Supreme Court held that a U.S. law making it a federal offense to "commit manslaughter upon the high seas" did not reach manslaughter committed on a U.S. vessel on a river in China because the river was not the "high seas." *Id.* at 103, 105-06. The Court so held even though U.S. law made it a federal offense to commit *murder* on board a U.S. vessel in such a river. *Id.* at 105. Although the Court could "conceive of no reason why" Congress would desire to punish murders on U.S. vessels in foreign rivers, but not manslaughters on those same vessels, it held that "Congress has not made them

punishable, and this Court cannot enlarge the statute." *Id.* Likewise, here, even if the Court thinks it would be preferable for murder within California waters to be a federal crime, if after exhausting all traditional tools of statutory interpretation, it is unclear whether 18 U.S.C. § 1111 reaches a killing in California's waters, "the tie must go to the defendant." *United States v. Santos*, 553 U.S. 507, 514 (2008).

## Conclusion

This Court should reverse Le's convictions on Counts One, Two, and Three, and Ritze's convictions on the lesser-included offense of Count One, and remand for resentencing on the remaining counts.

DATED: July 11, 2024

Respectfully submitted,

*s/ Davina T. Chen*

DAVINA T. CHEN
Law Office of Davina T. Chen
1751 Colorado Blvd., No. 190
Los Angeles, California 90041
(213) 446 8791
Davina@DavinaChen.com

## Certificate of Word Count

This brief contains 8,218 words, excluding the items exempted by Fed. R. App. P. 32(f). The brief's size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

When cumulated with the individual briefs in this consolidated matter, the words in this brief exceed the word-limit specified by the Court. The undersigned has filed a motion to exceed word limit.

DATED: July 11, 2024

*s/ Davina T. Chen*

DAVINA T. CHEN