**23-1814, 23-748**

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

HOANG XUAN LE,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Central District of California
Hon. Judge David O. Carter, District Judge
D.C. No. 8:20-cr-0002-DOC

# APPELLANT LE'S INDIVIDUAL OPENING BRIEF

DAVINA T. CHEN
LAW OFFICE OF DAVINA T. CHEN
1751 Colorado Blvd., No. 190
Los Angeles, California 90041
(213) 446 8791
Davina@DavinaChen.com

CRAIG WILKE
LAW OFFICE OF CRAIG WILKE
305 N Harbor Blvd., Ste. 216
Fullerton, California 92832
(714) 870 2278
Craig@CraigWilkeLaw.com

*Counsel for Defendant-Appellant Hoang Xuan Le*

## Table of Contents

**Page**

Table of Authorities .......... iiv

Statement of the Issues .......... 1

Introduction .......... 2

Statement of Jurisdiction .......... 3

Custody Status .......... 3

Statement of the Case .......... 3

A. Procedural History .......... 3

B. Facts Relevant to Issues Presented .......... 5

1. Improper Prosecution Argument about Self-Defense .......... 5

2. Improper Replacement of Juror, Failure to Begin Deliberations Anew, and Exposure to Extrinsic Evidence .......... 17

Summary of Argument .......... 24

Argument .......... 26

I. This Court must reverse because the prosecution's argument that, even if Le was justified in shooting Dao in self-defense, his subsequent failure to save Dao's life defeated that defense, was plainly improper and prejudicial. .......... 26

A. Standard of Review .......... 26

B. The prosecutor plainly misstated the law in closing rebuttal. .......... 27

C. The prosecutor's misstatement of law affected Le's substantial rights and warrants reversal. .......... 31

II. This Court must reverse because the replacement of juror BJR for mental health issues caused by other jurors' pressure to reach a specific verdict violated Le's unwaivable right to a unanimous verdict. .... 41

A. Standard of Review .... 41

B. The right to a unanimous verdict from an impartial jury cannot be waived. .... 43

C. BJR's replacement violated Le's right to a unanimous verdict from an impartial jury. .... 46

D. The district court erred in disregarding BJR's post-verdict statements, which unequivocally establish that the impetus for her removal was her position on the merits of the case. .... 51

III. This Court must reverse because the reconstituted jury did not begin its deliberations anew and, alternatively, because alternate juror LL was exposed to extrinsic evidence of the prior jury's timeline. .... 54

A. Standard of Review .... 54

B. The reconstituted juror's failure to begin deliberations anew violated Le's Fifth and Sixth Amendments rights. .... 55

C. Reversal is required because there is a reasonable possibility that juror LL's exposure to the prior jury's timeline could have affected the verdict. .... 61

Conclusion .... 63

Certificate of Word Count .... 64

Statutory Appendix

## Table of Authorities

**Cases Page(s)**

*Alberty v. United States*, 162 U.S. 499 (1896) ........................................ 29
*Brown v. United States*, 256 U.S. 335 (1921) ........................................ 29
*Darden v. Wainwright*, 477 U.S. 168 (1986)................................ 32, 34, 40
*Deck v. Jenkins*, 814 F.3d 954 (9th Cir. 2016)................................ passim
*Erlinger v. United States*, ____ S. Ct. ____, 2024 WL 3074427 (2024) ... 43
*Johnson v. Williams*, 568 U.S. 289 (2013)............................................. 50
*Lloyd v. United States*, 226 F.2d 9 (5th Cir. 1955).................................. 62
*McDonald v. Pless*, 238 U.S. 264 (1915) ................................................ 54
*Pena-Rodriguez v. Colorado*, 580 U.S. 206 (2017) .................................. 52
*Perez v. Marshall*, 119 F.3d 1422 (9th Cir. 1997) ............................. 49, 50
*Ramos v. Louisiana*, 590 U.S. 83 (2020)................................................. 43
*Tanner v. United States*, 483 U.S. 107 (1987) ........................................ 53
*United States v. Abbas*, 504 F.2d 123 (9th Cir. 1974)............................. 62
*United States v. Aguilar*, 743 F.3d 1144 (8th Cir. 2014) ........................ 60
*United States v. Alarcon-Simi*, 300 F.3d 1172 (9th Cir. 2002)............... 43
*United States v. Britt*, 79 F.4th 1280 (10th Cir. 2023)...................... 29, 30
*United States v. Brown*, 784 F.3d 1301 (9th Cir. 2015) .......................... 58
*United States v. Brown*, 823 F.2d 591 (D.C. Cir. 1987) .......................... 47
*United States v. Dominguez Benitez*, 542 U.S. 74 (2004)........................ 31
*United States v. Gomez*, 219 F. App'x 703 (9th Cir. 2007)...................... 58
*United States v. Hinkson*, 585 F.3d 1247 (9th Cir. 2009) ..... 41, 42, 50, 54
*United States v. Ingman*, 426 F.2d 973 (9th Cir. 1970) .......................... 38
*United States v. Keiser*, 57 F.3d 847 (9th Cir. 1995)............................... 29
*United States v. Lamb*, 529 F.3d 1153 (9th Cir. 1975) ............... 57, 58, 59

*United States v. Leahy*, 82 F.3d 624 (5th Cir. 1996) .............................. 49
*United States v. Litwin*, 972 F.3d 1155 (9th Cir. 2020) ........ 41, 46, 47, 48
*United States v. Lopez*, 581 F.2d 1338 (9th Cir. 1978) ..................... 43, 44
*United States v. Maloney*, 755 F.3d 1044 (9th Cir. 2014) ....................... 40
*United States v. Morsette*, 622 F.3d 1200 (9th Cir. 2010) ................ 27, 29
*United States v. Olano*, 507 U.S. 725 (1993) .............................. 27, 40, 60
*United States v. Pierre*, 254 F.3d 872 (9th Cir. 2001) ............................ 27
*United States v. Prime,* 431 F.3d 1147 (9th Cir. 2005) .............. 55, 61, 62
*United States v. Ramirez*, 257 F.3d 1075 (9th Cir. 2008) ....................... 28
*United States v. Ruiz*, 257 F.3d 1030 (9th Cir. 2001) ............................ 50
*United States v. Rusnak*, 981 F.3d 697 (9th Cir. 2020) .................... 31, 40
*United States v. Segna,* 555 F.2d 226 (9th Cir. 1977) .......... 26, 31, 38, 39
*United States v. Soulard*, 730 F.2d 1292 (9th Cir. 1984) ....................... 61
*United States v. Symington*, 195 F.3d 1080 (9th Cir. 1999) .......... passim
*United States v. Thomas*, 116 F.3d 606 (2d Cir. 1997) .......................... 47
*United States v. Ullah*, 976 F.2d 509 (9th Cir. 1992) ................ 43, 44, 45
*United States v. Vasquez*, 597 F.2d 192 (9th Cir. 1979) ........................ 55
*United States v. Velazquez*, 1 F.4th 1132 (9th Cir. 2021) ....................... 26
*United States v. Wells*, 879 F.3d 900 (9th Cir. 2018) ....................... 42, 55
*United States v. Wood*, 943 F.2d 1048 (9th Cir. 1991) ........................... 61

**Statutes**

18 U.S.C. § 924(c) ..................................................................... 3
18 U.S.C. § 1111 ....................................................................... 3
18 U.S.C. § 1117 ....................................................................... 3
18 U.S.C. § 3231 ....................................................................... 3
28 U.S.C. § 1291 ....................................................................... 3

## Other Authorities

Fed. R. Crim. P. 23(b), advisory committee notes, 1983 amendments, 97 F.R.D. 245 (1983) ........ 56, 57

Fed. R. Crim. P. 24, advisory committee notes, 1999 Amendments (1999) ........ 56

Model Penal Code § 2.01(3) (1985) ........ 30

Orfield, Trial Jurors in Federal Criminal Cases, 29 F.R.D. 43 (1962) ........ 56, 57

## Rules

Fed. R. Crim. P. 23(b)(3) ........ 47

Fed. R. Crim. P. 24(c) ........ 57

Fed. R. Crim. P. 31(a) ........ 43

Fed. Rules Evid. 606(b) ........ 52, 53, 59

## Constitutional Provisions

U.S. Const. amend. 6 ........ 43

U.S. Const. art. III § 2 ........ 43

## Statement of the Issues[1]

I. Whether the prosecution's improper argument that, even if Le was justified in shooting Dao in self-defense, his subsequent failure to save Dao's life defeated that defense requires reversal.

II. Whether the replacement of a juror who sought to be excused because other jurors' pressure on her to reach a specific verdict was causing her mental distress violated Le's non-waivable Sixth Amendment right to a unanimous verdict and thus requires reversal, notwithstanding trial counsel's acknowledgement that the Court had discretion to replace her.

III. Whether the reconstituted jury's failure to begin its deliberation anew, or the alternate juror's consideration of the prior jury's notes and timeline, require reversal.

[1] Pursuant to Ninth Circuit Rule 28-2.7, pertinent authorities are in a statutory addendum at the end of this brief.

## Introduction

This appeal presents important issues about expansive federal criminal jurisdiction over purely local conduct, a defendant's fundamental right to have a jury properly consider his defense to the serious charge of murder, and the bedrock constitutional right to be convicted only upon a unanimous verdict of an impartial jury. Appellants' Joint Opening Brief argues that there was no jurisdiction for Counts One through Three of the indictment, all involving an alleged murder off the coast of California, because the government could not prove that the alleged offenses occurred within the special maritime and territorial jurisdiction of the United States. If the Court agrees, these counts must be dismissed and the case remanded for resentencing as to the remaining counts.

Even if this Court finds that there was jurisdiction, this Court must nevertheless reverse the convictions because (1) the prosecution improperly and repeatedly misstated the law on self-defense; (2) the district court improperly replaced a juror who sought to be excused due to other jurors' pressure on her to reach a specific verdict; and (3) the district court failed to grant a new trial despite evidence that the

reconstituted jury did not begin deliberations anew and the alternate juror was exposed to extrinsic evidence.

## Statement of Jurisdiction

This brief raises Hoang Xuan Le's individual challenges to his convictions on Counts One through Three of the Indictment—first-degree murder (18 U.S.C. § 1111), conspiracy to commit murder (18 U.S.C. § 1117), and possession of a firearm in furtherance of murder (18 U.S.C. § 924(c)), all within the special maritime and territorial jurisdiction of the United States.

The district court asserted jurisdiction pursuant to 18 U.S.C. § 3231. Le's judgment was entered on August 7, 2023; he filed a timely notice of appeal on August 11, 2023. (JER-280, 286). This Court has jurisdiction under 28 U.S.C. § 1291.

## Custody Status

Le is in the custody of the Bureau of Prisons serving a sentence of life imprisonment.

## Statement of the Case

### A. Procedural History

Hoang "Wayne" Xuan Le and Sheila Marie Ritze were arrested on December 16, 2019, and indicted on January 2, 2020, which indictment

was twice superseded. (JER-4, 13, 103). The operative second superseding indictment charged Le and Ritze with first degree murder (Count One), conspiracy to commit murder (Count Two), and possession of a firearm in furtherance of murder (Count Three).[2]

Le and Ritze's trials were severed, and Le proceeded to trial first.

At Le's trial, the district court instructed the jury on first-degree murder as charged in Count One, as well as the lesser-included offenses of second-degree murder, voluntary manslaughter, and involuntary manslaughter. (14-LER-2870–2877). The district court also instructed the jury on self-defense and imperfect self-defense. (2-LER-153–158, 14-LER-2881–2884). The jury found Le guilty as charged on Counts One through Three. (2-LER-278–279). At her later trial, Ritze was acquitted of first-degree murder but convicted of the lesser-included offense of second-degree murder. (JER-265).

Le filed motions for a judgment of acquittal and, in the alternative, a new trial (3-LER-298). The district court denied these

---

[2] Le was also charged with seven drug trafficking counts (Counts Four through Eleven) to which he pleaded guilty and a related gun count (Count Twelve), which was dismissed on the government's motion. (JER-103, 280). These counts are not at issue in this appeal.

motions and sentenced Le to life imprisonment on Counts One and Two, and five years' consecutive on Count Three. (1-LER-25, JER-280). Ritze was sentenced to 262 months' imprisonment. (JER-265).

## B. Facts Relevant to Issues Presented

### 1. Improper Prosecution Argument about Self-Defense

It was undisputed that Dao died in the ocean off the coast of Southern California after leaving on a late-night lobster-fishing trip with Le and Ritze. The question for the jury was whether Le killed Dao in self-defense after Dao threatened him with a gun; or whether Le, with Ritze's assistance, lured his long-time friend lobster fishing for the purpose of killing him and collecting a debt through Dao's life insurance proceeds.

Le had been close friends with Dao, Dao's partner Natalie Nguyen, and their two young daughters for years. (5-LER-741, 793, 805). Le and Dao also had a professional and financial relationship—they trafficked in marijuana together, and Le frequently loaned Dao money to pay his marijuana and gambling debts. (5-LER-741, 751, 793; 10-LER-2061). Indeed, ten days before the fishing trip, Le lent Dao $500 to gamble in Las Vegas, and Dao repaid him $400 on the very afternoon

of the trip. (5-LER-750; 9-LER-1976–1977; 10-LER-2050–2051, 2059, 2080). According to testimony from Le, which was corroborated by documents recovered from Le's computer, Dao owed Le less than $6,000 prior to the fatal fishing trip. (9-LER-1964–1977; 14-LER-2900). Nguyen concurred that Dao did not owe Dao that much. (5-LER-754).

On October 14, 2019, Le met Dao, Nguyen, and their daughters for lunch at a seafood buffet. (10-ER-2079–2081). Lobster-fishing season had recently begun, and Le had gone fishing the night before with his friend Ritze, a highly experienced fisherwoman who owned the boat, and another friend, Koa Cao. (10-ER-2068–2076; 12-ER-2570–2576, 2579–2581). Le shared this story with Dao, who expressed an interest in going lobster fishing. (5-LER-751). Le agreed to arrange it, and later confirmed that Ritze would go out again that night, provided that Dao obtained a fishing license. (5-LER-755, 861-865; 8-LER-1668–1669).

Dao, Le, and Ritze got a late start but eventually left out of Dana Point Marina shortly before midnight on October 14. (8-LER-1726; 10-LER-2096–2105). When they returned at approximately 2:34 a.m., the next morning, October 15, Dao was not with them. (8-LER-1742). The following afternoon, the Coast Guard recovered Dao's body floating in

the ocean. (4-LER-572–574). He had drowned and had two non-fatal gunshot wounds and blunt force trauma, which were contributing factors to his death. (4-LER-641–642).

#### a. Self-Defense

At trial, Le claimed self-defense. (2-LER-92–152, 4-LER-546–577). He testified that, after baiting and dropping the lobster traps, they cruised around on the boat, drinking and listening to music. (10-LER-2106–2112). Ritze piloted the boat from the captain's seat in the middle of the boat, and Le and Dao were seated in the rear of the boat. (10-LER-2112–2116).

Dao asked Le for $2,000. (10-LER-2116). Feeling pressured, Le responded with profanity that he did not have the money. (10-LER-2116–2117). Dao became visibly angry, pulled out a .38 caliber revolver, and threatened Le by pointing it at his stomach. (10-LER-2117). Knowing of Dao's propensity for violence and scared, Le tried to grabbed the gun from Dao's hand. (10-LER-1977–1984, 2117–2118, 2122, 2134–2135).

While Le and Dao were struggling over the gun, it discharged twice and fell to the floor. (10-LER-2217–2118). In response to Dao's

continued assault, Le grabbed a long-handled tool on the boat and repeatedly hit Dao on the head. (10-LER-2118). They continued struggling at the rear of the boat until Le wrestled Dao overboard. (10-LER-2118–2119). Dao verbally threatened Le from the water, and Le retrieved the gun and threw it and Dao's other belongings overboard. (10-LER-2119, 2137–2138). Ritze threw up, and Le told her to drive away. (10-LER-2119, 2138).

Le testified that he did not report the incident to authorities because he was scared. (10-LER-2136–2137). Le did, however, tell his friend Shawn Whalin later that day that he had shot Dao during a fight on the boat. (8-LER-1596–1597, 1629–1630, 1644–1645; 10-LER-2141–2144). Whalin testified that he saw bruises on Le's arm. (8-LER-1595, 1693).

Prior to his arrest, Le made a variety of inconsistent statements. On one extreme, he told Dao's partner, Nguyen, that he had not actually gone on the trip with Dao. (5-LER-772–773, 8-LER-1598, 10-LER-2154–2156). He likewise told Dao's brother, Alex, that he had not gone on the trip as planned, but that he and his friend Shawn instead stayed at a bar at the harbor drinking with some girls they met. (10-

LER-2181–2183). Le recruited Whalin to corroborate this false alibi. (10-LER-2183–2187). Le later repeated this story to Coast Guard investigators prior to his arrest but before Dao's death was publicly reported. (10-LER-2194).

On the other extreme, Le told Tuac "Tony" Huang, a thrice-convicted felon with whom he trafficked drugs, that he and two other men took Dao out on a boat, that he demanded repayment of a $30-$40,000 debt, that he shot Dao three times when Dao refused to pay the debt, and that he and the two other men tied Dao up with weights around his ankles and threw him overboard. (7-LER-1398–1399). Le similarly told another criminal associate, Vinh Doan, that he had shot Dao over a $30-40,000 debt and that he had approached Dao's partner, Nguyen, about paying off Dao's debt from his life insurance policy. (7-LER-1324–1330). Le testified at trial that he told these stories because wanted to impress Huang and Doan. (10-LER-2150–2154, 2178–2179, 2187–2192).

These stories were undisputedly false. Video cameras at the marina documented that Dao went on the trip with Le and Ritze, not two other men. (8-LER-1728–1732). Dao was shot twice, not three

times, and at angles that suggested a struggle, not an execution. (4-LER-659–672, 12-LER-2593–2608). Dao had not been tied up, much less with weights. (4-LER-593-594, 673–674). To the contrary, his body was spotted floating in the water in a brightly colored jacket with his driver's and fishing licenses still in his pocket. (4-LER-582, 615–616). There was no evidence Dao owed Le anywhere close to $30-$40,000 nor evidence that Dao's debts had reached a breaking point—Dao had paid Le back $400 earlier that very day. (5-LER-846–849, 10-LER-2080). Le had no particular need for money as he lived with his mother and sister and had recently received a small inheritance after his father's death. (11-LER-2368–2371). It was also undisputed that, while Le spoke with Nguyen shortly after the fatal fishing trip, he never asked her to repay Dao's debt with the life insurance proceeds or otherwise. (5-LER-894–895, 906–907).

#### b. Prosecution Theory

The government's theory was that, far from acting in self-defense, Le purposely lured Dao onto the boat under the pretense of lobster fishing to kill him, purposely shot him, and threw his body overboard. (4-LER-536–546). Under this theory, Ritze was a coconspirator who

planned to commit this murder with Le, permitted her boat to be used for the murder, and piloted the boat during the murder. (4-LER-540). Le's purported motive for murdering his long-time friend was to collect Dao's debt to him from Nguyen who was the beneficiary of Dao's life insurance policy. (4-LER-539).

In support of this theory, Nguyen, Whalin, Hoang, and Doan recounted Le's various statements. Although the most damaging aspects of their testimony were impeached at trial,[3] Le admitted to

---

[3] It was undisputed that Le never asked Nguyen for any of the life insurance proceeds or to otherwise pay Dao's debt. (5-LER-894–895). But Nguyen testified that, at the lunch when Le invited Dao to go fishing, Le asked her whether Dao's life insurance policy was up to date. (5-LER-752). Le denied making this statement. (10-LER-2092–2093). Nguyen's testimony was impeached by her failure to disclose the statement for more than 15 months, despite numerous interviews with the authorities in which she was questioned about the insurance policy. (5-LER-924–948). At trial, Nguyen falsely denied telling the agent that she had come to believe that the prosecution lacked evidence of motive, but the Coast Guard CIS case agent testified that Nguyen made this very statement. (5-LER-946–947, 12-LER-2565–2566)

Whalin testified that Le told him he was going to "take [Dao] out" and that Dao's wife was going to give him some insurance money; and that Le asked him if he wanted to join him. (8-LER-1582–1583, 1592). Whalin also testified that, after telling him that he had killed Dao in a fight, Le suggested he would kill Nguyen as well. (8-LER-1601). Le denied planning to kill Dao or inviting Whalin to join him in killing Dao and also denied suggesting he would kill Nguyen as well. (10-LER-2027, 2165–2166). And Whalin was impeached by his multiple prior felony convictions (8-LER-1577–1578), his prior acts of dishonesty, (8-LER-

lying to Nguyen and Alex about not having gone on the trip, telling Whalin and Doan that he had killed Dao during a fight, and falsely bragging to Hoang that he murdered Dao.

The wildest testimony came from Sandra Ritze (Sandra), the mother of Sheila Ritze's ex-husband, who contacted authorities after reading about Ritze's arrest and Le's bluster to Hoang in the news. (6-LER-1141). Sandra testified that she had been very close with Ritze, but their relationship had suffered after her son divorced Ritze. (6-LER-1117–1122). Sandra had tried to rekindle their relationship, hoping to spend more time with her grand-daughter, whom Sandra described as her favorite person in the world. (6-LER-1116–1118, 1122). After Ritze's arrest, Sandra texted her niece, Shannon Love, about whether she

1620, 1657), his drug and alcohol intoxication at the time of the purported statements (8-LER-1577, 1587–1588, 1622, 1626–1628, 1671), his failure to report the purported plan to Dao or authorities (8-LER-1632–1634), his prior inconsistent statements (8-LER-1642–1644, 1647–1650), the sentencing consideration he expected to receive for his cooperation. (8-LER-1639–1640, 1659–1667). Whalin also admitted to making prior statements to authorities that Le was not violent, that Le was under the influence of drugs and alcohol when he made the statements, and that Le tended to exaggerate his criminal activity and propensity for violence while intoxicated. (8-LER-1628–1631). When the government asked Whalin how he could screw up his deal, Whalin responded, "Saying there is promises made to me that weren't."(8-LER-1710–1711).

would now have more opportunity to be with her granddaughter. (6-LER-1189-1193, 1204-1209). After Sandra told Love that the granddaughter had told her father she wanted her granny, Love texted, "Boy my powers are strong. I told u to be patient and u will have [the grand-daughter]." Sandra responded, "Yes your powers are strong. Now keep that witch in jail." (14-LER-2901–2905).

At trial, Sandra testified that she met Le for the first time in early October 2019, approximately ten days before the fishing trip. (6-LER-1122–1125). Le, Whalin, and Dao had driven Ritze to Las Vegas to attend a Billy Idol concert with Sandra. (*Id.*). Sandra claimed that, before the concert, Ritze and Le told her that they planned to murder Dao either that weekend or later on Ritze's boat because he owed Le money. (6-LER-1126–1126, 1133–1137). Sandra claimed that, when she asked Le how he would get his money if he killed Dao, Le said he would not get his money, but he would get satisfaction. (6-LER-1134).

Although Sandra testified that she thought Le and Ritze were serious, she did not actually alert anyone about their plan, but instead continued to enjoy her weekend with them—attending the concert; socializing with Ritze and Le that evening; spending the night at the

hotel with Ritze; and go-karting and lounging at the hotel pool the following day with Ritze, Le, and Whalin. (6-LER-1230–1275; 10-LER-2042–2058). It was only after reading several related press reports that Sandra contacted authorities and claimed that, three months earlier, Ritze and Le had shared with her their plan to kill Dao. (6-LER-1209–1220). Le denied making or hearing Ritze make any such statements. (10-LER 2035–2039, 2044–2047).

The government's theory had gaping holes. Dao's debt to Le was unremarkable, it made no sense that Le would believe that he could collect the debt by killing Dao, and Le never made any effort to collect the debt from Nguyen. (5-LER-750; 9-LER-1976–1977).[4] Ritze was a successful property manager (6-LER-1284), with no motive to participate in a murder plot, and her insistence that Dao obtain a fishing license was especially inscrutable had she been. (10-LER-2095).

---

[4] In November 2019, Le placed a tracking device on Dao and Nguyen's car. (9-LER-1885). He testified that after being told by the Coast Guard that Dao was still missing, he came to believe that Dao had survived but was faking his own death to recover insurance proceeds. Le testified that Dao had previously proposed such a plan and offered Le 10% of a purported $1 million policy to assist him. (10-LER-1991–1994). Le testified that he had placed the tracker on the Dao/Nguyen car because he was afraid that Dao had survived and would come after him. (11-LER-2225–2235).

While the government presented evidence that Le claimed to have murdered Dao over a debt, tied him up with weights, and sunk his body, these claims were demonstrably false. Witnesses confirmed Le was a big-time drug user and a small-time drug dealer, who wanted to be, but was not actually, a gangster. Thus, his moniker, Wangsta.[5] (5-LER-742, 904, 11-LER-2406).

### c. Jury Instructions and Argument

The jury was instructed that use of force, even deadly force, is justified when a person reasonably believes that it is necessary for the defense of oneself or another against the immediate use of unlawful force, and that the government had the burden to prove the defendant did not act in reasonable self-defense (2-LER-154, 14-LER-2871, 2872, 2875, 2877). It was instructed a belief was reasonable even if the danger did not actually exist. (2-LER-155). And it was instructed that a defendant has no duty to retreat, even if safety could be achieved by retreating. (2-LER-156). It was likewise instructed that even

[5] "Wangsta," Wannabe gangster. Urban Dictionary, https://www.urbandictionary.com/define.php?term=Wangsta (last accessed June 11, 2023)

unreasonable self-defense defeated the malice aforethought required to make out first or second-degree murder. (2-LER-157).

Faced with Le's testimony asserting self-defense, the government argued in its closing argument that Le was a liar, that his testimony was contrary to all the other witnesses, and that he was the witness with the greatest motivation to lie. (2-LER-73–80).

In closing, the defense disputed that Le's testimony was contrary to all the other witnesses. (2-LER-134–145). The only physical evidence in the case, the forensic evidence, was more consistent with a struggle than a planned murder. (2-LER-122–127). The only evidence of premeditated murder was Le's own words. (2-LER-127). The defense acknowledged that Le had given inconsistent statements but explained that his false alibi stemmed from his fear of Alex Dao and his exaggerated accounts were mere bluster and demonstrably false. (2-LER-127-145). Ultimately, the government's theory just made no sense. There was no reason why Le would kill his long-time friend over a relatively insignificant debt that he never sought to collect. (2-LER-93–105).

In rebuttal, the government switched course and argued that Le's defense failed as a matter of law as follows:

> [I]f you accept that and accept his whole description of it, it still falls apart because he has the gun when James Dao is in the water. And at that point, the threat ends and the decision to leave him to the ocean is unreasonable force and it is not self-defense.

(1-LER-18). As detailed below, the government repeatedly made this improper argument. (1-LER-17–18). While the district court properly instructed the jury that an individual threatened with deadly force is justified in using deadly force against his assailant (2-LER-125), it did not instruct the jury that the law imposes no duty on the victim of such a threat thereafter to save his assailant's life.

### 2. Improper Replacement of Juror, Failure to Begin Deliberations Anew, and Exposure to Extrinsic Evidence

#### a. Jury Deliberations

The jury began deliberations on Friday afternoon. (1-LER-26). After deliberating for approximately ninety minutes, the jury left for the weekend. (*Id.*). It returned Monday morning, at 8:30 a.m. At 9:44 a.m., the jury sent its first note, signed by VG as the foreperson, asking the Court to "clarify whether or not jurors can look upon (compare) each

other's notes." (2-LER-169). Although the court and defense counsel were both inclined to respond, "no," ultimately in an abundance of caution, the court merely re-read to the jury the instruction that their memory controlled, and notes are only to assist their memory. (2-LER-169–170, 176). They resumed deliberating and continued through Tuesday and Wednesday without apparent incident. (2-LER-176–195).

On Thursday, December 9, 2021, after more than three full days of deliberation, the foreperson sent a note to the court:

> One of the jurors is unable to continue. She cannot make a decision. To quote "I can't do this." She would like to be excused, but the rest of the jury would like to continue to deliberate with an alternate if necessary.

(2-LER-199). After conferring with counsel, the court responded to the jury in writing:

> If the juror is personally asking to be excused, that juror may send a note to the Court individually. That note should include the reason the juror is asking to be excused without revealing any numerical or other information about the jury's deliberations or voting.

(2-LER-199–208).

Soon afterwards, the court received another jury note:

> I am asking to be excused from further deliberation. My experience in the jury deliberations has put my mental health into a position that has become dangerous to me. At this point, I am unable to continue to subject myself to this and I need to protect my mental health. Juror #2.

(2-LER-211).

After again conferring with counsel, the court summoned juror 2, BJR, to the courtroom and asker her two questions, limiting her response to "yes" or "no."

> THE COURT: Without revealing any information about where the jury stands, numerically or otherwise, is this worsening of your mental health based on pressure from other jurors to reach a specific verdict?
>
> JUROR 2: Yes.
>
> THE COURT: Regardless of the deliberative process and any positions you've taken, are you physically or mentally unable to make any decision applying the law to the facts of this case?
>
> JUROR 2: Your Honor, I don't know how to answer this question … I'm sorry … Without elaborating, I can't give you an answer right now.
>
> THE COURT: Without getting into the discussions or the deliberations?
>
> JUROR 2: Exactly.

> THE COURT: Then we do not want you to answer. It's just a yes or a no.

(2-LER-211–229).

After conferring with counsel again, the court declined to excuse BJR. (2-LER-229–235). The court advised BJR of its decision outside the presence of the jury and then brought the other jurors back into the courtroom to advise them of its decision and reread the jury instruction regarding the duty to deliberate. The court recessed at 11:37 a.m. (2-LER-235–239).

Thirty-one minutes later, at 12:14 pm, the foreperson sent yet another note to the court:

> Juror #2 is extremely stressed and has informed us that she will not be capable of any further deliberation. She has indicated that she has had thoughts of hurting herself in order to be removed from this process. She presents clearly as distressed and in crisis. The rest of the jurors would like to continue with the deliberation process but are unable to due to her inability to go on with the process. There is a concern that her vote does not represent the result of complete and comprehensive deliberation, but rather a way to remove herself from a process that is causing her extreme stress and is potentially causing harm to her health.

(2-LER-245, 3-LER-296). BJR asked the court to separate her from the other jurors, and the court removed her to a separate room, accompanied by the marshal. (2-LER-246).

After again conferring with counsel, the court asked BJR to answer "yes" or "no" to two further questions:

> THE COURT: "We received a note informing us that you will not be capable of any further deliberation; is that true?" Yes or no
>
> JUROR 2: Yes.
>
> THE COURT: "We've received a note informing us you've had thoughts of hurting yourself to be removed from this process; is that true?"
>
> JUROR 2: Yes.

(2-LER-248).

Government counsel advised the court that BJR should be excused. (2-LER-249). Defense counsel stated: "I believe there's independent grounds to excuse her despite her earlier answer that, I think, caused us some pause, and I think the court would be … within its discretion to excuse her, replace her with a randomly selected alternate." The court excused BJR from the jury. (2-LER-249).

Following BJR's dismissal, the court randomly selected the first alternate juror, LL, to replace her. (2-LER-264–265). The court

instructed the jurors that it had replaced BJR with LL, and admonished them "not [to] speculate about the reason for the substitution." (2-LER-265). The court further instructed the jurors:

> You must start your deliberations anew.
>
> This means that you should disregard entirely any deliberations taking place before the alternate was substituted and consider freshly the evidence as if the previous deliberations had never occurred. Although starting over may seem frustrating, please do not let it discourage you. It is important that each juror have a full and fair opportunity to explore his or her views and respond to the views of other jurors so that you may come to a unanimous verdict"

(2-LER-265–266). The court recessed at 1:51 p.m. (2-LER-267).

The newly reconstituted jury deliberated until 4:13 p.m. (2-LER-272). The jury resumed deliberations at 8:30 a.m. the following morning. (2-LER-272). At 12:07 p.m., the foreperson sent a note stating that the jury had reached a unanimous verdict. (2-LER-297). Having deliberated for less than six hours, the jury found Le guilty on all counts. (2-LER-278–279).

**b. New Trial Motion**

After the verdict, Le filed a new trial motion. (3-LER-298). As relevant here, he argued that a new trial was warranted because (1) the

district court erred in replacing holdout juror BJR after she was bullied into requesting to be excused for mental health reasons, and (2) the reconstituted jury did not begin deliberations anew after the holdout juror was replaced with an alternate juror, LL, but rather considered the prior jury's timeline and began where it had left off. (3-LER-338–344).

In support of his new trial motion, Le submitted the declarations of two investigators who interviewed BJR, LL, and other jurors. BJR explained that, during deliberations, she informed the other jurors that she believed the prosecution did not prove the case and she was voting not guilty. (3-LER-346). She faced pressure to change her vote, but eventually she informed the other jurors that they should send a note stating that they were deadlocked. The foreperson told her that she was not okay to tell the judge they were deadlocked and that if BJR could not continue, they would have her replaced by the alternate. BJR explained that, because she did not believe the remaining jurors were going to notify the court that they were deadlocked, she decided she wanted out. (3-LER-347). BJR also explained that one of the jurors said she had experience lobster fishing. That juror informed the group she

did not believe Le's testimony that they went lobster fishing because, in her experience, it takes much longer to put the cages in the water. (3-LER-348).

The alternate juror, LL, explained that when the group began deliberations with him, the other jurors had written certain evidence on a whiteboard—primarily a timeline—which they explained to him. (3-LER-351). LL said the other jurors explained the timeline did not allow for sufficient time to drop the lobster hoops. (3-LER-351).

The district court denied the new trial motion, finding that it was prohibited from considering either BJR or LL's post-verdict statements under Federal Rule of Evidence 606(b) (1-LER-33–35), that it had had good cause to replace juror BJR based on her mental health issues (1-LER-37–38), that there was no evidence other than LL's statement that the jury did not begin deliberations anew (1-LER-38).

## Summary of Argument

The trial convictions must be vacated for the following reasons:

*First*, the prosecution argued for the first time in its rebuttal that, even if the jury credited Le's testimony, it should still convict on first-degree murder because Le's failure to save Dao's life once the initial

threat had passed defeated self-defense. This is incorrect. Without a duty to act, failing to save someone's life is not first-degree murder. And where the law permits an individual to use deadly force to repel a deadly attack, it does not thereafter impose a duty on the victim of that attack to save the life of his assailant. Although trial counsel did not object, the prosecution's improper argument that Le's defense failed as a matter of law was plain error warranting reversal.

*Second*, the replacement of the holdout juror violated Le's constitutional right to a unanimous verdict of an impartial jury. Trial counsel's acknowledgment that the court had discretion to replace BJR does not defeat this claim because, as this Court has held, the right to a unanimous verdict belongs to both the defendant and society and cannot be waived. Faced with a juror who cannot continue because the other jurors' pressure on her to reach a specific verdict was causing her severe mental distress, the district court's only option was to declare a mistrial.

*Third*, regardless of the reason for BJR's replacement, the reconstituted jury was required to begin deliberations anew, and it was not permitted to consider the written timeline created by the prior jury.

The speed with which the new jury reached a verdict alone shows that it did not begin deliberations anew. Further, the district court erred in disregarding LL's statement that, when he entered the jury room, the previous jury's timeline of evidence was still on the whiteboard. This was evidence that the new jury did not begin deliberations anew. It was also evidence that LL considered extrinsic evidence that had a reasonable possibility of affecting the verdict.

## Argument

### I. This Court must reverse because the prosecution's argument that, even if Le was justified in shooting Dao in self-defense, his subsequent failure to save Dao's life defeated that defense, was plainly improper and prejudicial.

#### A. Standard of Review

"A prosecutor's misstatements of law during closing argument provide grounds for reversal." *United States v. Velazquez*, 1 F.4th 1132, 1136 (9th Cir. 2021). Indeed, such misstatements may violate due process. *Deck v. Jenkins*, 814 F.3d 954, 977-78 (9th Cir. 2016). Where there was no objection, review is for plain error. *United States v. Segna,* 555 F.2d 226, 231 (9th Cir. 1977). Under plain error review, this Court may reverse only when (1) there is error, (2) that was plain, (3) that affected the appellant's substantial rights, and (4) that "seriously

affect[ed] the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 736-37 (1993). That standard is met here.

### B. The prosecutor plainly misstated the law in closing rebuttal.

Le claimed self-defense. He testified that Dao asked to borrow money from him, and that when he told Dao he did not have any more money to lend him, Dao pointed a gun at him and threatened to shoot him. In the ensuing struggle over the gun, Dao was shot twice, hit in the head, and fell overboard. The forensic evidence was consistent with a struggle. By contrast, the government's theory that Le killed Dao for insurance money was undermined by evidence of their relationship, Le's lack of financial need, and the undisputed fact that Le never sought to collect any insurance money.

A defendant who reasonably believes he is in danger of death or great bodily harm may use deadly force to defend himself. *United States v. Morsette*, 622 F.3d 1200, 1202 (9th Cir. 2010). Once a defendant raises self-defense, the government has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. *United States v. Pierre*, 254 F.3d 872, 876 (9th Cir. 2001). The jury must

unanimously reject self-defense to find the defendant guilty. *United States v. Ramirez*, 257 F.3d 1075, 1083 (9th Cir. 2008).

But in its rebuttal argument, the government argued that even if the jury accepted Le's testimony in its entirety, Le was still guilty because after disarming Dao, he did not save Dao from drowning:

> Self-defense. I could spend a lot of time talking about it, but I'm going to say one thing and I'm going to credit him. You can credit him in his own testimony on this if you want.
>
> By his own account, James Dao was in the water. He had the gun. The gun was on the boat . . . he told you James Dao was in the water; the gun was on the deck. And what did he say? "I threw the gun in the water." Okay? So even if you accept that, right, that defeats self-defense. Why? If you've got the gun, you're no longer facing deadly force from a man floundering in the water; right? The threat is gone. By turning the boat around and going back to shore and leaving the wounded man in the water, that is not reasonable force. Okay? He claims he had the gun by his own account, and he threw it in the water.
>
> And I asked him on cross, "You had the gun. He's in the water. You could have stayed there and called the Coast Guard; right? You could have radioed Harbor Patrol. You could have thrown him a life preserver. You could have at least radioed in or told somebody when you got back in." They did none of those things. That evinces an intent to kill James Dao.

> And it negates the idea if you accept that James Dao pulled the gun on him. And the only evidence of that is his word, the word of a liar. But if you accept that and accept his whole description of it, it still falls apart because he has the gun when James Dao is in the water. And at that point, the threat ends and the decision to leave him to the ocean is unreasonable force and it is not self-defense.

(1-LER-17–18).

This was a plain misstatement of well-settled federal law on self-defense. The Supreme Court has long held that a defendant who reasonably believes he is in danger of death or great bodily harm may use deadly force to defend himself. *Brown v. United States*, 256 U.S. 335 (1921); *Alberty v. United States*, 162 U.S. 499, 508 (1896). This Court, of course, applies that test. *Morsette*, 622 F.3d at 1202; *United States v. Keiser*, 57 F.3d 847, 850-52 (9th Cir. 1995). And that test has not changed. *See, e.g., United States v. Britt*, 79 F.4th 1280, 1286 (10th Cir. 2023). Thus, if Le reasonably feared for his life, he was justified in using deadly force to defend himself, and self-defense would constitute a complete defense to all the charges. *Id.* Indeed, so long as Le actually feared for his life, even if the jury found this fear unreasonable,

imperfect self-defense would constitute a complete defense to first- or second-degree murder. *Id.* at 1286-87.

And yet, the government argued that Le's failure to save Dao's life defeated self-defense. The prosecution argued that if the jury "accept[ed] that James Dao pulled the gun on him," and it "accept[ed] his whole description of it, it still falls apart because he has the gun when James Dao is in the water," because "the decision to leave him to the ocean is unreasonable force and it is not self defense." (1-LER-18). This argument was plainly incorrect. Absent a duty to act, the failure to perform any act cannot constitute murder. Model Penal Code § 2.01(3) (1985) (requiring "a duty to perform the omitted act"). Where an individual is justified in using deadly force to save his own life, the law can impose no duty on him to take actions to prevent the death of his assailant: It would be inherently contradictory for the law to justify a victim's use of deadly force against his assailant, but then also impose on the victim a duty to save his assailant's life. If the jury "accepted [Le's] whole description of it" (1-LER-18), Le was not guilty.

### C. The prosecutor's misstatement of law affected Le's substantial rights and warrants reversal.

"For an error to affect a defendant's substantial rights, the 'error must have substantial and injurious effect or influence in determining the . . . verdict.'" *United States v. Rusnak*, 981 F.3d 697, 708 (9th Cir. 2020) (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 81 (2004)). "The defendant must show there is 'a reasonable probability that, but for the error claimed, the result of the proceeding would have been different.'" *Id.* (quoting *Dominguez Benitez*, 542 U.S. at 78). "The reasonable probability standard is not the same as, and should not be confused with, a requirement that a defendant prove by a preponderance of the evidence that but for error things would have been different." *Dominguez Benitez*, 542 U.S. at 83 n. 9. "A reasonable probability is less than a certainty, or even a likelihood." *Rusnak*, 981 F.3d at 707 (cleaned up).

This Court has not hesitated to find the reasonable probability standard met when the prosecution misstates the law on the central issue in dispute. *Deck*, 814 F.3d at 985; *Segna*, 555 F.2d at 231-32. Where, as here, the prosecution misstates the law in a way that goes to the heart of the defense; where it goes so far as to argue that, even if

the jury credited the defendant on the facts, it would not make out the defense on the law; where the court's instructions to the jury do not address the misstated issue of law; where the misstatement first arises in the prosecution's rebuttal argument, when the defendant has no opportunity to correct it; and where the jury convicts only after having deliberated for days and pressuring a juror into being replaced, the misstatement of law affects a defendant's substantial rights.

In *Deck*, this Court held that there was a "reasonable probability" that the prosecutor's misstatement of the law in closing argument affected the verdict. 814 F.3d at 986.[6] Deck had been convicted in State

---

[6] *Deck* arose on federal habeas. The Court found a "reasonable probability" that the prosecutor's statements affected the verdict to make out a due process violation under *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). *Deck*, 814 F.3d at 879-85. That standard is the same as the prejudice standard under *Dominguez Benitez.*

Eight judges of this Court dissented from a denial of rehearing en banc based on their view that the Court did not properly defer to the California court's harmlessness determination as required by the AEDPA. *Deck*, 814 F.3d at 958 (Bea, J., dissenting from the denial of rehearing en banc). This dissent involved deference under the AEDPA, not the question whether there was a reasonable probability that, but for the prosecutor's misstatements, the result would have been different. *Id.*at 972. Even the dissenters agreed that the *Deck* majority made a "good argument" that there was a reasonable probability of a different result. *Id.*

court of attempted lewd act upon a child in a case involving an online chat with a fictitious girl. After chatting for a while, they agreed to meet. Although Deck told her that he "probably won't be able to keep my hands off her," on the day in question, he said he was sick "so no kissing or nothing." He was arrested after greeting her at the agreed-upon location. *Id.* at 973-74. Deck defended on the ground that he was approaching his initial meeting cautiously and did not have the intent to engage in a lewd act on that day. *Id.* at 976.

On rebuttal, the prosecutor argued that he did not have to prove Deck was going to commit a lewd act on that day. "[E]ven if his intent was just to meet her, get to know her, break the ice and follow the next day, the next week, maybe [in] two weekends when mom's gone, again, as long as he took a direct, but ineffectual step toward the goal, that is all I need." *Id.* at 974-75 (emphasis omitted). The California Court of Appeal held that this was a misstatement of California law on attempt, which requires "the acts of the defendant must go so far that they would result in the accomplishment of the crime unless frustrated by extraneous circumstances." *Id.* at 975. But the California Court concluded that the misstatement was not prejudicial to Deck. *Id.*

On federal habeas, this Court held that the prosecution's misstatement of the law violated Deck's constitutional right to due process under *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). *Deck,* 814 F.3d at 979-85. To reach this conclusion, this Court found that there was a "reasonable probability" that, but for the prosecution's misstatement of law, the result of the proceeding would have been different. *Id.* at 979. In holding that the "reasonable probability" standard was met, this Court explained that (1) the prosecutor's misstatements were not inadvertent or isolated, (2) the misstatements were not neutralized by instructions that addressed the specific statements of the prosecutor, and (3) the evidence concerning the disputed issue was not overwhelming. *Id.*at 980-85.

These three features are present here as well. First, even more than in *Deck*, the prosecution repeatedly argued that "even if" the jury credited Le, he was still guilty: "I'm going to credit him," "You can credit him in his own testimony," "By his account," "if you accept that," "So even if you accept that," "But if you accept that and accept his whole description of it." (1-LER-17–18). The prosecution's repeated assertions that the jury could convict *even* under Le's version of the facts

"unquestionably shows that he presented alternative theories of the case on which the jury could rely to convict [Le], rather than making a passing incorrect statement of his primary argument." *Deck*, 814 F.3d at 981.

Indeed, the prosecution returned thrice to this argument in a short rebuttal. The prosecution first introduced the idea several pages earlier, when it argued that "abandoning someone in the open ocean on a cold dark night 3 miles offshore is a use of force." (1-LER-14–15). Then, after the lengthy and incorrect explication of the law of self-defense quoted above, the prosecution returned to the issue in defending the FBI case agent's working hypothesis that this was a murder:

> If it's a killing with justification, you do not abandon the victim in the water. Don't you see how that defeats everything they've said about self-defense or justification? Right? Because once he's in the water and you have the gun, those precepts stop. And by leaving him in the water, you're not acting with – you've left the realm of justification.

(1-LER-19).

Also as in *Deck*, "the prosecutor's unequivocal assertions" — "that is not reasonable force," "at that point, the threat ends and the decision

to leave him in the ocean is unreasonable force and it is not self-defense," "once he's in the water and you have the gun, those precepts stop" (1-LER-18, 19) —"leave no doubt he was arguing, incorrectly, that the jury could still convict" Le even if it had reasonable doubt about whether Le acted in justifiable self-defense when shooting Dao and sending him overboard during the struggle. *Deck*, 814 F.3d at 981.

Second, the misstatements were not neutralized by instruction from the court that addressed the specific statements of the prosecutor. The district court properly instructed the jury on the law of self-defense, including that force likely to cause death or great bodily harm is justified if a person reasonably believes that such force is necessary to prevent death or great bodily harm (1-LER-154), and that an individual has no duty to retreat even if safety could have been achieved by retreating (1-LER-156). But the instructions did not explain that an individual who has justifiably used deadly force against an assailant does not have a subsequent duty to save the assailant's life. (1-LER-154–156). That is, the instructions did not address the "issue that was the gravamen of the prosecutor's misstatement." *Deck*, 814 F.3d at 983.

Third, the prosecution's misstatement went to the heart of Le's defense, and the evidence was not overwhelming. Le testified that he and Dao engaged in a struggle that resulted in Dao being shot twice, hit in the head, and going overboard. The forensic evidence was consistent with such a struggle rather than a planned killing, the proffered motive was implausible, and the evidence of premeditation was dubious. The jury deliberated for more than three full days before sending out a series of notes that resulted in the replacement of a holdout juror.

Another indication that the government's evidence was not overwhelming was Ritze's acquittal of first-degree murder. As detailed in Ritze's brief, the prosecution argued at Ritze's trial that, even if the jury did not believe she premeditated murder with Le, she would still be guilty of second-degree murder for leaving Dao in the water. (2-LER-164–165). The jury's acquittal of Ritze on first-degree, and conviction on second-degree murder, suggests it credited that version. Although that was a separate trial with a different jury, Ritze's acquittal of first-degree murder nevertheless confirms that the evidence of first-degree murder was not overwhelming.

This Court's decision in *Segna* also supports reversal. *Segna* involved a conviction for first-degree murder, where the only contested issue was Segna's legal sanity. 555 F.2d at 228-29. As with self-defense, once a defendant raises the defense of insanity and offers evidence in support, the presumption of sanity disappears and the prosecution has the burden of proving the fact of sanity beyond a reasonable doubt. *Id.* at 230-31 (citing *United States v. Ingman*, 426 F.2d 973, 976 (9th Cir. 1970)). In *Segna*, the prosecution argued in closing that because a man is presumed sane, the opinion of the prosecution's expert, unlike the defendant's, "has a presumption of law with it." *Id.* at 230. "In concluding, the prosecution asked the jury to return a guilty verdict 'unless you are convinced by scientific evidence the man (Segna) is sick and doesn't appreciate the wrongfulness of his acts.'" *Id.*

Noting that the government had "enveloped" the government expert's opinion in an "aura of official approval" that could be overcome only by "scientific evidence that Segna was not sane," this Court reversed for plain error under Rule 52(b). *Id.* at 232. Decided before *Dominguez Benitez,* which lowered the bar for relief to a "reasonable" probability, this Court held there was a "high" probability that the

prosecutor's misstatements materially affected the jury's verdict. *Id.* at 231. Given the timing of the misstatements (closing argument) and how close the evidence on the issue of insanity was, this Court reasoned that the misstatements materially affected the verdict. *Id.* at 231-32. It reached this conclusion even though the jury instructions, defense counsel, and even some of the prosecutor's comments on the issue correctly stated the law. *Id.* at 232.

This case makes out a stronger case for reversal than *Segna* did. Here, too, the single issue of whether Le and Ritze planned a murder for insurance money that they never sought to collect or whether Le acted in self-defense was hotly contested. But here, the prosecution went beyond improperly enveloping its witnesses with an aura of official approval and misstating the defense's burden to overcome that. It expressly argued that, *even if* the jury fully credited the defense, it should still convict. Whereas in *Segna* the jury instructions correctly stated the law that the prosecutor misstated, *id.* at 232, here the court's jury instructions were silent as to whether Le had a duty to save Dao after repelling his attack. (2-LER-154–156). This case presents an even stronger case for reversal than *Segna* also because the prosecution here

made its improper arguments in rebuttal, which is particularly prejudicial because the defense has no opportunity to respond. *See Darden*, 477 U.S. at 182-83; *see also United States v. Maloney*, 755 F.3d 1044 (9th Cir. 2014) (en banc) (granting government motion for summary reversal where the prosecution made improper argument in rebuttal).

"A reasonable probability is less than a certainty, or even a likelihood." *Rusnak*, 981 F.3d at 707 (cleaned up). Here, where the government grossly misstated the law on the only issue in dispute, did so repeatedly and forcefully, and was never corrected, that standard is met. The error warrants reversal because it "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Olano,* 507 U.S. at 737. Where the government improperly and repeatedly argues, without correction, that even if the jury credits the defense on the facts, the defense is defeated as a matter of law, it is as if the defendant has had no trial at all.

## II. This Court must reverse because the replacement of juror BJR for mental health issues caused by other jurors' pressure to reach a specific verdict violated Le's unwaivable right to a unanimous verdict.

### A. Standard of Review

This Court reviews the district court's dismissal of a juror during deliberations for abuse of discretion and its factual findings for clear error. *United States v. Litwin*, 972 F.3d 1155, 1170 (9th Cir. 2020) (cleaned up). "[W]hile district courts have leeway in how they approach juror dismissal issues, because defendants have a Sixth Amendment right to a unanimous jury verdict, 'the district court's discretion in this area is not unbounded.'" *Id.* at 1171 (quoting *United States v. Symington*, 195 F.3d 1080, 1085 (9th Cir. 1999)). "If the record evidence discloses *any reasonable possibility* that the impetus for a juror's dismissal stems from the juror's views on the merits of the case, the court must not dismiss the juror." *Litwin*, 972 F.3d at 1170 (cleaned up) (emphasis added).

This Court employs a two-part test to determine whether a district court has abused its discretion in denying a new trial motion. *United States v. Hinkson*, 585 F.3d 1247, 1261 (9th Cir. 2009) (en banc). The first step is to determine de novo whether the trial court identified

and applied the correct legal rule to the relief requested. *Id.* at 1262. If the trial court failed to do so, it abused its discretion. *Id.* At the second step, the Court determines whether the application of the rule to the facts is essentially a legal or factual test. *Id.* at 1259. If the test requires the court to "consider legal concepts in the mix of fact and law and to exercise judgment about the values that animate legal principles, then the concerns of judicial administration will favor the appellate court, and the question should be classified as one of law and reviewed de novo." *Id.* at 1260 (internal quotation marks and citation omitted). This class of question includes those, as raised here, that implicate constitutional rights. *Id.*

To the extent the district court's error stemmed from its determination that BJR's post-verdict statements were inadmissible under Federal Rule of Evidence 606(b), this Court reviews de novo "the construction or interpretation of the Federal Rules of Evidence, including whether particular evidence falls within the scope of a given rule." *United States v. Wells*, 879 F.3d 900, 914 (9th Cir. 2018) (cleaned up).

### B. The right to a unanimous verdict from an impartial jury cannot be waived.

The government's primary argument with respect to the replacement of juror BJR during deliberations was that, by agreeing to the replacement, Le's trial counsel waived any claim of error. (3-LER-375–376, 377–378, 407–409, 422–23). Yet, the right to a unanimous verdict cannot be waived, much less by counsel.

The right to a unanimous verdict from an impartial jury is guaranteed by Article III, section 2, of the Constitution; the Sixth Amendment, *Ramos v. Louisiana*, 590 U.S. 83, 90 (2020); and Rule 31(a) of the Federal Rules of Criminal Procedure. In the Supreme Court's most recent opinion on the Sixth Amendment right to a jury trial, *Erlinger v. United States*, ____ S. Ct. ____, 2024 WL 3074427 (2024), the Court describes this right as a right to a "unanimous" verdict fifteen times. This Court has long held that this right to a unanimous verdict from an impartial jury cannot be waived or forfeited. *United States v. Alarcon-Simi*, 300 F.3d 1172, 1176 (9th Cir. 2002); *United States v. Ullah*, 976 F.2d 509, 513 (9th Cir. 1992); *United States v. Lopez*, 581 F.2d 1338, 1340 (9th Cir. 1978). The right belongs not only

to the defendant, but to society as a whole, and cannot be eliminated even if the defendant so desires. *Ullah*, 976 F.2d at 513.

In *Lopez*, after the jury advised the judge that it was deadlocked, the judge told the parties he intended to discharge the jury. 581 F.2d at 1340. Defense counsel, believing the split was in his client's favor, stated that the defendant wished to waive the right to a unanimous verdict and to accept a vote of ten jurors. The judge asked the defendant three times if she wished to waived her right to a unanimous verdict of twelve jurors and accept the verdict of 10 of 12. The defendant repeatedly stated that she wished to waive her right. She was convicted on a vote of 10 to 2. *Id.*

On appeal, this Court reversed the defendant's convictions. *Id.* at 1342. Although the defendant had expressly and repeatedly stated she wished to accept the verdict of ten jurors out of twelve, this Court held that a defendant being tried by a jury in a federal criminal case cannot waive the right to a unanimous verdict. *Id.* at 1340. Without reaching the constitutional implications of the question, this Court held that a defendant cannot waive the jury unanimity required by Federal Rule of Criminal Procedure 31(a). *Id.*

In *Ullah*, in addition to reiterating that the "text, history, and purposes of Rule 31(a) clearly demonstrate that a criminal defendant cannot waive the right of jury unanimity under any circumstances," this Court further held that a criminal defendant also cannot waive the *constitutional* right to a unanimous jury verdict. 976 F.2d at 513 & n. 5. In *Ullah*, the defendants had, through counsel, agreed to permit the alternatives to participate in deliberations and for the jury to return a verdict on the agreement of twelve of the jurors. *Id.* at 510-511, 513. The jury returned a guilty verdict when twelve of the fourteen jurors voted guilty. *Id.*at 511. Again, this Court reversed the convictions despite the defendants' agreement to the procedure. "The requirement that a jury in a federal prosecution determine, without dissent, that an individual is guilty of a criminal act before a defendant is punished for that crime benefits both the defendant and society as a whole." *Id.* at 513 (citation omitted). "The desire of a defendant to eliminate that requirement does not obviate its necessity." *Id.*

The right to a unanimous jury includes the right not to have a juror replaced because she disagrees with other jurors about the merits of the case. "[R]emoving a juror merely because she disagrees with her

fellow jurors on the proper outcome of the case would provide an obvious end run around the unanimous jury verdict guarantee." *Litwin*, 972 F.3d at 1169; *see also Symington*, 185 F.3d at 1085 ("To remove a juror because he is unpersuaded by the Government's case is to deny the defendant his right to a unanimous verdict.") (internal quotation marks and citation omitted). "When faced with a juror who refuses to agree with other jurors about the strength of the government's case, the court has two options: 'declare a mistrial or send the juror back to deliberate with instructions that the jury continue to attempt to reach agreement.'" *Litwin*, 972 F.3d at 1169 (quoting *United States v. Symington*, 195 F.3d at 1085-86). Replacing the juror is not among those options. If it were, "the right to a unanimous verdict would be illusory." *Id.* (internal quotation marks and citation omitted).

### C. BJR's replacement violated Le's right to a unanimous verdict from an impartial jury.

The district court did not hold that trial counsel waived Le's right to a unanimous verdict. It held on the merits that it had properly dismissed BJR for good cause because of her severe mental health issues—even though BJR said those issues stemmed from pressure from the other jurors to reach a specific verdict. (1-LER-37–38).

Whether viewed as a failure to identify the correct legal rule, or a misapplication of that rule, the district court erred in replacing BJR. Given that she could not continue, the only constitutionally permissible option was for the court to declare a mistrial.

Although a court may dismiss a juror for good cause after the jury begins deliberating, Fed. R. Crim. P. 23(b)(3), the court must not dismiss a juror "if the record evidence discloses a reasonable possibility that the impetus for a juror's dismissal stems from the juror's views on the merits of the case." *Litwin*, 972 F.3d at 1170 (cleaned up). Even if there are "strong counter-narratives indicating that the impetus for the jurors' dismissals stemmed from reasons other than the jurors' views on the merits," dismissal is improper if there is a "reasonable possibility that the dismissals instead stemmed from the jurors' views on the strength of the government's case." *Id.* (citing *Symington*, 195 F.3d at 1083; *United States v. Thomas*, 116 F.3d 606, 611, 614-17 (2d Cir. 1997); *United States v. Brown*, 823 F.2d 591, 594-95 (D.C. Cir. 1987)). Stated the other way, this means that dismissal is permissible only if "the available evidence [is] sufficient to leave one firmly convinced that the

impetus for a juror's dismissal is unrelated to his or her position on the merits." *Litwin,* 972 F.3d at 1170 (cleaned up).

At the time of BJR's dismissal, the available evidence could not have left anyone firmly convinced that the impetus for her dismissal was unrelated to her position on the merits. As detailed above, from the start, the jury foreperson did not merely express concerns about BJR's mental health; rather, she explained that the jury wished to excuse BJR and continue deliberating without her. (3-LER-294). When asked directly, BJR agreed that the worsening of her mental health was "based on pressure from other jurors to reach a specific verdict." (2-LER-228). The jury foreperson's final note revealed that her problem was not with BJR's mental health but with BJR's "vote," which the foreperson suggested might not represent the result of complete and comprehensive deliberation. (3-LER-296). In light of this record, there is more than a "reasonable possibility" that the impetus for BJR's removal came from her views on the case.

The district court's contrary conclusion may be characterized either as a failure to identify the correct legal rule or a misapplication of that rule to the facts, but either way, it was wrong. The district court

recognized that Le's argument relied on *Symington* and *Litwin*, which hold that juror dismissal is inappropriate unless unrelated to her position on the merits of the case. (1-LER-37). But the court chose to rely instead on *Perez v. Marshall*, 119 F.3d 1422 (9th Cir. 1997), and *United States v. Leahy*, 82 F.3d 624, 629 (5th Cir. 1996), opining that *these* cases hold that a court "may dismiss holdout jurors if there are distinct, independent grounds for dismissal." (*Id.*).

Neither of the cases the district court relied upon sets forth the correct legal rule. *Leahy* is a Fifth Circuit case. Unlike this Court, the Fifth Circuit holds that "[e]vidence that a juror was holding out … does not alter the trial court's discretion in removing the juror." 82 F.3d at 629 n. 4. In contrast to this Court's rule that dismissal is proper only if the available evidence is "sufficient to leave one firmly convinced that the impetus for a juror's dismissal is *unrelated* to her position on the merits," *Symington*, 195 F.3d at 1087 n. 5 (emphasis added), the Fifth Circuit holds that dismissal is proper so long as the juror was not removed "without factual support" or "for a legally irrelevant reason." *Id.* at 629.

As for *Perez v. Marshall*, that case arose on federal habeas review of a California conviction. 119 F.3d at 1426. Recognizing the difference between habeas and direct review, this Court held in *Symington* that *Perez* did not provide the law for direct federal review. *Symington*, 195 F.3d at 1086 n. 3. Indeed, in *Johnson v. Williams*, 568 U.S. 289, 304 (2013), the United States Supreme Court noted that because the California Supreme Court had expressly declined to follow *Symington*, *Symington* could not provide the law on habeas review of California convictions. By relying on *Leahy* and *Perez*, the district court abused its discretion by failing to identify the correct legal standard. *Hinkson*, 585 F.3d at 1262; *see also United States v. Ruiz*, 257 F.3d 1030, 1033 (9th Cir. 2001) (en banc) ("Application of wrong legal standard constitutes an abuse of discretion").

Even if the standards in *Perez* and *Leahy* could somehow be reconciled with *Symington* and *Litwin*, the district court erred in its application of the law to the facts. The district court held that BJR's mental health issues were a "distinct, independent" ground for dismissal. (1-LER-37). But BJR said that her mental health issues were *based on* pressure from other jurors to reach a specific verdict. They can

hardly, then, be described as either independent or distinct. Applying the correct legal standard, "the district court could not have been 'firmly convinced' that the impetus for [BJR's] dismissal was unrelated to her position on the merits of the case." *Symington*, 195 F.3d at 1088 n. 7.

### D. The district court erred in disregarding BJR's post-verdict statements, which unequivocally establish that the impetus for her removal was her position on the merits of the case.

If there were any doubt that the impetus for BJR's dismissal stemmed from her position on the merits of the case, they are eliminated by BJR's post-verdict explanation that she was the hold-out for acquittal, that the jury foreperson refused to declare a deadlock, and that this was the impetus for her removal. The district court refused to consider these statements, holding that they violated Federal Rule of Evidence 606(b). (1-LER-33). But Rule 606(b) does not apply to this scenario.

Rule 606(b) of the Federal Rules of Evidence provides:

> **(b) During an Inquiry Into the Validity of a Verdict or Indictment.**
>
> **(1) Prohibited Testimony or Other Evidence.** During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred

> during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.
>
> **(2) Exceptions.** A juror may testify about whether:
>
> **(A)** extraneous prejudicial information was improperly brought to the jury's attention;
>
> **(B)** an outside influence was improperly brought to bear on any juror;
>
> **(C)** a mistake was made in entering the verdict on the verdict form.

Fed. Rules Evid. 606(b).

By its terms, Rule 606(b) does not apply to BJR's statement: BJR was not a "juror" covered by the rule, and her statements were not about "deliberations" that led to a "verdict." Rule 606(b) is the federal codification of the common-law no-impeachment rule. *Pena-Rodriguez v. Colorado*, 580 U.S. 206, 217 (2017). This rule "evolved to give substantial protection to verdict finality and to assure jurors that, once their verdict has been entered, it will not later be called into question based on the comments or conclusions they expressed during deliberations." *Id.* at 211. As codified, the rule prohibits jurors from

impeaching their own verdict by testifying about anything that occurred during the deliberations that led to that verdict, with the exceptions of extraneous prejudicial information, outside influences, or (as added in 2006) clerical mistakes on the verdict form. Fed. Rules Evid. 606(b).

BJR was not a juror covered by the rule because she was not on the jury that delivered a verdict. Obviously, Rule 606(b) does not cover *any* individual who has ever served on *any* jury. If an alternate juror was excused before deliberations, but then saw the deliberating jurors intoxicated at a club, that individual's testimony would not be prohibited by the rule. *Tanner v. United States*, 483 U.S. 107, 127 (1987) (court may consider records of club where jurors dined and testimony of marshal who accompanied jurors to determine whether they were intoxicated during deliberations). Having been excused prior to a verdict in the case being reached, she was no longer a juror to which the rule applies.

More to the point, her statements were not about the deliberations that led to a verdict, much less the verdict being challenged—but rather were about failed deliberations that reached no verdict at all. The reconstituted jury was instructed that they "must start [their]

deliberations anew … [and] should disregard entirely any deliberations taking place before the alternate was substituted and consider freshly the evidence as if the previous deliberations had never occurred." (2-LER-265). The non-impeachment rule prohibits "verdicts solemnly made and publicly returned into court" from being "attacked and set aside on the testimony of those who took part in their publication." *McDonald v. Pless*, 238 U.S. 264, 268 (1915). But BJR did not solemnly make and publicly return any verdict. Once she was dismissed, she was no longer privy to the deliberations that led to the jury's verdict. Thus, her statements about failed deliberations are not covered by Rule 606(b). The district court erred in failing to consider this evidence.

## III. This Court must reverse because the reconstituted jury did not begin its deliberations anew and, alternatively, because alternate juror LL was exposed to extrinsic evidence of the prior jury's timeline.

### A. Standard of Review

These issues were first raised in the new trial motion. As described above, this Court employs a two-part abuse of discretion test in reviewing the denial of a new trial motion. *Hinkson*, 585 F.3d at 1261. Where, as here, constitutional issues are at play, de novo review is appropriate. *Id.* at 1260. To the extent that the district court's error

in denying a new trial was based on an error in interpreting Federal Rule of Evidence 606(b), this Court reviews de novo the construction or interpretation of the Federal Rules of Evidence. *Wells*, 879 F.3d at 914.

Where jurors are exposed to extrinsic evidence, this Court engages in an independent view of the entire record. *United States v. Prime,* 431 F.3d 1147, 1157 (9th Cir. 2005). "A defendant is entitled to a new trial when the jury obtains or uses evidence that has not been introduced during trial if there is a reasonable possibility that the extrinsic material *could* have affected the verdict." *Id.* (internal quotation marks and citation omitted). The prosecution has the burden to prove beyond a reasonable doubt that extrinsic evidence did not contribute to the verdict. *Id.* at 1157 (citing *United States v. Vasquez*, 597 F.2d 192, 193 (9th Cir. 1979)).

### B. The reconstituted juror's failure to begin deliberations anew violated Le's Fifth and Sixth Amendments rights.

Regardless of the reason for a juror's replacement during deliberations, after joined by an alternate, the reconstituted jury must begin deliberations anew. Here, the earlier jury deliberated for over three days before the events that led to BJR's replacement began. After LL joined the jury, the reconstituted jury deliberated for less than six

hours before returning guilty verdicts on all counts. The jury's failure to begin deliberations anew violated Le's Fifth and Sixth Amendment rights to procedural due process and a unanimous verdict of an impartial jury.

"The central difficulty with substitution, whether viewed only as a practical problem or a question of constitutional dimensions (procedural due process under the Fifth Amendment or jury trial under the Sixth Amendment), is that there does not appear to be any way to nullify the impact of what has occurred without the participation of the new juror." *See* Fed. R. Crim. P. 23(b), advisory committee notes, 1983 amendments, 97 F.R.D. 245, 301 (1983). That is why, until 1999, Rule 24 required alternates to be discharged once deliberations had begun. Fed. R. Crim. P. 24, advisory committee notes, 1999 Amendments.

Prior to 1999, repeated proposals to permit the substitution of alternate jurors after deliberations had begun were rejected. A preliminary draft of the rule submitted by the original Advisory Committee on Criminal Rules to the Supreme Court permitted substitution of alternate jurors after deliberations began. Orfield, Trial Jurors in Federal Criminal Cases, 29 F.R.D. 43, 45-47 (1962). The

proposal was withdrawn after the Supreme Court inquired, "Has the Committee satisfied itself that it is desirable or constitutional that an alternate juror may be substituted after the jury has retired and begun its deliberation?" *Id.* at 46. The final form of the rule on alternate jurors did not permit alternates to be substituted during deliberations. *Id.* at 50. In 1983, post-deliberation substitution was again considered and rejected. *See* Fed. R. Crim. P. 23(b), advisory committee notes, 1983 amendments, 97 F.R.D. 245, 298-301 (1983) (explaining that, "[i]n rejecting the substitution-of-juror alternative, the Committee's judgment is in accord with that of most commentators and many courts" and collecting sources).

This Court has recognized that the "inherent coercive effect upon an alternate juror who joins a jury that has, as in this case, already agreed that the accused is guilty is substantial." *United States v. Lamb*, 529 F.3d 1153, 1156 (9th Cir. 1975) (en banc). This coercive effect is why Rule 24(c) mandates that, when a juror is replaced during deliberations, the Court must instruct the jury to begin deliberations anew. Fed. R. Crim. P. 24(c). Failure to instruct the jury to begin

deliberations anew is reversible error. *United States v. Gomez*, 219 F. App'x 703, 704 (9th Cir. 2007).

The district court here did instruct the reconstituted jury to begin deliberations anew. (2-LER-265–266). But, although we generally presume that juries follow a court's instruction, "it has been widely recognized that jurors may not be able to set aside their conclusions and that an alternate may be intimidated, choosing to go along with other jurors' views rather than exercise independent judgment." *United States v. Brown*, 784 F.3d 1301, 1306 (9th Cir. 2015). Here, the jury deliberated for more than three days before BJR was replaced. The reconstituted jury deliberated for less than six hours before returning guilty verdicts on all counts. (1-LER-28). The timing of the verdict alone shows that the jury did not begin deliberations anew.

In *Lamb*, this Court reversed where an alternate was seated after deliberations had begun. 529 F.2d at 1156. Although the reversal there was based on the plain violation of Rule 24(c), which at that time did not permit an alternate to be seated after deliberations had begun, this Court noted that the short time the reconstituted jury required to reach a verdict showed that the jury did not begin deliberations anew:

> The impermissible coercion upon the alternative juror in this case was manifestly inherent, and that there was not the conscientious, careful reconsideration by the twelve of the newly constituted jury would seem apparent from the fact that, despite the district judges' instruction to the jury to "begin at the beginning," a jury that had required almost four hours to reach its initial verdict needed, after being reconstituted, only twenty-nine minutes to find the appellant guilty a second time.

*Id.*. Likewise, here, the reconstituted jury's failure to begin at the beginning is evidenced from its rapid return of the verdict.

That the reconstituted jury did not begin deliberating anew is further confirmed by LL's post-verdict statements, in which he explained that when he joined the other jurors, their notes remained on a whiteboard, including a timeline. (3-LER-351). The other jurors explained that the timing refuted Le's testimony. (3-LER-351).

The district court refused to consider LL's statements, holding that they, like BJR's statements, were inadmissible under Rule 606(b). (1-LER-34). LL's statement were not inadmissible under Rule 606(b). Rule 606(b) provides an exception where "an outside influence was improperly brought to bear on any juror." Fed. Rules Evid. 606(b)(2). LL was not a juror until he replaced BJR; the earlier jury's evidentiary

timeline left on the whiteboard was "an outside influence [that] was improperly brought to bear on" him as a juror.

In *United States v. Olano*, the Supreme Court recognized the participation of alternates in jury deliberation as an "outside intrusion," but declined to decide whether testimony about alternate participation would violate Rule 606(b). 507 U.S. 725, 738, 739-40 (1993). Lower courts, however, have taken testimony about the participation of alternates—recognizing that, until they are jurors, alternates are outside the jury's deliberation process and their participation is therefore an outside influence improperly brought to bear on any juror. *See United States v. Aguilar*, 743 F.3d 1144, 1150 (8th Cir. 2014) (collecting cases).

Although the scenario is reversed here, the principle is the same. The timeline created during the prior jury's deliberations was an outside influence improperly brought to bear on LL. Just as alternate jurors' presence in the jury room during deliberations are an "outside intrusion" on deliberating jurors, *Olano*, 507 U.S. at 738, the timeline on the whiteboard prepared during the earlier jury's deliberation was an outside influence on LL once LL joined the jury. As such, LL's

statements concerned an outside influence that was improperly brought to bear on LL and thus were not prohibited by Rule 606(b).

LL's statements show that the reconstituted jury did not in fact begin its deliberations anew. Instead, they picked up where they had left off when BJR refused to change her vote to guilty. That is why they were able to return their verdict after less than a day of deliberation.

### C. Reversal is required because there is a reasonable possibility that juror LL's exposure to the prior jury's timeline could have affected the verdict.

Finally, in addition to showing that the reconstituted jury did not begin deliberations anew, LL's exposure to the prior jury's timeline also constituted exposure to extrinsic material. Because there is a reasonable possibility that the extrinsic material could have affected the verdict, reversal is required for this reason as well. *Prime,* 431 F.3d at 1157.

This Court has long held that pedagogical devices that purport to summarize the evidence should not be admitted into evidence or otherwise be used by the jury during deliberations. *United States v. Wood*, 943 F.2d 1048, 1053-54 (9th Cir. 1991); *United States v. Soulard*, 730 F.2d 1292, 1300 (9th Cir. 1984); *United States v. Abbas*, 504 F.2d

123, 125 (9th Cir. 1974). This is because these sorts of devices "'act as a speaking, continuous witness throughout the jury's deliberation of certain specific, isolated—albeit significant—testimony to the exclusion of the totality of the evidence taken at the trial which must be viewed in its entirety.'" *Abbas*, 504 F.3d at 125 (quoting *Lloyd v. United States*, 226 F.2d 9, 17 (5th Cir. 1955)).

Here, the prior jury's timeline played such a role of a speaking, continuous, unsworn, unconfronted witness. Worse, we do not even know whether it was fairly representative of the evidence that was admitted at trial. That juror LL thought to mention it establishes a reasonable possibility that his consideration of the timeline affected the verdict. Indeed, that the jury was focused on the timeline—as opposed to Le's many and varied statements—is itself significant. The government cannot bear its burden of proving beyond a reasonable doubt that LL's consideration of the timeline did not affect the verdict. *Prime*, 431 F.3d at 1157. Therefore, reversal is required. *Id.*

## Conclusion

For the reasons set forth in Appellants' Joint Brief, this Court should dismiss the convictions on Counts One through Three and remand for resentencing on the remaining counts. If the Court finds that federal jurisdiction is proper, for the foregoing reasons, it should reverse Counts One through Three and remand for a new trial.

DATED: July 11, 2024

Respectfully submitted,

*s/ Davina T. Chen*
DAVINA T. CHEN
Law Office of Davina T. Chen
1751 Colorado Blvd., No. 190
Los Angeles, California 90041
(213) 446-8791
Davina@DavinaChen.com

*s/ Craig Wilke*
CRAIG WILKE
Law Office of Craig Wilke
305 N Harbor Blvd., Ste. 216
Fullerton, California 92832
(714) 870 2278
Craig@CraigWilkeLaw.com

*Attorneys for Defendant-Appellant Hoang Xuan Le*

## Certificate of Word Count

This brief contains 12,777 words, excluding the items exempted by Fed. R. App. P. 32(f). The brief's size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

When cumulated with the joint brief and Ms. Ritze's individual opening brief in this consolidated matter, the words in this brief exceed the word-limit specified by the Court. The undersigned has filed a motion to exceed word limit.

DATED: July 11, 2024

*s/ Davina T. Chen*
DAVINA T. CHEN