Nos. 23-1814, 23-748

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

*v.*

HOANG XUAN LE AND SHEILA MARIE RITZE,
*Defendant-Appellants*.

*APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA*
*DISTRICT COURT NO. CR 8:20-00002(B)-DOC*

# GOVERNMENT'S CONSOLIDATED ANSWERING BRIEF

BILAL A. ESSAYLI
Acting United States Attorney

CHRISTINA T. SHAY
Assistant United States Attorney
Chief, Criminal Division

GREGORY S. SCALLY
Assistant United States Attorney
Deputy Chief, Orange County Office

8000 United States Courthouse
411 West Fourth Street
Santa Ana, CA 92701
Telephone: (714) 338-3592
Email: gregory.scally@usdoj.gov

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

## TABLE OF CONTENTS

**PAGE**


I. INTRODUCTION ..... 1

II. ISSUES PRESENTED ..... 2

A. Joint Issue ..... 2

B. Issues Presented Only by Le ..... 2

C. Issues Presented Only by Ritze ..... 3

III. STATEMENT OF THE CASE ..... 4

A. Jurisdiction, Timeliness, and Bail Status ..... 4

B. Statement of Facts and Procedural History ..... 5

1. The offense ..... 5

a. Ritze befriends Le, and both show a propensity toward violence ..... 5

b. Dao's murder is planned ..... 8

c. Dao's body is discovered floating in the Pacific Ocean. ..... 11

d. Ritze and Le's post-murder conduct confirms their culpability. ..... 14

i. Le's statements and actions ..... 14

ii. Le and Ritze's tracking of Nguyen, Dao's partner ..... 15

iii. Ritze and Le's continued relationship ..... 17

## TABLE OF CONTENTS (continued)

PAGE


e. Le and Ritze are arrested, and police interview Ritze. .... 18

2. Charges and denial of joint motion to dismiss for lack of jurisdiction .... 25

3. Le's trial and post-trial proceedings .... 28

a. Le's testimony .... 28

b. Closing arguments .... 29

c. Jury deliberations and dismissal of juror undergoing mental-health crisis .... 32

d. Post-trial motion .... 36

4. Ritze's pretrial, trial, and post-trial proceedings .... 38

a. Ritze's motion to exclude her statements to coworkers .... 38

b. Ritze's motion to suppress statements to police .... 39

c. Trial and replaying of exhibit for jury in open court .... 41

d. Convictions and post-trial motions .... 43

e. Sentencing .... 44

IV. SUMMARY OF ARGUMENT .... 45

V. ARGUMENT .... 49

## TABLE OF CONTENTS (continued)

**PAGE**

A. The District Court Had Jurisdiction Over Defendants' Murder Offense and Correctly Instructed the Jury on Jurisdiction ........ 49

1. Standard of review ........ 49

2. In AEDPA, Congress conferred federal criminal jurisdiction over the 12-mile band along the coast ..... 49

a. AEDPA's plain language establishes jurisdiction. ........ 49

b. Congress's declaration is consistent with 18 U.S.C. § 7(1) ........ 55

c. Congress's declaration does not lose its effectiveness based on where it appears in the United States Code ........ 60

d. Congress's statement does not raise constitutional questions ........ 62

i. Congress's declaration is consistent with its power to define and punish felonies on the "high seas." ........ 63

ii. Congress can confer jurisdiction under its power to define crimes in admiralty. ........ 69

3. The district court also had jurisdiction because the "high seas" begin at the lower-water mark for purposes of federal criminal jurisdiction ........ 73

i. The "high seas" begins at the low-water mark for purposes of federal criminal jurisdiction ........ 73

## TABLE OF CONTENTS (continued)

PAGE

ii. The SLA did not preclude concurrent jurisdiction ........ 75

B. The Government's Unobjected-To Statements During Rebuttal During Le's Case Were Not Plainly Erroneous ..... 77

1. Standard of review ........ 77

2. The government's statement of the law was correct ........ 77

3. Any error did not affect Le's substantial rights or the fairness of the proceedings ........ 83

C. Le Waived the Right to Challenge Dismissal of the Juror Undergoing a Mental-Health Crisis, and Dismissal Was Proper Anyway ........ 87

1. Standard of review ........ 87

2. Le waived any challenge to the dismissal of the juror ........ 88

3. The district court applied the correct legal standard ........ 93

4. Juror 2 was dismissed because of her mental health condition, not because of her views of the evidence, which were unknown to all parties ........ 96

5. The district court properly rejected Juror 2's post-verdict statements under Federal Rule of Evidence 606(b) ........ 100

## TABLE OF CONTENTS (continued)

PAGE

D. There Is No Evidence that Le's Jury Failed to Begin Its Deliberations Anew, and the Alternate Was Not Exposed to Extrinsic Evidence .......... 105

1. Standard of review .......... 105

2. The district court was correct to reject the affidavits regarding post-trial statements of jurors about deliberations .......... 106

3. The jury was not exposed to extrinsic evidence .......... 109

E. Ritze's Post-Arrest Statements Were Properly Admitted During Her Trial .......... 110

1. Standard of review .......... 110

2. Ritze voluntarily, knowingly, and intelligently waived her *Miranda* rights .......... 111

a. Ritze was advised of and waived her *Miranda* rights .......... 112

b. Any intoxication or other circumstances did not undermine the validity of her *Miranda* waiver .......... 114

c. No *Miranda* re-advisement was necessary before the second interview .......... 116

3. Ritze's statements were voluntary .......... 118

a. All enumerated factors support the voluntariness of her statements .......... 120

b. Nothing about the agents' tactics rendered Ritze's statements involuntary .......... 121

## TABLE OF CONTENTS (continued)

**PAGE**


c. Any intoxication did not render her statements involuntary ..... 126

4. Any error in the admission of the statements was harmless, at least with respect to the murder conviction ..... 127

F. Ritze's Statements to Her Co-Workers Were Properly Admitted ..... 129

1. Standard of review ..... 129

2. The recording was direct evidence of the crime charged ..... 129

3. Even if subject to Rule 404, the recording proved knowledge, intent, and lack of accident or mistake in Dao's murder ..... 132

4. The workplace recording was relevant and probative ..... 132

5. Any error in the workplace recording's admission under Rule was harmless ..... 134

G. The Court Properly Denied Ritze's Request to Exclude a Victim of the Crime from the Courtroom During a Proceeding in Open Court ..... 134

1. Standard of review ..... 134

2. Ritze tried to exclude the victim's mother from an open court proceeding, not jury deliberation ..... 135

3. The victim's mother had a statutory right to be present at all open court proceedings ..... 137

## TABLE OF CONTENTS (continued)

**PAGE**


4. In any event, there was no prejudice ........................ 138

H. The District Court Properly Denied Defendant's Motion for Judgment of Acquittal Because the Evidence Was Sufficient to Prove Defendant Committed Second Degree Murder ........................ 141

1. Standard of review ........................ 141

2. Applicable law ........................ 141

3. The evidence amply supported the jury's conclusion that Ritze acted with the intent necessary to commit Second Degree Murder ........................ 142

I. The District Court Properly Denied Defendant's Motion for a New Trial ........................ 146

1. Standard of review ........................ 146

2. The defense request to hold a new trial so Ritze can make different tactical decisions at trial was properly denied ........................ 147

J. There Were No Errors at Sentencing and, In Any Event, the Sentence Was Substantively Reasonable ........................ 148

1. Standard of review ........................ 148

2. The district court properly rejected Ritze's request to apply a minor role adjustment at sentencing ........................ 149

3. Ritze's sentence was substantively reasonable ........................ 153

VI. CONCLUSION ........................ 157

# TABLE OF AUTHORITIES

**DESCRIPTION** **PAGE(S)**

## Federal Cases

*Alaska v. United States*,
545 U.S. 75 (2005) ........ 76

*Alberty v. United States*,
162 U.S. 499 (1896) ........ 82

*American Banana Co. v. United Fruit Co.*,
213 U.S. 347 (1909) ........ 67

*Ashcroft v. Tennessee*,
322 U.S. 143 (1944) ........ 121

*Barber v. State of Hawaii*,
42 F.3d 1185 (9th Cir. 1994) ........ 76

*Brandon v. United States*,
190 F.2d 175 (9th Cir. 1951) ........ 148

*Brown v. Horrell*,
644 F.3d 969 (9th Cir. 2011) ........ 122

*Brown v. United States*,
256 U.S. 335 (1921) ........ 82

*Carson v. U.S. Office of Special Counsel*,
633 F.3d 487 (6th Cir. 2011) ........ 61

*Colorado v. Connelly*,
479 U.S. 157 (1986) ........ 111, 118, 120

*Conn. Nat'l Bank v. Germain*,
503 U.S. 249 (1992) ........ 50

*Conyers v. Merit Sys. Protection Bd.*,
388 F.3d 1380 (Fed. Cir. 2004) ........ 61

## TABLE OF AUTHORITIES (continued)

**DESCRIPTION** **PAGE(S)**

*Cunard S.S. Co. v. Mellon*,
262 U.S. 100 (1923) ........ 67

*Deck v. Jenkins*,
814 F.3d 954 (9th Cir. 2016) ........ 86, 87

*DeLovio v. Boit*,
7 F.Cas. 418 (1815) ........ 70, 73

*Erlinger v. United States*,
602 U.S. 821 (2024) ........ 92

*The Genesee Chief*,
53 U.S. 443 (1851) ........ 54, 58, 73

*Gov't. of the V.I. v. Gereau*,
523 F.2d 140 (3d Cir. 1975) ........ 103

*Guam v. Dela Pena*,
72 F.3d 767 (9th Cir. 1995) ........ 116

*The Hamilton*,
207 U.S. 398 (1907) ........ 67

*Haynes v. Washington*,
373 U.S. 503 (1963) ........ 121

*Hoopengarner v. United States*,
270 F.2d 465 (6th Cir. 1959) ........ 57, 64

*In re Pangang Group Company, LTD.*,
901 F.3d 1046 (9th Cir. 2018) ........ 50

*Jackson v. Virginia*,
443 U.S. 307 (1979) ........ 141

*Johnson v. United States*,
318 U.S. 189 (1943) ........ 87, 88

## TABLE OF AUTHORITIES (continued)

**DESCRIPTION** **PAGE(S)**

*Johnson v. United States*,
520 U.S. 461 (1997) ........ 87

*Lego v. Twomey*,
404 U.S. 477 (1972) ........ 118

*Makarewicz v. Scafati*,
438 F.2d 474 (1st Cir. 1971) ........ 124

*Medeiros v. Shimoda*,
889 F.2d 819 (9th Cir. 1989) ........ 126

*Miller v. United States*,
88 F.2d 102 (9th Cir. 1937) ........ 58, 66, 70

*Murray v. Hildreth*,
61 F.2d 483 (5th Cir. 1932) ........ 56, 64, 69, 74

*Ortiz-Sandoval v. Gomez*,
81 F.3d 891 (9th Cir. 1996) ........ 129, 134

*Pena-Rodriguez v. Colorado*,
580 U.S. 206 (2017) ........ 139

*Perez v. Marshall*,
119 F.3d 1422 (9th Cir 1997) ........ 94, 95

*Ramos v. Louisiana*,
590 U.S. 83 (2020) ........ 92

*Rodriguez v. McDonald*,
872 F.3d 908 (9th Cir. 2017) ........ 111

*Ross v. McIntyre*,
140 U.S. 453 (1891) ........ 63, 64, 74

*Rowland v. Cal. Men's Colony*,
506 U.S. 194 (1993) ........ 53

## TABLE OF AUTHORITIES (continued)

**DESCRIPTION** **PAGE(S)**

*Schwier v. Cox*,
340 F.3d 1284 (11th Cir. 2003) .......... 61

*The Scotland*,
105 U.S. 24 (1881) .......... 66, 67

*Smith v. United States*,
423 U.S. 1303 (1975) .......... 52

*Springs v. Stone*,
362 F. Supp. 2d 686 (E.D. Va. 2005) .......... 61

*Tanner v. United States*,
483 U.S. 107 (1987) .......... 101, 102, 104, 108

*Thompson v. United States*,
608 F. App'x 726 (11th Cir. 2015) .......... 60, 64, 69, 74

*United States v. Abbas*,
504 F.2d 123 (9th Cir. 1974) .......... 109

*United States v. Aguilar*,
743 F.3d 1144 (9th Cir. 2014) .......... 108

*United States v. Alarcon-Simi*,
300 F.3d 1172 (9th Cir. 2002) .......... 92

*United States v. Alston*,
974 F.2d 1206 (9th Cir. 1992) .......... 146

*United States v. Alvarez-Valenzuela*,
231 F.3d 1198 (9th Cir. 2000) .......... 142

*United States v. Amaya-Ruiz*,
121 F.3d 486 (9th Cir. 1997) .......... 124

*United States v. Andaverde*,
64 F.3d 1305 (9th Cir. 1995) .......... 117

## TABLE OF AUTHORITIES (continued)

**DESCRIPTION** **PAGE(S)**

*United States v. Berberian*,
851 F.2d 236 (9th Cir. 1988) .... 89

*United States v. Bevans*,
16 U.S. 336 (1818) .... 66, 70, 71, 72

*United States v. Bollinger*,
837 F.2d 436 (11th Cir. 1988) .... 90

*United States v. Briggs*,
291 F.3d 958 (7th Cir. 2002) .... 103

*United States v. Brito*,
136 F.3d 397 (5th Cir. 1998) .... 103

*United States v. Britt*,
79 F.4th 1280 (10th Cir. 2023) .... 82

*United States v. Brown*,
934 F.3d 1278 (11th Cir. 2019) .... 105

*United States v. Busic*,
549 F.2d 252 (2d Cir. 1977) .... 54

*United States v. Butler*,
249 F.3d 1094 (9th Cir. 2001) .... 110

*United States v. California*,
436 U.S. 32 (1947) .... 76

*United States v. Chadwell*,
793 F.3d 910 (9th Cir. 2015) .... 137

*United States v. Christensen*,
828 F.3d 763 (9th Cir. 2015) .... 94, 95

*United States v. Cortes*,
757 F.3d 850 (9th Cir. 2014) .... 49

## TABLE OF AUTHORITIES (continued)

**DESCRIPTION** **PAGE(S)**

*United States v. Crawford*,
66 F. Supp. 3d 1311 (D. Or. 2014) ........ 120

*United States v. Crews*,
502 F.3d 1120 (9th Cir. 2007) ........ 112

*United States v. Decoud*,
456 F.3d 996 (9th Cir. 2006) ........ 102, 104

*United States v. Del-Toro-Barboza*,
673 F.3d 1136 (9th Cir. 2012) ........ 147

*United States v. Depue*,
879 F.3d 1021 (9th Cir. 2018) ........ 87

*United States v. Depue*,
912 F.3d 1227 (9th Cir. 2019) ........ 88

*United States v. Dewey*,
188 U.S. 254 (1903) ........ 64

*United States v. Doe*,
170 F.3d 1162 (9th Cir. 1999) ........ 110

*United States v. Downen*,
496 F.2d 314 (10th Cir. 1974) ........ 134

*United States v. Durham*,
464 F.3d 976 (9th Cir. 2006) ........ 106

*United States v. Durkee*,
25 F.Cas. 941 (C.C.N.D.Cal. 1856) ........ 72

*United States v. Endicott*,
869 F.2d 452 (9th Cir. 1989) ........ 147

*United States v. Flores*,
289 U.S. 137 (1933) ........ 70, 73

## TABLE OF AUTHORITIES (continued)

**DESCRIPTION** **PAGE(S)**

*United States v. Frias-Cobos*,
349 F. App'x 171 (9th Cir. 2009) .......... 135

*United States v. Fuchs*,
218 F.3d 957 (9th Cir. 2000) .......... 87

*United States v. Gonzalez Becerra*,
784 F.3d 514 (9th Cir. 2015) .......... 83, 100

*United States v. Gootee*,
34 F.3d 475 (7th Cir. 1994) .......... 90

*United States v. Guerrero*,
803 F.2d 783 (3d Cir. 1986) .......... 134

*United States v. Guillen*,
995 F.3d 1095 (10th Cir. 2021) .......... 124

*United States v. Hall*,
691 F.2d 48 (1st Cir. 1982) .......... 54

*United States v. Haswood*,
350 F.3d 1024 (9th Cir. 2003) .......... 119, 120, 121

*United States v. Huntress*,
956 F.2d 1309 (5th Cir. 1992) .......... 95

*United States v. Jaycox*,
962 F.3d 1066 (9th Cir. 2020) .......... 149

*United States v. Johnson*,
495 F.3d 951 (8th Cir. 2007) .......... 105

*United States v. Jones*,
597 F.2d 485 (5th Cir. 1979) .......... 90

*United States v. Keiser*,
57 F.3d 847 (9th Cir. 1995) .......... 82

## TABLE OF AUTHORITIES (continued)

**DESCRIPTION** **PAGE(S)**

*United States v. Klensch*,
87 F.4th 1159 (9th Cir. 2023) .................................... 149, 150, 151, 152

*United States v. Kupau*,
781 F.2d 740 (9th Cir. 1986) ............................................................ 136

*United States v. Lague*,
971 F.3d 1032 (9th Cir. 2020) ............................................................ 129

*United States v. Lakhani*,
480 F.3d 171 (3d Cir. 2007) ............................................................ 103

*United States v. Leahy*,
82 F.3d 624 (5th Cir. 1996) ............................................................ 94, 95

*United States v. Lei Shi*,
525 F.3d 709 (9th Cir. 2008) ............................................................ 67, 68

*United States v. Leser*,
358 F.2d 313 (9th Cir. 1966) ............................................................ 91

*United States v. Leung*,
796 F.3d 1032 (9th Cir. 2015) .................................... 100, 102, 107, 108

*United States v. Litwin*,
972 F.3d 1155 (9th Cir. 2020) ........................................... 95, 97, 98, 99

*United States v. Loftis*,
843 F.3d 1173 (9th Cir. 2016) ............................................................ 130

*United States v. Lopez*,
581 F.2d 1338 (9th Cir. 1978) ............................................................ 91, 93

*United States v. Lucas*,
963 F.2d 243 (9th Cir. 1992) ............................................................ 141

*United States v. Marin*,
90 F.4th 1235 (9th Cir. 2024) ............................................................ 67

## TABLE OF AUTHORITIES (continued)

**DESCRIPTION** **PAGE(S)**

*United States v. Medina Casteneda*,
511 F.3d 1246 (9th Cir. 2008) ... 135

*United States v. Miller*,
721 F.3d 435 (7th Cir. 2013) ... 116

*United States v. Miller*,
984 F.2d 1028 (9th Cir. 1993) ... 118, 119, 126

*United States v. Moran-Garcia*,
966 F.3d 966 (9th Cir. 2020) ... 50

*United States v. Morsette*,
622 F.3d 1200 (9th Cir. 2010) ... 82

*United States v. Munoz*,
409 Fed. Appx. 117 (9th Cir. 2010) ... 148

*United States v. Murphy*,
483 F.3d 639 (9th Cir. 2007) ... 91

*United States v. Narvaez-Gomez*,
489 F.3d 970 (9th Cir. 2007) ... 110

*United States v. Navarro*,
608 F.3d 529 (9th Cir. 2010) ... 85

*United States v. Nevils*,
598 F.3d 1158 (9th Cir. 2010) ... 141

*United States v. Norton*,
867 F.2d 1354 (11th Cir. 1989) ... 103

*United States v. Olano*,
507 U.S. 725 (1993) ... 77, 87, 138

*United States v. Perez*,
116 F.3d 840 (9th Cir. 1997) ... 89

## TABLE OF AUTHORITIES (continued)

**DESCRIPTION** **PAGE(S)**

*United States v. Preston*,
751 F.3d 1008 (9th Cir. 2014)....................124

*United States v. Reed*,
575 F.3d 900 (9th Cir. 2009)....................142

*United States v. Richter*,
782 F.3d 498 (9th Cir. 2015)....................142

*United States v. Rising Sun*,
522 F.3d 989 (9th Cir. 2008)....................148, 156

*United States v. Rocha*,
598 F.3d 1144 (9th Cir. 2010)....................142

*United States v. Rodgers*,
150 U.S. 249 (1893)....................63, 64, 74

*United States v. Rodriguez-Preciado*,
399 F.3d 1118 (9th Cir. 2005)....................111, 116, 117

*United States v. Ron Pair Enterprises, Inc.*,
489 U.S. 235 (1989)....................51

*United States v. Ross*,
1 Gall. 624, 27 F.Cas. 899 (D.R.I. 1813)....................65, 74

*United States v. Rubies*,
612 F.2d 397 (9th Cir 1979)....................68

*United States v. Seagrist*,
27 F.Cas. 1002 (C.C.S.D.N.Y. 1860)....................65, 74

*United States v. Segna*,
555 F.2d 226 (9th Cir. 1977)....................77, 83, 85

*United States v. Smith*,
1 Mason 147, 27 F.Cas. 1166 (D. Mass. 1816)....................63, 65, 69, 74

## TABLE OF AUTHORITIES (continued)

**DESCRIPTION** **PAGE(S)**

*United States v. Soulard*,
730 F.2d 1292 (9th Cir. 1984) .......... 109

*United States v. Symington*,
195 F.3d 1080 (9th Cir. 1999) .......... passim

*United States v. Tallman*,
952 F.2d 164 (8th Cir. 1991) .......... 103

*United States v. Tingle*,
658 F.2d 1332 (9th Cir. 1981) .......... 122

*United States v. Trujillo*,
713 F.3d 1003 (9 Cir. 2013) .......... 153

*United States v. Ullah*,
976 F.2d 509 (9th Cir. 1992) .......... 93

*United States v. Upton*,
512 F.3d 394 (7th Cir. 2008) .......... 116

*United States v. Voris*,
964 F.3d 864 (9th Cir. 2020) .......... 105

*United States v. Welden*,
377 U.S. 95 (1964) .......... 61

*United States v. Wells*,
879 F.3d 900 (9th Cir. 2018) .......... 105, 106

*United States v. Williams*,
659 F.3d 1223 (9th Cir. 2011) .......... 51, 52

*United States v. Wiltberger*,
18 U.S. 76 (1820) .......... 63, 72, 74

*United States v. Wolf*,
813 F.2d 970 (9th Cir. 1987) .......... 124

## TABLE OF AUTHORITIES (continued)

**DESCRIPTION** **PAGE(S)**

*United States v. Wood*,
943 F.2d 1048 (9th Cir. 1991) .......... 109

*United States v. Zavala-Mendez*,
411 F.3d 1116 (9th Cir. 2005) .......... 141

*United States v. Zenon-Encarnacion*,
185 F.Supp.2d 127 (D.P.R. 2001) .......... 59

*Warger v. Shauers*,
574 U.S. 40 (2014) .......... 100

*Waring v. Clarke*,
46 U.S. 441 (1847) .......... 63

*Wynne v. United States*,
217 U.S. 234 (1910) .......... 58, 59

**State Cases**

*People v. Belcher*,
11 Cal. 3d 91 (1974) .......... 52

*People v. Vega-Robles*,
9 Cal. App. 5th 382 (Cal. 2017) .......... 52

**Federal Statutes**

1 U.S.C. § 112 .......... 61

14 U.S.C. § 89(a) .......... 68

18 U.S.C. § 7 .......... passim

18 U.S.C. § 1001 .......... 25, 43

18 U.S.C. § 1111 .......... 25, 43

18 U.S.C. § 1117 .......... 25

## TABLE OF AUTHORITIES (continued)

**DESCRIPTION** **PAGE(S)**

18 U.S.C. § 2280 ... 67

18 U.S.C. § 3231 ... 4

18 U.S.C. § 3771 ... 137

28 U.S.C. § 1291 ... 4

43 U.S.C. § 1313 ... 75

43 U.S.C.A. § 1301 ... 75

**State Statutes**

Cal. Penal Code § 793 ... 52

Cal. Gov't Code § 170 ... 14

**Federal Rules**

Fed. R. App. P. 4(b)(1)(A)(i) ... 4

Fed. R. Crim. P. 29 ... 141

Fed. R. Crim. P. 33(a) ... 147

Fed. R. Evid. 403 ... 129, 134

Fed. R. Evid. 404 ... 38, 129, 132

Fed. R. Evid. 606 ... passim

**United States Sentencing Guidelines**

U.S.S.G. § 3B1.2 ... 149, 150, 151, 153

U.S.S.G. § 3C1.1 ... 155, 156

## TABLE OF AUTHORITIES (continued)

**DESCRIPTION** **PAGE(S)**

### Federal Regulations

33 C.F.R. § 2.20 ........ 74

33 C.F.R. § 2.32(a) ........ 73, 74

### Other

AEDPA § 901(a). ........ passim

U.S. Const., Art. I, § 8, Cl. 10. ........ 63

U.S. Const., Art. III, § 2, Cl. 1. ........ 70

Nos. 23-1814, 23-784

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

*v.*

HOANG XUAN LE AND SHEILA MARIE RITZE,
*Defendant-Appellants.*

*APPEAL FROM THE UNITED STATES DISTRICT COURT*
*FOR THE CENTRAL DISTRICT OF CALIFORNIA*
*DISTRICT COURT NO. CR 8:20-00002(B)-DOC*

**GOVERNMENT'S CONSOLIDATED**
**ANSWERING BRIEF**

## I

## INTRODUCTION

Defendants Wayne Le and Sheila Ritze took James Dao out on Ritze's boat in the Pacific Ocean, where they brutally beat, shot, and murdered him. Because the murder occurred within the special maritime and territorial jurisdiction of the United States, a federal grand jury indicted Le and Ritze. Each defendant was convicted.

On appeal, both defendants challenge the jurisdiction of the federal government to prosecute their crimes. Individually, they assert a host of other issues, not all of which were preserved at trial. But neither defendant has failed to establish reversible error, particularly in light of the centuries of case law supporting federal jurisdiction and the overwhelming evidence again them. This Court should affirm.

# II

# ISSUES PRESENTED

## A. Joint Issue

1. Was there federal maritime jurisdiction over defendants' crimes based either on the Antiterrorism and Effective Death Penalty Act or 18 U.S.C. § 7's definition of "high seas"?

## B. Issues Presented Only by Le

2. Has Le failed to establish plain error based on the government's statements during closing argument about Le's abandonment of Dao at sea?

3. Did Le waive his right to object to the dismissal of a particular juror? In the alternative, was the district court justified in

dismissing the juror due to her mental health crisis during deliberations?

4. Did Federal Rule of Criminal Procedure 606(b) bar consideration of post-trial affidavits containing juror statements as to what occurred during deliberations? In the alternative, has Le failed to establish that not considering them was reversible error?

## C. Issues Presented Only by Ritze

5. Did Ritze knowingly, voluntarily, and intelligently waive her *Miranda* rights before giving statements to law enforcement?

6. Were Ritze's statements to law enforcement voluntary?

7. Did the district court properly admit a recording of Ritze's statement of intent to kill people on her boat approximately 17 days before she killed Dao on her boat?

8. Did the district court properly deny Ritze's request to exclude the victim's mother from the courtroom during the playback of evidence in open court?

9. Was there sufficient evidence of Second Degree Murder?

10. Did the district court properly deny Ritze's motion for a new trial, which was based on her wish to make different tactical decisions about what evidence to present?

11. Did the district court act within its discretion by refusing to apply a minor-role reduction at sentencing?

12. Was Ritze's sentence substantively reasonable?

## III

## STATEMENT OF THE CASE

### A. Jurisdiction, Timeliness, and Bail Status

The district court's jurisdiction rested on 18 U.S.C. § 3231. This Court's jurisdiction rests on 28 U.S.C. § 1291. The district court entered judgment for Ritze on April 17, 2023. (JER-265.)[1] Ritze filed a timely notice of appeal three days later. (JER-272.) *See* Fed. R. App. P. 4(b)(1)(A)(i). The district court entered judgment for Le on August 7,

[1] "RitzeER" refers to Ritze's Excerpts of Record, "LER" refers to Le's Excerpts of Record, "JER" refers to the joint Excerpts of Record, and "SER" refers to the government's Supplemental Excerpts of Record. "Ritze AOB" refers to Ritze's Opening Brief, "Le AOB" refers to Le's Opening Brief, and "Joint AOB" refers to defendants' Joint Opening Brief.

2023. (JER-280.) Le filed a timely notice of appeal four days later. (JER-286.) Defendants are both in custody.

## B. Statement of Facts and Procedural History

On October 16, 2019, James Dao's dead body was found floating in the Pacific Ocean off the coast of California, seven miles from the shore, with bullet wounds and signs of blunt force trauma. (4-LER-579-612.) After investigation, defendants were charged with First Degree Murder and Conspiracy to Murder, as well as other offenses. (JER-103-30.) They were severed for trial. (3-LER-458.) Le was convicted at trial of First Degree Murder, Conspiracy to Murder, and his related firearms offense. (JER-280.) Ritze was convicted of Second Degree Murder and False Statements to Law Enforcement. (JER-265.) Those convictions were based on substantial trial evidence that explained how and why defendants murdered Dao.

### *1. The offense*

#### *a. Ritze befriends Le, and both show a propensity toward violence.*

At the time of the murder, Ritze worked at Team Property Management ("TPM"), a property management company of approximately eight people that worked with homeowners' associations

("HOAs"). (14-RitzeER-3498.) Ritze met Le and Khoa Cao, or "K.C.," through Cao's cousin, Cindy, who was an HOA customer of TPM. (14-RitzeER-3499.) During the summer of 2019, Ritze told her mother-in-law, Sandra Ritze ("Sandra") [2] about Le, whom she described as a drug dealer, and who she thought was among the greatest people in the world. (7-RitzeER-1755.)

Ritze bragged to others about her "new friends" who had "tons of drugs and lots of money" and were gangsters and dangerous people. (3-SER-625, 4-SER-839; 7-RitzeER-1709, 9-RitzeER-2167.) She told a friend that Le could "come over with an AK and blow anybody's head off" (9-RitzeER-2172); Le indeed owned an AR-15 type firearm. (10-RitzeER-2363, 2441-43, 1-SER-271.) She had good reason to make that claim. Le discussed his propensity for violence with Ritze, once texting her about a "drunk" whom he left with "swollen black eyes" and whose blood he had to clean off his walls. (9-RitzeER-2061-62, 3-SER-662.)

But Le was not alone in making threatening statements. Starting in July 2019, a few months before the murder, Ritze repeatedly talked

---

[2] Because Sandra Ritze shares a last name with defendant Ritze, this brief refers to her as "Sandra" for clarity.

about committing violence to her co-workers. She said things like, "I wanna kill somebody," and would talk about taking people out on her boat and "getting rid of them." (9-RitzeER-2290, 14-RitzeER-3498.) She talked about having friends, including Le, who would kill people for her. (9-RitzeER-2290.) Indeed, Ritze told her co-workers that she could "kick [their] ass" if she wanted to and that she was not a person to mess with. (4-SER-793; *see also* 4-SER-779 (threatening co-worker by saying "I'll fuck you up! I'll drag you out and fuck you up!").)

Despite Ritze's characterization on appeal, these statements were not taken lightly by her coworkers. (Ritze AOB 8, 45; 9-RitzeER2268; RitzeER-2292.) Everyone at her workplace was afraid of Ritze. (4-SER-808.) One co-worker brought a weapon to work to protect herself from Ritze. (9-RitzeER-2292.) A few weeks before the murder, an employee at TPM texted their boss about Ritze's threats, including statements about "killing people and taking out people" and about how "her friends have a list of who owes them money and who they are going to kill." (4-SER-828-36.) The employee said that she was not taking "this as a joke" but rather taking "every word she says seriously." (4-SER-830.) Ritze's behavior also scared her coworker Idania Amaya, who had

mentioned Ritze's behavior to her daughter. (4-SER-822.) On September 27, 2019, weeks before the murder, Amaya's daughter was at the TPM office and surreptitiously took a recording of Ritze's statements that were scaring TPM employees. (9-RitzeER-2100-01, 2262; 3-SER-702-03; Trial Ex. 309.) In the recording, Ritze discusses killing people on her boat and her "friends that will just go kill people in a heartbeat so they were like all on standby." (3-SER-702-03.)

#### *b. Dao's murder is planned.*

Le knew Dao, the murder victim, because they illegally dealt marijuana together. (9-LER-1956.) But over the course of their relationship, Dao incurred thousands of dollars in debt to Le. (9-LER-1841, 10-LER-2178-79).)

That debt resulted in friction between the two business partners. For example, weeks before the murder, Le and Dao had gotten into a serious physical fight, during which Le gave Dao a black eye but Dao prevailed by choking Le and ultimately let him go so he would not pass out or die from lack of air. (5-LER-0792-93, 0894.) Though they resumed a friendship after the fight, according to Natalie Nguyen, Dao's life partner, Le remained "agitated because [Dao] owed him money." (5-

LER-0793.) Neither Le nor Dao showed the other respect in the way they spoke to one another, which included swearing at each other. (5-LER-0952, 0961-62.)

Le had also separately complained to one of his drug runners, Shawn Whalin, about Dao's debt to him. Le told Whalin that Dao owed him money—Dao kept gambling and using Le's name to get drugs fronted to him—and as a result, Le was planning to kill Dao. (8-LER-1589-90, 1592.)

Le also had reason to believe that killing Dao would allow him to recover his money. Dao would tell people who lent him money, including Le, that his debts were secure because he had a life insurance policy. (5-LER-0753-54.) Dao would say that if something happened to him, his partner, Nguyen, would make sure the person lending Dao money would get paid from the proceeds of the life insurance policy. (5-LER-0911-12.) Indeed, prior to the fatal boat trip, Le told Whalin he would get money from Nguyen through an insurance policy. (8-LER-1583.) Le also made plans to ensure that he got his share of the life-insurance proceeds. A few weeks prior to the boat trip, Le ordered a GPS tracking device to keep track of Nguyen, and he asked Nguyen on

the day of the murder if Dao's insurance policy was up to date. (5-LER-0752, 0924-27, 0957-58; 9-LER-1833-34; 4-SER-915.)

The plan to murder Dao was set by the time Ritze, Le, Dao, and Whalin went to Las Vegas together on October 4, 2019, about ten days before the murder. (10-RitzeER-2357-58; 7-RitzeER-1611.) There, they met up with Sandra Ritze, Ritze's mother-in-law, who had invited Ritze to a Billy Idol concert there in the hopes of reconnecting with her after their relationship had become strained due to Ritze's heavy drinking. (7-RitzeER-1755-57, 8-RitzeER-1910-13.)

Sandra had not previously met Le, Dao, or Whalin. (8-RitzeER-1912.) Ritze introduced Le as "Wayne" and Shawn as "Robert" (his middle name) but mumbled the name of Dao. (8-RitzeER-1914-15.) Sandra followed up with Ritze about the name of the third man she was with, saying to Ritze, "Sheila, I heard you say Wayne, I heard you say Robert, but I didn't get the other guy's name." (8-RitzeER-1915.) Ritze responded, "Well, I don't want you to look at him. I don't want you to talk to him. We will be offing him this weekend." (8-RitzeER-1915.)

After the Billy Idol concert, Sandra, Ritze, Le, and Whalin were in the hotel room together. (8-RitzeER-1921.) In Ritze's presence, with

Ritze "cheering 'em on" (8-RitzeER-1923), Le told Sandra that he was going to "off" Dao (6-LER-1133-34). He explained that he was a hitman, that Dao owed him money, and that if he killed Dao, Le would get satisfaction. (6-LER-1134; 8-RitzeER-1921-25.) Ritze talked about how she and Le could go out lobster hunting at nighttime and use her boat to commit the shooting. (6-LER-1135-37; 8-RitzeER-1924.)

#### *c. Dao's body is discovered floating in the Pacific Ocean.*

After midnight on October 15, 2019, Le, Ritze, and Dao left the Dana Point Harbor in Ritze's boat and went approximately three miles out to sea. (8-LER-1726-28; 7-LER-1548-51; 7-RitzeER-1671-89; 4-SER-933-45, 989-1001.)

This trip had been sold to Dao as a lobster-fishing trip. (5-LER-744, 751.) The evidence showed that was a ruse. Midnight was not when Ritze typically went lobster fishing. She generally did so an hour before sunset, as she had the day before, because that was the peak time to catch lobster; she would never leave at midnight for such trips. (8-RitzeER-1781-82, 1859, 1894-95; 5-LER-0996-97; 6-LER-1098-99, 1106-07; 8-LER-1768-69.) In addition, Ritze would generally stay within 50 feet of the jetty during lobster-fishing trips, which is where

the lobsters are, and would never go miles offshore. (5-LER-1000-02; 6-LER-1099; 3-RitzeER-581-94; 9-RitzeER-2066-68; 10-RitzeER-2496-2501.) Once they put their hoop-nets down, they would wait and watch the hoop-nets to protect them from being stolen, a risk that caused Ritze to not like to leave the area at all. (5-LER-1005-1006, 1105; 8-RitzeER-1784-89, 1864.) They would always stay within about 100 to 200 feet of the hoop-nets to be within sight of them. (6-LER-1106; 8-RitzeER-1786.)

Ritze's boat returned at approximately 2:30 a.m. on October 15 with just Le and Ritze aboard. (8-LER-1742-43; 7-RitzeER-1693-94; *see also* 7-RitzeER-1529, 1539.) She was able to return her boat to shore from the water, a process requiring skill. (7-RitzeER-1697-1704, 1734; 8-RitzeER-1779, 1897-1900.)

The next day, Dao's body was found floating seven miles from shore, with bullet wounds, including one in the back and one in the head (6-RitzeER-1369-72), head and face injuries indicative of the application of repeated blunt force (6-RitzeER-1348, 1373-75), and bleeding around the brain from the gunshots and blunt force injuries (6-RitzeER-1380). (*See also* 4-LER-0646-49.) The cause of death was

drowning, with blunt force injuries and gunshot wound of head as contributing conditions. (6-RitzeER-1380-81; 4-LER-0656.) A bullet recovered from the body was consistent with a .38 caliber. (4-LER-0699.) That finding was in line with Le's messages to Whalin, weeks after the murder, that he had a .38 caliber gun. (8-LER-1608-09; *see* 9-LER-1838-1839 (Le's Internet searches for .38 caliber guns).)

The available evidence as to where within the ocean the murder occurred was primarily analysis of cell phone records of Dao's and Le's phones, which showed that Dao's phone stopped emitting a signal in a location approximately three nautical miles from shore. Map exhibits prepared by the government identified 13 location points in the water that represented location points of the phones used by the participants from the portion of the boat trip during which the phones were the farthest from shore. (JER-172.) The map also included a line in the water approximating the distance of three nautical miles from shore. (JER-173.) Eleven of the 13 location points from the boat trip fell within the three nautical mile line, though several were quite close to

the three nautical mile line, including five points that were less than 300 yards away. (JER-174, 178.)[3]

#### *d. Ritze and Le's post-murder conduct confirms their culpability.*

##### i. Le's statements and actions

Neither Le nor Ritze reported Dao's death to authorities. (5-LER-0973-76, 4-SER-952; 7-RitzeER-1657-61.) To the contrary, Le lied about his whereabouts on the night of the murder to Dao's partner, Nguyen; Dao's brother; and two uniformed Coast Guard agents. He told Nguyen he had not gone on the boat at all and did not know where Dao was (5-LER-0772-73); he told Coast Guard agents the same false story (5-LER-0979-82; 4-SER-960-75, 982-84); he told Whalin he was going to lie to Dao's brother (7-LER-1386, 1441); and he lied to Dao's brother and asked Whalin to back him up on his false alibi (7-LER-1385-89, 1453).

---

[3] While the crime does appear to have occurred more than three (non-nautical) miles from shore (*see* 3-SER-743-55), the government conceded below that it could not prove beyond a reasonable doubt that the crime occurred more than three *nautical* miles from shore, as a nautical mile is longer than a non-nautical mile. (JER 168, 174.) California's jurisdiction extends to three *nautical* miles from shore, rather than just three miles from shore. *See* Cal. Gov't Code § 170.

Le also admitted to multiple associates, either directly or obliquely, that he had murdered Dao. (7-LER-1387-88 (statement to friend Tony Hoang that he had shot a guy who owed him money and did not pay up); 8-LER-1594-97 (statement to Whalin regarding Dao that he "took care of it" and "shot 'em").) Le did not mention Dao's having pulled a gun on him. (8-LER-1601-02 (Whalin's testimony regarding Le's conversation with him).) He provided a particularly clear story to his friend Vinh Doan, recounting that (1) he asked Dao for money that Dao owed him, (2) he shot Dao a few times, (3) Dao had grabbed Le's jacket, (4) Dao fell into the ocean, and (5) as Dao was falling back holding Le's jacket, Le slipped out of it and Dao fell into the ocean with Le's jacket. (7-LER-1324-1325; 1327-28.) He also told Doan and Whalin that he planned to collect money from Nguyen using Dao's life insurance policy (7-LER-1330, 1334), and he told Whalin that if she did not comply, he would "handle" her, meaning kill her (8-LER-1601).

ii. Le and Ritze's tracking of Nguyen, Dao's partner

In addition, Le and Ritze worked together to place a GPS tracker on Nguyen's car. (9-LER-1885.) Ritze appears to have helped Le procure the tracker. (9-LER-1823-25; 9-RitzeER-2081-85.) Her phone

contained browser history relating to trackers from two weeks after the murder (9-RitzeER-2074, 2-SER-349-50), and e-mail correspondence between Ritze and Logistimatics, a company that sells GPS trackers. (9-RitzeER-2068-72, 1-SER-244-48.) A little over a month after the murder, Ritze received an e-mail from Logistimatics notifying her that a particular tracking device had a low battery, and Ritze forwarded the e-mail to Le. (2-SER-244-48.) The e-mail included a then-current location for the tracking device, which matched the residence of Nguyen. (9-RitzeER-2070.)

Messages between Ritze and Le showed them discussing Nguyen's whereabouts. (9-RitzeER-2078-80, 2-SER-503.) In one message in late November 2019, Le texted Ritze: "Tracker went to Arizona last night . . . hmmmmm . . . I want my 100k, bitch is prolly trying to stash it." (9-LER-1830-33; 4-SER-926.) Nguyen was indeed in Arizona at the time. (5-LER-0795.)

A few months later, agents recovered a tracking device from a vehicle driven by Nguyen. The tracker matched the appearance of a tracker depicted in a phone found on Ritze's phone, and lab analysis

showed that Le's DNA was on the tracker. (9-LER-1823-1825, 1885; 9-RitzeER-2081-85.)

iii. Ritze and Le's continued relationship

In the meantime, Ritze and Le continued their close relationship. Ritze texted her friend about Le, referring to him as her "sweetheart" (9-RitzeER-2093-95) and a "gangster" part of "Asian gangs out here" who "don't fuck around with nobody." (9-RitzeER-2095-96, 3-SER-683-87.) She went on another trip to Las Vegas with Le, during which she appeared to enjoy herself, betrayed no signs of fearing Le, and largely appeared to be her usual self. (9-RitzeER-2208-09, 2225-27; 2-SER-273-89, 297, 353, 355 (photographs from trip).)

She also expressed her adoration for Le through texts to him. (9-RitzeER-2064; 2-SER-512 ("I adore u"; "Thanks for making my night and allowing us to have a fun date with no work involved [heart emoji]."); 9-RitzeER-2085-86; 2-SER-361-63 ("u are so cute"; "I got this super stoked thinking about you [heart emoji] u are the best"; "Hi sweetheart."); 9-RitzeER-2087, 2-SER-396 ("[heart emoji] my greatest catch ever is you"); 9-RitzeER-2087, 2-SER-401 ("I just want to tell you how much I appreciate you and so many ways I value our friendship

more than you'll ever know."); 9-RitzeER-2088, 2-SER-412 ("You are an amazing man and I am not only proud but honored to be by your side.").

Ritze had herself named as a driver on Le's car on an insurance card that took effect a little over a month after the murder. (9-RitzeER-2089-91; 2-SER-514-51.) When she was pulled over and arrested for a traffic violation about six weeks after the murder, she gave Le as her emergency contact. (9-RitzeER-2104, 3-SER-701; Trial Ex. 308.) Ritze also helped Le with his methamphetamine dealing. (4-SER-857-58, 865-67; 5-RitzeER-1195.) She also professed her love for him after her arrest for Dao's murder. (9-RitzeER-2105-07; 3-SER-770-71.)

#### ***e. Le and Ritze are arrested, and police interview Ritze.***

Le and Ritze were eventually arrested for Dao's murder. During Ritze's arrest on December 19, 2019, police used two flash bang diversion devices—which emit only a bright light and sound, and do not expel any physical projectile—on the ground floor of Ritze's apartment, while she was upstairs. (4-RitzeER-0877-78, 0979-80.) Ritze was physically startled and ducked down in response to the flash bang devices, which likely resulted in her hitting her head on something. (4-RitzeER-0877-78, 0890, 0979-80.) One of the agents observed a small

laceration on her forehead but did not know how she sustained her injury (4-RitzeER-0891); she was immediately treated on scene for the injury, and no further treatment was needed. (4-RitzeER-0895-96.) She was compliant with instructions from the agents and responded appropriately. (4-RitzeER-0892, 0896.)

At approximately 5:30 a.m. the day of her arrest, agents began their first interview with Ritze. (14-RitzeER-3240.) The agents were cordial. She was asked if she needed to use the restroom before the interview, and she declined. (14-RitzeER-3240.) They took her handcuffs off. (14-RitzeER-3240, 3346.) The agent calmly and gently explained that they would go to a "private spot" to talk, and asked Ritze, "Fair enough?" (14-RitzeER-3240.) Ritze responded, "Can I get my chapstick?" (14-RitzeER-3240; 13-RitzeER-3083.) The agent immediately responded, "Yes, absolutely you can have your chapstick," and Ritze brought her chapstick to the van. (14-RitzeER-3240; 13-RitzeER-3083.) The agent offered Ritze the opportunity to bring her water, an opportunity to refill her water and asked if she wanted to bring anything else from the refrigerator. (14-RitzeER-3240; 13-RitzeER-3083.) Ritze accompanied agents to the van and had no

trouble walking to or getting into the van. (13-RitzeER-3083.) She did not exhibit objective signs of intoxication. (13-RitzeER-3083; 4-RitzeER-0932.) She did not complain about a head injury. (4-RitzeER-0932.) An agent asked if she was warm enough, and she responded that she was. (14-RitzeER-3241.)

Both agents introduced themselves, and then Ritze was read her *Miranda* rights. (14-RitzeER-3241-42.) At the end of reading her the rights, the agent said, "Okay? So does [ ] all that make sense? I see[,] I see you nodding your head yeah?" and Ritze said, "Yeah." (14-RitzeER-3242.) She engaged in pleasant small talk with the agents for several minutes. (14-RitzeER-3243-3252.) When she said that she thought she had been hit in the head by something during the agents' entry to her apartment, the investigator responded, "Okay, I'm sorry about that" (14-RitzeER-3278)—despite the fact that agents had not hit her in the head with anything. (4-RitzeER-0979-80.) Ritze replied, "It's okay[,] I'm just freaking, fuck, why me, why?" (14-RitzeER-3278.) Asked midway through the interview, "[D]o you feel that we treated you with respect today?" Ritze answered, "Yeah, considering, yeah." (14-RitzeER-3309.) The agent, in trying to convince Ritze to speak, said,

"[W]e've been respectful with you. We didn't put you in a room with a bright spotlight and, you know, . . . I think we have a good rapport going right now, and I wan[t] [to] to keep that." (14-RitzeER-3267.) Ritze responded, "Yeah." (*Id.*)

During the interview, Ritze frequently lied. Among other things, she at first claimed to know nothing about the victim or the murder, but she later recounted witnessing an altercation between Le and Dao in which the victim, whose name she claimed to not know, "went over" the side of the boat. (14-RitzeER-3265, 3269-70, 3272.) Asked what time they went out on the water the night of the murder, she lied and said, "[M]aybe around five or so," despite having left after midnight. (14-RitzeER-3281.) She also admitted to giving a GPS tracker to Le but feigned ignorance about the fact that one of the trackers was at a location associated with the victim. (14-RitzeER-3317-19.) She also attempted to garner sympathy. She invoked her daughter (14-RitzeER-3269) and told investigators that her "brother's a Sheriff" and her "best friend is a District Attorney for the City of Anaheim." (14-RitzeER-3279.)

The first interview ended at approximately 7:49 a.m. (14-RitzeER-3346.) She was then transported to Santa Ana, where she was interviewed that same morning at approximately 8:30 a.m. by two different FBI agents. (9-RitzeER-2138; 4-SER-868.)[4] She did not appear to be in physical pain or in need of medical assistance due to her forehead laceration, but rather was alert and oriented. (9-RitzeER-2149.) One of the agents reminded Ritze of her *Miranda* rights, saying, "And, just as a reminder, so—so you're clear—as a reminder, you know, you were read your *Miranda* rights, it's still in play, nothing's changed. Okay, so you know—but we'd like to talk to you a little bit more." (14-RitzeER-3349.) Ritze responded, "Okay." (*Id.*)

Ritze then proceeded to speak to agents and change her story, suggesting that Dao was killed because he "owed a bunch of people money or something." (14-RitzeER-3350.) She also claimed that she continued to see Le because she did not want to "get hurt" and was

[4] At the suppression hearing, there was a factual dispute about how much later the second interview occurred; the government provided evidence that it occurred less than an hour after the end of the first interview. (4-SER-868.) At the most, it occurred approximately three hours after the first interview ended. (1-RitzeER-210-11.)

"scared to death." (14-RitzeER-3364-66, 3375.) She also told agents that Le had told her that if law enforcement ever approached to not "tell them anything" and "ask for your attorney." (14-RitzeER-3440.) Ritze shared her view of that, saying, "I don't believe in that . . . . I really don't . . . . Especially, you know, not saying anything, um, is—is horrible and I know, I know that." (*Id.*)

During both interviews, Ritze felt comfortable telling agents if she did not understand something they said and even pretended not to understand when she did. For example, during the first interview, asked if she had been "roped into" the killing, she responded, "I don't understand what that means." (14-RitzeER-3266.) She had a similar response when agents discussed getting a search warrant for her house and phone. (14-RitzeER-3265, 3370.)

One of the agents openly displayed frustration with Ritze and, unlike the agents in the first interview, was more assertive in pointing out the inconsistent and nonsensical portions of Ritze's statements, including using occasional profanity to underscore the depth of deception Ritze was using. (*E.g.*, 14-RitzeER-3363-65, 3428-29.) As in the first interview, Ritze brought up her daughter, again as a ploy to

gain sympathy from the agents, and to enhance her credibility as a non-violent mother. (14-RitzeER-3360 ("I didn't know [Le] had plans for none of that. I have kids.").) In response to Ritze's second broaching of the topic of her family, the agent suggested that Ritze help herself and help her daughter by telling the truth. (14-RitzeER-3375-76, 3391, 3394, 3446.)

On the same day she was interviewed, at approximately 4:10 p.m., Ritze underwent a medical screening at the Santa Ana Jail. (13-RitzeER-3087-88.) Registered Nurse Heather Sanchez ("RN Sanchez"), who had both training and daily experience in dealing with intoxicated people (4-RitzeER-0809-10), conducted the screening. She noted no injury, based on both Ritze's own report and RN Sanchez's observation of her physical appearance. (4-RitzeER-0818-19; 10-RitzeER-2572, 2579.) RN Sanchez, however, prescribed, among other medications, Levitiracem, an anti-seizure medication, based on a specific protocol mandating a medication regimen for patients suspected of current alcohol abuse or withdrawal, including by patient self-report only, and in the absence of objective signs of either. (13-RitzeER-3087-88.)

### 2. *Charges and denial of joint motion to dismiss for lack of jurisdiction*

Ritze and Le were ultimately charged with Dao's death. Ritze was indicted on charges including First Degree Murder, in violation of 18 U.S.C. § 1111, Conspiracy to Commit Murder, in violation of 18 U.S.C. § 1117, and False Statements to Law Enforcement, in violation of 18 U.S.C. § 1001. (5-RitzeER-1243-70.) Le was similarly indicted on the same two murder charges, as well as related firearms and drug offenses. (*Id.*)

Defendants both moved to dismiss the charge for a lack of jurisdiction. (JER-031, 133-36.) The government opposed, citing the portion of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which provided that the 12-mile band along the coast of the United States "for purposes of Federal criminal jurisdiction . . . is within the special maritime and territorial jurisdiction of the United States for purposes of title 18, United States Code." (JER-140-145; JER-059 (citing Pub. L. No. 104-132, Title IX, 901(a)).) The government also argued that given the evidence that the crime occurred approximately three nautical miles out to sea, the crime occurred

within the "high seas," as the term is used in 18 U.S.C. § 7(1). (JER-064-73.)

The parties jointly requested that the district court "decide the purely legal question of whether 'the special maritime and territorial jurisdiction of the United States' includes the 12 nautical miles seaward of the mean low water line along the coast of California as the government contends, or begins three miles offshore as the defendants contend." (JER-153.) The parties agreed that the acts that the government alleged constituted the crimes charged "occurred on a boat in the Pacific Ocean within 12 nautical miles seaward of the mean low water line along the coast of Orange County, California." (JER-154.)

In a tentative ruling, the district court noted the "practical matter" of the impossibility of proving the murder's occurrence in either jurisdiction if the defense rule that federal jurisdiction begins only at three nautical miles from shore were correct, given that if the case were prosecuted in state court, there would "still [be] an argument that the murder . . . may[ ] [have] occurred outside the three-mile area." (JER-228.) The court observed that "someone has to have jurisdiction" (JER-235) and noted "the unique fact situation that we're facing" (JER-238).

Ultimately, the district court ruled that "the plain language" of section 901 of AEDPA "supports the government's contention" that the 12-mile band along the coast was within the special maritime and territorial jurisdiction of the United States. (JER-249.) The district court found that Congress could constitutionally confer jurisdiction in this manner under both its power to define and punish felonies on the high seas and its power to extend federal judicial power "to all cases of admiralty and maritime jurisdiction." (JER-249-50.) Accordingly, the district court found that the special maritime and territorial jurisdiction of the United States "includes the area from the mean low water mark up to twelve nautical miles from the coastline." (JER-249.) The district court held that the phrase "high seas" as it was used in 18 U.S.C. § 7(1) referred to "waters not within the territorial jurisdiction of the United States" and thus did not provide jurisdiction in this case. (JER-248.) Accordingly, the district court adopted jury instructions for both Le and Ritze's trials defining "the special maritime and territorial jurisdiction of the United States" to include "the territorial sea of the United States, from the mean low tide point on the shore extending seaward to twelve miles offshore." (JER-256, 264.)

### 3. *Le's trial and post-trial proceedings*

#### a. *Le's testimony*

Defendants were severed for trial, and Le proceeded first. (Ritze AOB 18; Le AOB 4.) Le testified in his defense. In doing so, he corroborated much of the government's evidence, including:

- his ownership of a .38 caliber revolver (9-LER-1986-88);
- the fight that he had with Dao weeks before the murder (9-LER-1983-84);
- Dao's statements to him and others that his debts could be paid off with his life-insurance policy (9-LER-1990);
- his lies to Nguyen, Dao's brother, and the Coast Guard about the boat trip (10-LER-2155-56, 2182, 2184-86, 2194);
- his statement to a friend Tony Huang that he had shot Dao on a boat and that Dao owed him $30 to $40 thousand (10-LER-2178-79);
- his statement to his friend Vinh Doan that he had shot Dao because he owed him money and intent to recover from Dao's life-insurance policy (10-LER-2153); and

- his placement of a tracker on Nguyen's car and his text message to Ritze accusing Nguyen of "trying to stash" the "100K" he thought he was owed (11-LER-2226, 2229, 2234).

Le's main contention was that he acted in self-defense. He claimed that Dao had pulled a gun on him, they fought over the gun, two shots went off, he hit Dao on the head twice with a stick, Dao fell in the water, Dao yelled at Le that he would get him, Le told Ritze to drive the boat away, and they left. (10-LER-2116-2121.) But his testimony was belied by other evidence, including that Dao had been shot in the back, which would suggest that he was not shot during a struggle (4-LER-0641-0642, 0644-0645); Dao's nine blunt-force wounds, which were inconsistent with his being hit merely with a stick (4-LER-0646-0647; 4-SER-1005); and Le's admission that he lied to no less than six people about what happened on the boat. (11-LER-2249-2256, 2263-2264.)

***b. Closing arguments***

During closing argument, the government agreed that it had to prove that "the defendant did not act in reasonable self-defense, and defendant doesn't have to prove anything." (2-LER-0073.) "And that burden on the government never shifts." (2-LER-0073.) The

government then explained how Le's claim of self-defense was inconsistent with the testimony of five other witnesses and the forensic evidence in the case. (2-LER-0076-78.)

In response, the defense doubled down on its self-defense theory in its closing argument. The defense argued that the jury should accept Le's version of the facts and find that Le's actions and leaving Dao in the ocean a "reasonable response when somebody pulls a gun on you in the middle of the ocean." (2-LER-0122.) The defense told the jury there was no legal duty to call the Coast Guard, and his failure to do so "doesn't make his actions any less reasonable." (2-LER-0122.) The defense also argued that an FBI agent improperly influenced Whalin's testimony, making the bizarre argument that when Whalin described what Le had did—shooting someone over money and leaving him in the ocean—the agent was incorrect to subsequently refer to that as a murder. (2-LER-0127-28.)

In rebuttal, the government reiterated that it bore the burden of proof. (1-LER-0005-6.) Much of the rebuttal was focused on pointing out the lack of credibility in Le's self-defense story. At one point, the government argued that "by turning the boat around and going back to

shore and leaving the wounded man in the water, that is not reasonable force." (1-LER-0017.) The government, responding to the defense argument that the evidence showed that Le had no intent to kill Dao at all, said Le's failure to stay there, call the Coast Guard, radio Harbor Patrol, throw him a life preserver, or radio in or tell anyone when they got back to shore "evinces an intent to kill James Dao." (1-LER-0017-18.) The government said that if the jury accepted Le's story, then even on Le's telling, at the end of the struggle, Le had the gun, and Dao was in the water, "at that point, the threat ends and the decision to leave him to the ocean is unreasonable force and it is not self-defense." (1-LER-0018.) The defense did not object.

The government also addressed the defense's attack on the FBI agent, telling the jury that an agent "looking at a body with two bullet wounds, badly beaten, that had been abandoned in the ocean" would naturally call it "murder." (1-LER-0018-19.) Among other things the government argued that "[i]f it's a killing with justification, you do not abandon the victim in the water." (1-LER-0019.) The defense objected to none of this part of the government's argument.

#### *c. Jury deliberations and dismissal of juror undergoing mental-health crisis*

During deliberations, the foreperson sent a note that read: "One of the jurors is unable to continue. *She cannot make a decision*. To quote: 'I can't do this.'" (2-LER-0199 (emphasis added).) The district court immediately requested and received defense input. (2-LER-0199-0200.) Le (through counsel) cautioned the district court about inquiring any further of the jurors about the note because of the risk of receiving answers as to the status of deliberations. (2-LER-0200.) The district court proposed sending a note back asking that the juror in question, if this were true, send a note individually; Le agreed to that proposal. (2-LER-0202, 0205, 0208.)

Juror 2 subsequently sent a note stating, "I am asking to be excused from further deliberation. My experience in the jury deliberations has put my mental health in a position that has become dangerous to me. *At this point I am unable to continue* to subject myself to this and I need to protect my mental health." (2-LER-0214 (emphasis added).) The district court immediately requested and received input from both sides. (2-LER-0214-16.) The government requested that the juror be dismissed. (2-LER-0214-16.) Le cited the district court to

*United States v. Symington*, 195 F.3d 1080, 1087 (9th Cir. 1999), as "set[ting] forth, uh, 'any reasonable possibility test' that the . . . request to removing a juror stems from the juror's views on the merits of the case . . . and if we're there . . . I don't think removal . . . is allowed." (2-LER-0216-17.) The district court asked if there was a further step it should take before making a decision, whether Le was requesting a mistrial, and whether Le was requesting further inquiry of the juror by the district court. (2-LER-0219-20.) Counsel for Le replied, "I have no further statement, Your Honor." (2-LER-0220.) The district court suggested putting the two questions described below to the juror. (2-LER-0220-27.) Le supported the further inquiry. (*Id.*)

Asked whether the worsening of her mental health was based on pressure from other jurors to reach a specific verdict, Juror 2 said, "Yes." (2-LER-0228.) Asked if she were able to make a decision applying the law to the facts of the case, Juror 2 answered that she could not answer only "yes" or "no" without elaborating. (2-LER-0228-29.) Both sides proposed denying her request to be excused and sending her back to deliberate. (2-LER-0230.) The district court denied her request to be excused and sent Juror 2 back to deliberate. (2-LER-

0235.) The district court then re-instructed the full jury on the Ninth Circuit Pattern Jury Instruction on Duty to Deliberate. (2-LER-0236-39.)

The same day, the district court received a note from the foreperson that said:

> Juror 2 is extremely stressed and has informed us *she will not be capable of any further deliberation*. She's indicated that she has had thoughts of hurting herself in order to be removed from this process. She presents as *clearly distressed and in crisis*. The rest of the jurors would like to continue with the deliberation process, but are unable to due to her *inability to go on with the processes*. There's a concern that her vote does not represent the result of a complete and comprehensive deliberation, but rather a way to remove herself from a process that is causing her extreme stress and potentially causing harm to her mental health."

(2-LER-0244-0245 (emphasis added).) The parties met and conferred and proposed two questions be put to the juror, with the agreement that if the answer to both questions was "yes," the parties would agree that the juror should be dismissed. (2-LER-0235-46.) The district court asked the juror the two proposed questions. (2-LER-0247-48.) Asked whether it was true she would not be capable of further deliberation, Juror 2 replied, "Yes." (2-LER-0248.) Asked whether it was true that

she had had thoughts of hurting herself to remove herself from the process, Juror 2 replied, "Yes." (2-LER-0248.)

The district court then asked both parties if either party would like "any further inquiry." (2-LER-0248.) Le, through counsel, stated, "No, Your Honor. (*Id.*) The government stated its position that Juror 2 should be excused. (*Id.*) Defendant, through counsel, supported the government's request for dismissal, stating, "I believe there's independent grounds to excuse her despite her earlier answer that, I think, caused us some pause, um, and I think the Court would be within its . . . within its discretion to excuse her, replace her with a randomly selected alternate." (*Id.*) The district court, having heard Le's support for dismissal of Juror 2, dismissed Juror 2. (*Id.*; 2-LER-0260.) Le did not ask for a mistrial.

Following the district court's dismissal of Juror 2, the district court randomly selected an alternate juror to replace Juror 2. (2-LER-0264-65.) The district court then instructed the jurors that they "must start [their] deliberations anew . . . [and] should disregard entirely any deliberations taking place before the alternate juror was substituted

and consider freshly the evidence as if the previous deliberations had never occurred." (2-LER-0265-66.)

The newly reconstituted jury proceeded to deliberate for approximately five and a half hours. (1-LER-0028.) It returned a verdict of guilty on First Degree Murder, Conspiracy to Murder, and the related firearm charge. (2-LER-0278-79.)

#### *d. Post-trial motion*

After trial, Le moved for a new trial on numerous grounds. (3-LER-0298-0351.) As relevant on appeal, Le alleged that (1) Juror 2 had been improperly bullied into requesting excusal, and (2) that the new jury with the alternate juror seated improperly failed to begin deliberations anew. (2-LER-0299.) Defendant supported these allegations with affidavits from jurors. The allegations in the affidavits included, as relevant on appeal, the following: (1) Juror 2's statement that she "felt pressured by the statements from and conduct of the other jurors," who were "hostile towards her" (3-LER-0346-47); (2) Juror 2's statement that during deliberations she wanted to send a note saying they were deadlocked, but because the other jurors did not do so, she decided she wanted out (3-LER-0347); and (3) a statement from the

alternate juror who was seated after Juror 2 that when they began deliberations with him, the other jurors had a timeline on a whiteboard that they explained to him, along with their belief that the timeline "did not allow for sufficient time to drop the lobster hoops." (3-LER-0351.)

The district court denied the motion for new trial in a written order. It held that the affidavits submitted by Le with his motion for new trial "go against the plain text of Rule 606(b)'s prohibition—they improperly implicate the internal affairs of the jury and discuss 'statement[s] made or incident[s] that occurred during the jury's deliberations.'" (1-LER-0034 (citing Fed. R. Evid. 606(b)(1)).) With an exception not relevant on appeal, the district court rejected consideration of the affidavits based on the prohibition in Rule 606(b). (1-LER-0035.) The district court further found that Juror 2 was dismissed "due to the juror's extreme mental health," not based on the juror's view of the merits. (*Id.*) Finally, the district court found that Le's argument that the jury failed to begin its deliberations anew after the alternate was seated was entirely based on a portion of the affidavits submitted with his motion for new trial that was inadmissible

under Rule 606(b), and as such, denied the motion on that ground. (1-LER-0038.)

#### *4. Ritze's pretrial, trial, and post-trial proceedings*

##### *a. Ritze's motion to exclude her statements to coworkers*

Prior to trial, Ritze moved to exclude her statements to her co-workers, arguing that they were not relevant to the murder and were merely propensity evidence inadmissible under Fed. R. Evid. 404. (14-RitzeER-3460-61.) The government argued that the recording made by Amaya's daughter, as well as other statements, showed that the killing was not an accident or mistake (1-RitzeER-0133), and were relevant to showing the nature of the relationship between Ritze and Le and her willingness to associate with him while knowing of his violent tendencies. (5-RitzeER-1118-19.)

The district court found the statements to the co-workers, including the recording, that specifically related to taking people on her boat and killing them, to be admissible. It reasoned that the statement referred to Le (5-RitzeER-1131); the coworker statements were consistent across the board and with the testimony of Sandra Ritze (5-RitzeER-1134); and there was a strong nexus to the crime charged. (1-

RitzeER-0133.) The district court found that Ritze's concerns with the reliability of the statements—based on her "partying" around the time of statements— "just go[ ] to the weight of the evidence, not the admissibility." (5-RitzeER-1132.) The district court excluded Ritze's statement to co-workers that she could "kick their ass" and similar statements as too generalized and lacking a sufficient nexus to the crime charged. (5-RitzeER-1129-30; 1-RitzeER-0133.) The district court also excluded narcotics dealing by Ritze with Le between the murder and her arrest. (5-RitzeER-1135; 1-RitzeER-0134.)

#### ***b. Ritze's motion to suppress statements to police***

Ritze also moved to suppress her statements made to police based on the ineffectiveness of the *Miranda* waiver and the involuntariness of the interview. Her claims were based in part on her alleged intoxication during the interview, which she called a medical expert to testify about. But her own expert stated that, in the videos of her interviews, he "saw no signs of alcohol impairment in any of the videos," and "saw no signs of alcohol withdrawal in either [of the] videos." (1-RitzeER-0156.) He also saw no examples of pronounced confusion (1-RitzeER-0148), or slow information processing by Ritze (1-RitzeER-

0159.) That testimony was consistent with the findings of the medical staff at the Santa Ana jail. *See supra* Section III.B.1.e.

The district court also denied that motion after holding an evidentiary hearing and listening to extensive argument. (1-RitzeER-0179-223). The district court, having listened to the recording of Ritze's *Miranda* waiver, concluded, "[H]ere, it seems listening to the tape that her cognitive abilities are very good." (4-RitzeER-0902.) Thus, the court ruled that Ritze knowingly and intelligently waived her *Miranda* rights. (1-RitzeER-0208, 0223.) The court found that Ritze's *Miranda* waiver was effective for the second interview too. It remarked that the agent's reminder sufficed based on "the shortness of time" between the interviews and "the Ninth Circuit's prior rulings in this regard." (1-RitzeER-0217.)

It also rejected the argument that an agent's reference to Ritze's daughter overbore her will because the agent did not dwell on the daughter; rather, after mentioning her, he went "right back to the crime" (1-RitzeER-0192) and "the focus [was] on the investigation" (1-RitzeER-0195, 0212-13, 0216). The district court also noted that Ritze "brings up family first." (1-RitzeER-0195.) Thus, the district court

found that the agents' questioning "have not overruled the will of the Defendant and that is absolutely shown to this Court by not a preponderance but by clear and convincing evidence"—above the required standard of a preponderance—and described Ritze as "mature, articulate, well spoken, [and] aware of time and place." (1-RitzeER-0216.)

#### *c. Trial and replaying of exhibit for jury in open court*

At trial, the government presented extensive evidence of the murder as recounted above, including her statements to coworkers and redacted versions of her statements to law enforcement.

Prior to deliberations, the district court inquired of the parties how they would like to handle requests by the jury to view evidence of recordings that were shown during trial with transcripts. (11-RitzeER-2860.) The defense requested that the jurors not be allowed to see the transcripts—despite having agreed to the transcriptions before the trial (*see, e.g.* 13-RitzeER-3082)—and the district court ordered that the recordings could be available for replay in open court, where the district court could admonish the jurors that the synced transcript displayed with the exhibits was not evidence but an aid, in accordance with the

parties' earlier agreed-upon instructions. (11-RitzeER-2860-64.) The district court instructed the jury accordingly. (11-RitzeER-2867.)

During deliberations, the jury sent a note requesting to see two video recordings admitted into evidence. (1-RitzeER-0123.) Ritze requested that the courtroom be closed and that the evidence be sent back to the jury—after having earlier objected to that procedure (1-RitzeER-0127, 11-RitzeER-2860-64)—saying the procedure was "deliberation" and complaining that the victim's mother had been present during the entire trial, even though the victim's mother had never been identified during the course of the trial and had not cried out at all during any of the proceedings. (1-RitzeER-0125-26.) Defendant cited no legal authority for closing the courtroom, and the district court denied the request. (1-RitzeER-0125-28.) The videos were replayed for the jury, with the district court instructing the jury according to the parties' agreed-upon jury instruction regarding the transcript before the playing of each video. (1-RitzeER-0128-30.) Afterward, the district court instructed them, "You may resume your deliberations," and the jury retired to continue their deliberations. (1-RitzeER-0130.)

#### *d. Convictions and post-trial motions*

The jury convicted Ritze of the lesser included charge of Second Degree Murder, in violation of 18 U.S.C. §§ 1111(a), (b), and False Statement to Government Agency, in violation of 18 U.S.C. § 1001(a)(2). (12-RitzeER-2976, 3015.)

Ritze moved for a judgment of acquittal on the grounds that the evidence was insufficient to prove the elements of Second Degree Murder. (1-RitzeER-0090-0101.) The district court denied the motion for judgment of acquittal, finding that "intent alone is substantiated in this case by those pre-offense statements" to Sandra Ritze. (1-RitzeER-0112-0113, 0115.) Ritze also moved for a new trial, arguing that because she was acquitted of First Degree Murder, she should have another trial where evidence relevant to intent would be entirely excluded, on the grounds that it was relevant to premeditation (1-RitzeER-0101-03)—despite its relevance to the overall issue of intent, which would still be in dispute at a trial on a charge of Second Degree Murder only. (1-RitzeER-0106-10.) The district court similarly denied that motion. (1-RitzeER-0113-16.)

#### *e. Sentencing*

At sentencing, Ritze argued that she should receive a reduction for having a minor role in the offense. (1-RitzeER-0027-29). The district court disagreed. It noted that Ritze's "callousness is extraordinary," citing five specific examples of Ritze's extraordinary callousness in committing the murder. (1-RitzeER-0069-72.)

Ritze argued that her troubled upbringing, diagnosis of PTSD, substance abuse, and her daughter warranted a downward variance (1-RitzeER-0025-27, 0036-42, 0044-45; 2-RitzeER-0303-04, 0306-07.) The district court did vary downward, finding that Ritze's correctly calculated criminal history category of IV was overstated and that use of category II was more appropriate. (1-RitzeER-0074-75.) This reduction was the equivalent of a significant downward variance, rejecting the applicable Guideline range of 324 to 405 and using a significantly lower range of 262 to 327 months. (1-RitzeER-0075.) Ritze was sentenced at the low end of the reduced range to a term of 262 months. (1-RitzeER-0002-03, 0077.)

## IV

## SUMMARY OF ARGUMENT

The district court had jurisdiction over defendants' murder offenses. The issue is wholly resolved by the plain language of Congress's pronouncement in AEDPA § 901(a): "[A]ll the territorial sea of the United States . . . for purposes of Federal criminal jurisdiction is part of the United States, subject to its sovereignty, and is within the special maritime and territorial jurisdiction of the United States for the purposes of title 18, United States Code." Pub. L. No. 104-132, Title IX, 901(a). Because the territorial sea consists of the 12-mile band along the coast, the district court's jury instruction that "the special maritime and territorial jurisdiction of the United States includes the territorial sea of the United States, from the mean low tide point on the shore extending seaward to twelve miles offshore" was correct. In the alternative, this Court can affirm because the crime happened within "the high seas" as defined under 18 U.S.C. § 7(1). While the term "high seas" has come to have a different meaning in other contexts, the only courts to have addressed the inner limits of the term "high seas" in connection with federal criminal jurisdiction have deemed it to start at

the coast and run seaward. Under this definition, defendants' murder of Dao undoubtedly occurred on the "high seas."

The Court should also reject Le's individually raised issues. First, the government did not misstate the law in its rebuttal. The comments were a proper response to the defense arguments that Le had no intent to kill Dao. Moreover, the government did not say that Le had a duty to save Dao; rather, it argued that his and Ritze's affirmative act of leaving Dao in the ocean, depriving him of the ability to get back on the boat when they were facing no threat from him, amounted to murder. This was a correct statement of the law. At a minimum, it was not clearly or obviously wrong under the plain-error standard, and Le cannot meet the other prongs of that standard either. Le also waived the issue of the dismissal of the juror below when he consented to her dismissal, gambling on a favorable verdict with the new jury. Finally, the district court properly rejected the allegations in the post-trial affidavits recounting juror statements about what occurred during deliberations under Federal Rule of Evidence 606(b), which prohibits the district court from receiving such statements.

Finally, the Court should reject Ritze's individually raised issues. The district court did not err in any admission of evidence. Ritze was advised of and knowingly, voluntarily, and intelligently waived her *Miranda* rights, and it is evident from the audio and video recordings of her statements that she remained oriented and clear-headed throughout her interviews. Ritze's *Miranda* waiver remained effective for the second interview with agents that occurred no more than three hours after the first, particularly given the agent's reminder of her rights. Agents also did not overbear her will by mentioning her daughter, which was done only in response to her own efforts to use her daughter as a ploy to gain sympathy. In addition, the district court did not abuse its discretion by admitting the recording of Ritze's statements to her co-workers about her intent to kill people on her boat. The statement, in addition to being direct evidence of the charged crime, was probative of Ritze's intent, knowledge, lack of mistake, and lack of accident in Dao's murder. Regardless, any error in the admission of the interview or statements was harmless given the other, overwhelming evidence of Ritze's guilt at trial.

Ritze's other issues are similarly meritless. The district court also properly denied Ritze's request to exclude the victim's mother from a proceeding held in open court in which the jury had an exhibit with transcripts played back for it. The victim's mother had a statutory right to be present, the proceeding in no way constituted jury "deliberation," and there was no prejudice from the ruling. There was sufficient evidence to prove Second Degree Murder, as there was plenty of evidence supporting the inference that Ritze acted deliberately and intentionally to kill Dao, or, at a minimum, acted recklessly with extreme disregard for human life. The district court properly denied Ritze's motion for a new trial because the wish to make different tactical decisions does not entitle a defendant to a redo of proceedings. Finally, the district court properly rejected Ritze's request to apply a minor role adjustment at sentencing and arguments for a downward variance based on personal circumstances, and her far-below-Guidelines sentence was reasonable.

# V

# ARGUMENT

## A. The District Court Had Jurisdiction Over Defendants' Murder Offense and Correctly Instructed the Jury on Jurisdiction

### *1. Standard of review*

The Ninth Circuit reviews jury instructions, when challenged as misstatements of the law, de novo. *United States v. Cortes*, 757 F.3d 850, 857 (9th Cir. 2014).

### *2. In AEDPA, Congress conferred federal criminal jurisdiction over the 12-mile band along the coast*

#### *a. AEDPA's plain language establishes jurisdiction.*

Congress explicitly included the entire territorial sea of the United States within the special maritime and territorial jurisdiction of the United States. Pub. L. No. 104-132, Title IX, 901(a) ("AEDPA § 901(a)"). This inclusion was set out in the United States Code as a Statutory Note to 18 U.S.C. § 7. In the Statutory Note, Congress

> declare[d] that all the territorial sea of the United States, as defined by Presidential Proclamation 5928 of December 27, 1988, for purposes of Federal criminal jurisdiction is part of the United States, subject to its sovereignty, and is within the special maritime and territorial jurisdiction of the United States for the purposes of title 18, United States Code.

Pub. L. No. 104-132, Title IX, 901(a). Presidential Proclamation 5928 of December 27, 1988, in turn, defined the territorial sea of the United States as "extend[ing] to 12 nautical miles from the baselines of the United States." 54 Fed. Reg. 777 (Dec. 27, 1988); *see also United States v. Moran-Garcia*, 966 F.3d 966, 968-69, n.2 (9th Cir. 2020).

"The first and most important canon of statutory construction is the presumption that a legislature says in a statute what it means and means in a statute what it says there." *In re Pangang Group Company, LTD.*, 901 F.3d 1046, 1056 (9th Cir. 2018) (citing *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992)) (citation modified). "When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." *Id.* (citation modified).

The plain language of this declaration is clear. Even defendants concede that the plain language of AEDPA § 901(a) "would appear to declare that the U.S.'s entire territorial sea, including State waters, f[alls] within [the special maritime and territorial jurisdiction of the United States]." (Joint AOB 32-33.) Because the "words of [the] statute are unambiguous . . . judicial inquiry is complete." *In re Pangang Group Company, LTD.*, 901 F.3d at 1056 (citation modified). This Court

need not go beyond the unambiguous, plain language of the statute to resolve the issue presented here.

There is only a rare carve-out to following the plain language of legislation. "The plain meaning of legislation should be conclusive, except in those rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242 (1989) (citation modified). Courts "need not examine legislative history as an aide to interpretation unless the legislative history *clearly indicates* that Congress meant something other than what it said." *United States v. Williams*, 659 F.3d 1223, 1225 (9th Cir. 2011) (emphasis added) (citation modified). Otherwise, if "the plain meaning of the statute is unambiguous, that meaning is controlling and [this Court] need not examine legislative history as an aide to interpretation." *Id.*

This is not the rare case where "the legislative history clearly indicates that Congress meant something other than what it said." *Williams*, 659 F.3d at 1225 (citation modified). To the contrary, nothing in the legislative history that defendants point to indicates an intent

other than what is clear on the face of the declaration. In fact, to the extent this Court finds the need to delve into legislative history, the whole reason to do so is to divine the purpose behind such legislation and give effect to the legislative solution to the practical problem that the legislation represents. *Williams*, 659 F.3d at 1225. Here, the clear purpose of the legislation is to ensure that changes in the law did not result in any area of offshore waters that would allow immunity from criminal liability. The right interpretation, then, is the one that gives effect to that purpose—the one that does not allow this murder to have been perpetrated with impunity.[5]

To the contrary, the canon of statutory construction against absurdity prohibits this result. Defendants' proposed judicial elimination of AEDPA § 901(a) produces absurd results, and thus

[5] The double jeopardy clause of the California state constitution provides a broader prohibition on successive prosecutions than that afforded by the United States Constitution. *People v. Vega-Robles*, 9 Cal. App. 5th 382, 426-27 (Cal. Ct. App. 2017). A previous federal prosecution may act as a bar to subsequent state prosecution in the state of California. *Smith v. United States*, 423 U.S. 1303, 1305 (1975) (quoting *People v. Belcher*, 11 Cal. 3d 91 (1974)); *see also* Cal. Penal Code § 793 (providing that a conviction or acquittal in another jurisdiction, including the United States, is a bar to prosecution in the state of California).

should be rejected. *See Rowland v. Cal. Men's Colony*, 506 U.S. 194, 200 (1993) (recognizing "the common mandate of statutory construction to avoid absurd results").

In particular, adopting defendants' judicial elimination of Congress's declaration would result in the absurdity of requiring the government to prove whether the murder—or, in future cases, a rape, assault, or other violent crime committed at sea—occurred more than three nautical miles out to sea or less than three nautical miles out to sea. The nature of evidence available to prove the location of a crime committed at sea is largely limited to phone data, especially where the only non-involved witness to the crime is dead because he was murdered by the commission of the crime itself. And the government cannot be expected to use such data to prove beyond a reasonable doubt whether the crime occurred a few yards on either side of a three-nautical-mile line from the shore. Requiring such proof "would be purely artificial and arbitrary as well as unjust, and would make the Constitution of the United States subject one part of [a body of water] to the jurisdiction of a court of the United States, and deny it to another

part equally public and but a few yards distant." *The Genesee Chief*, 53 U.S. 443, 458 (1851).

Courts have long considered such practical effects before in evaluating what the government must prove to resolve legal questions about the location of a prosecution. For example, the First Circuit refused to construe the air-piracy statute "in a way that would require proof of precisely where [a defendant's] threats and assaults took place, in a plane traveling across many states at great speed, high above the earth." *United States v. Hall*, 691 F.2d 48, 50 (1st Cir. 1982) (Breyer, J.). The Second Circuit held similarly, saying "[i]t is incomprehensible . . . that courts must conduct a potentially fruitless search to determine exactly where a crime is committed when the alleged perpetrators are traveling at 600 m.p.h." *United States v. Busic*, 549 F.2d 252, 258 (2d Cir. 1977). In criminalizing air piracy, Congress "did not direct its statute to an abstract world of Platonic forms, but to the real world of action." *Id.* Here, similarly, requiring proof of precisely where the murder took place—in a boat miles out to sea in the open ocean— would be absurd.

#### *b. Congress's declaration is consistent with 18 U.S.C. § 7(1).*

Defendants argue that Congress's declaration must be interpreted to mean something other than what it says because it cannot coexist with 18 U.S.C. "§ 7(1)'s exclusion of State waters." (Joint AOB 33.) The thrust of defendants' argument seems to be that 18 U.S.C. § 7(1) somehow places any waters within state jurisdiction outside of the special maritime and territorial jurisdiction of the United States, despite the absence of any language to that effect on the face of the statute.

This would be true if § 7(1) specifically excluded waters within the jurisdiction of a state from ever being included in the special maritime and territorial jurisdiction of the United States. But § 7(1) does no such thing. Putting aside the dispute concerning whether the "high seas" includes state waters, and assuming *arguendo* that it does not, 18 U.S.C. § 7(1) only defines certain areas that are not in the jurisdiction of any state as falling within the special maritime and territorial jurisdiction of the United States. *See* 18 U.S.C. § 7(1) (defining the special maritime and territorial jurisdiction of the United States as including, *inter alia*, "any other waters within the admiralty and

maritime jurisdiction of the United States and out of the jurisdiction of any particular State" and "any vessel . . . when such vessel is within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State"). Section 7(1) does *not* say—contrary to defendants' repeated contention—that the special maritime and territorial jurisdiction of the United States *does not* or *cannot* include waters within the jurisdiction of a state.

Indeed, courts interpreting section 7(1) or its predecessors have specifically held that it does not exclude state waters from its reach. In *Murray v. Hildreth*, a bootlegger was prosecuted in federal court for murdering a United States Customs agent on a boat 200 feet from the Florida coast. 61 F.2d 483, 484 (5th Cir. 1932). The defendant, like defendants here, argued that there was no federal jurisdiction over the offense and that he could only be prosecuted for murder in state court. *Id.* The statute conferring jurisdiction read virtually identically to § 7(1). *See id.* at 484-85.

The Fifth Circuit rejected the jurisdictional challenge, specifically endorsing concurrent jurisdiction between the state and federal sovereign: "As between the United States and the several states, there

is no reason why the jurisdiction over crimes within the three-mile limit could not be made concurrent, as has usually been done in the punishment of offenses committed in violation of both federal and state laws." *Id.* at 485 (citation modified). The Fifth Circuit thus held that "the United States has jurisdiction to prosecute appellant if the crime charged against him was committed on the ocean below the low-water mark." *Id.*

Similarly, in *Hoopengarner v. United States*, the Sixth Circuit found concurrent federal jurisdiction for prosecution of a boat captain for recklessly piloting a boat on the Detroit River, 850 feet from the nearest point of land. 270 F.2d 465, 467 (6th Cir. 1959). On appeal, the defendant "submit[ted] that the situs of the offense was within the jurisdiction of the State of Michigan, and, therefore, outside the federal admiralty and maritime jurisdiction." *Id.* at 469. That defendant made the exact argument defendants make here, arguing that § 7(1) excludes any waters within the jurisdiction of any particular State from the special maritime and territorial jurisdiction of the United States. *Id.* at 470. The Sixth Circuit rejected this reading of § 7(1), saying that "[t]he fact that an offense can be prosecuted at common law in a state court

does not oust the maritime jurisdiction of a federal court." *Id.* at 471. Rather, "[a] federal court, under the maritime jurisdiction of the United States, may have jurisdiction over an offense, even though the state courts have concurrent jurisdiction." *Id.* at 471 (citing *The Genesee Chief*, 53 U.S. at 458).

This Court long ago also rejected the notion that the presence of state jurisdiction presents an absolute bar to the assertion of federal jurisdiction. In *Miller v. United States*, the defendants were convicted at trial for piracy-related offenses. 88 F.2d 102, 103 (9th Cir. 1937). Citing the Fifth Circuit's decision in *Murray v. Hildreth*, the Ninth Circuit found "no merit" in the defendants' argument, identical to defendants' here, that "the state of California has exclusive jurisdiction of crimes committed within its limits" and upheld the exercise of federal criminal jurisdiction. *Id.* at 103-04.

Additional courts, including the Supreme Court, have found that the existence of territorial jurisdiction—i.e., where offenses can be tried in the courts of a territory (as opposed to a state)—similarly does not preclude the assertion of federal criminal jurisdiction. In *Wynne v. United States*, the Supreme Court considered whether Wynne, who had

committed a murder while on board a vessel in the Honolulu harbor, could be tried for federal murder. 217 U.S. 234 (1910). Although the case involved application of a predecessor statute to present-day § 7, the relevant jurisdictional language was nearly identical. *See e.g.* 5339 Rev. Stat. (U.S. Comp. Stat. 1901 at 3643). Addressing the relationship of state and federal law, the Supreme Court concluded that even if the territorial courts of Hawaii had jurisdiction over homicides in the Honolulu harbor, that did not deprive the federal court of jurisdiction to try Wynne. Rather, the Court found that "concurrent jurisdiction" existed to federally prosecute the murder. *Wynne*, 217 U.S. at 245; *see also generally United States v. Zenon-Encarnacion*, 185 F.Supp.2d 127 (D.P.R. 2001) (rejecting a challenge to the assertion of federal criminal jurisdiction by a group of civilians who assaulted a military vessel inside a coastal bay in Puerto Rico and finding federal criminal jurisdiction to be concurrent with the jurisdiction of the territorial courts of Puerto Rico).

Finally, in 2015, in a case of murders occurring between 50 and 200 yards off Florida's coastline, the Eleventh Circuit addressed the exact point defendants make here: specifically, an argument "that the

murder [the defendant] was charged with committing was 'within the exclusive jurisdiction of the courts of the state of Florida,'" and thus could not be prosecuted in federal court. *Thompson v. United States*, 608 F. App'x 726, 728-29 (11th Cir. 2015). The Eleventh Circuit held, citing AEDPA § 901(a), that "federal criminal jurisdiction begins at the coast's mean low water line and extends out into the sea." *Id.* at 728. The Eleventh Circuit also specifically rejected defendant's argument that "18 U.S.C. § 7(1) bars his federal prosecution because it limits the jurisdiction of the United States to only those waters that are 'out of the jurisdiction of any particular State.'" *Id.* at 729.

These cases followed a long tradition of federal criminal jurisdiction over waters on the coast from the low-water mark.

#### ***c. Congress's declaration does not lose its effectiveness based on where it appears in the United States Code.***

Defendants also attempt to avoid the plain text of AEDPA based on its appearance in a statutory note rather than the main text of § 7(1). But courts must give the same weight to congressional declarations as laws which have been codified. "The laws of the United States are evidenced by the Statutes at Large, not by their placement

within the United States Code." *Springs v. Stone*, 362 F. Supp. 2d 686, 697 n.7 (E.D. Va. 2005) (citing 1 U.S.C. § 112 and *Conyers v. Merit Sys. Protection Bd.*, 388 F.3d 1380, 1382 n.2 (Fed. Cir. 2004)). Where a "district court apparently believed that public laws have less 'weight' as laws than laws which have been codified," the Eleventh Circuit has stated that "[t]he reverse is true: 'the Code cannot prevail over the Statutes at Large when the two are inconsistent.'" *Schwier v. Cox*, 340 F.3d 1284, 1288 (11th Cir. 2003) (quoting *United States v. Welden*, 377 U.S. 95, 98 n.4 (1964)); *see also Carson v. U.S. Office of Special Counsel*, 633 F.3d 487, 495 (6th Cir. 2011) ("[T]he Office of Special Counsel had a duty to comply with the statutory note following section 1214 . . . ."). Accordingly, there is no basis to reject AEDPA § 901(a)'s unambiguous conferral of federal criminal jurisdiction over the entire territorial sea based on its location within the U.S. Code as a Statutory Note.

Further, defendants' argument based on the judicial language that Congress does not "hide elephants in mouseholes" is wrongheaded. The exercise of federal criminal jurisdiction seaward from the low water mark—as made explicit in AEDPA § 901(a)—is no "elephant" that "worked a dramatic change in the balance between state and federal

criminal jurisdiction." (Joint AOB 8.) To the contrary, such exercise of federal criminal jurisdiction has been consistently present since the founding of the Republic. *See infra* Section V.A.2.d. There simply is, contrary to defendants' assertion, no "200-year-old exclusion of State ocean waters from [the special maritime and territorial jurisdiction of the United States]" (Joint AOB 10) for Congress to have departed from in AEDPA § 901(a); rather, AEDPA § 901(a) follows in a long tradition of inclusion of State ocean waters in the special maritime and territorial jurisdiction of the United States.

#### *d. Congress's statement does not raise constitutional questions.*

Defendants assert that any law that places ocean waters within the jurisdiction of a State under the special maritime and territorial jurisdiction of the United States raises "serious questions about its constitutionality." (Joint AOB 38.) But Congress was constitutionally able to place such ocean waters under the special maritime and territorial jurisdiction of the United States under two of its powers enumerated in the Constitution: its power to define and punish felonies on the high seas and its power to define crimes in admiralty.

i. Congress's declaration is consistent with its power to define and punish felonies on the "high seas."

Congress's ability to define and punish felonies on the "high seas" is specifically enumerated in the Define and Punish Clause of Congress's powers in the Constitution. U.S. Const., Art. I, § 8, Cl. 10. The understanding of "high seas" at the time of the adoption of the Constitution was indisputably the waters below the low tide mark, i.e., running from shore seaward. *United States v. Wiltberger*, 18 U.S. 76, 94 (1820) (equating "high seas" with at least "the ocean which washes a coast"); *United States v. Smith*, 1 Mason 147, 27 F.Cas. 1166, 1167 (D. Mass. 1816).

Indeed, for purposes of federal criminal jurisdiction, the Supreme Court has defined the "high seas" this way in cases dating back to the 19th century. *United States v. Rodgers*, 150 U.S. 249, 253 (1893) (stating "'high seas' mean the portion of the sea which washes the open coast" and upholding the exercise of federal criminal jurisdiction (quoting *Waring v. Clarke*, 46 U.S. 441 (1847))); *Ross v. McIntyre*, 140 U.S. 453, 471 (1891) ("The term 'high seas' includes waters on the sea-coast without the boundaries of low-water mark . . . ."); *Wiltberger*, 18

U.S. at 94; *see also United States v. Dewey*, 188 U.S. 254, 271 (1903) (citing the high seas definition from *Ross* in a civil suit).

Applying this precedent, the Fifth Circuit and, more recently, its successor circuit, the Eleventh Circuit (in an unpublished case), have defined "high seas" in criminal cases this way. *Thompson*, 608 F. App'x at 728 ("For purposes of federal criminal jurisdiction, the term 'high seas' refers to '*all* waters seaward of the territorial sea baseline.'"); *Murray*, 61 F.2d at 484 ("The term 'high seas' includes waters on the sea-coast without the boundaries of low-water mark." (quoting *Ross*, 140 U.S. at 471)). Similarly, the Sixth Circuit has held that a crime committed 850 feet from the nearest point of land was committed on the "high seas" for purposes of federal criminal jurisdiction. *Hoopengarner*, 270 F.2d at 467, 471.

Indeed, this definition of the high seas dates back to the earliest days of the Republic. Circuit Justice Story, the drafter of a predecessor statute to the federal criminal statute criminalizing murder,[6] stated, "for it never has been doubted that the waters of the ocean, on the sea-

[6] *See Rodgers*, 150 U.S. at 268-69 (Gray, J., dissenting).

coast, without low-water mark, are the high seas." *Smith*, 27 F.Cas. at 1167 (Story, Cir. J.). Justice Story used that evident proposition of law—that the high seas started at the low-water mark—to uphold the exercise of federal criminal jurisdiction for a criminal offense that took place within three miles of the shore of Massachusetts, finding that it occurred on the high seas. *Id.*; *see also United States v. Ross*, 1 Gall. 624, 27 F.Cas. 899, 900 (D.R.I. 1813) (Story, Cir. J.) (stating "the words, 'high seas,' mean any waters on the sea coast, which are without the boundaries of the low water mark" and again upholding the exercise of federal criminal jurisdiction); *United States v. Seagrist*, 27 F.Cas. 1002, 1003 (C.C.S.D.N.Y. 1860) (position of boat just off a coast, fastened to the shore by cables, was "within the common acceptance of the term, on the 'high seas,' outside of low water mark on the coast").

This line of cases—as opposed to any cited by defendants in their joint brief on appeal—squarely addresses the issue presented in this appeal: What does the high seas mean in 18 U.S.C. § 7(1), in the specific context of federal criminal jurisdiction? In the face of this precedent spanning the centuries, defendants simply pretend that none of it exists, wholly ignoring it in their opening brief.

Instead, they concoct an alternate legal reality—itself at odds with longstanding precedent—that says that the federal government cannot exercise jurisdiction over an area where the state exercises jurisdiction. But Congress's power to extend federal criminal jurisdiction to waters also within state criminal jurisdiction was confirmed as early as 1818 in *United States v. Bevans*, 16 U.S. 336, 386-87 (1818), as discussed further below. And the Ninth Circuit has squarely held that Congress has the power to provide for punishment of offenses at sea even though the place is within the jurisdiction of a state. *Miller*, 88 F.2d at 104.

Thus, defendants are incorrect to cast the 1996 pronouncement of Congress as working a dramatic overhaul of federal-state relations (Joint AOB 2, 7-8). In reality, Congress simply made explicit and unambiguous an earlier, long-accepted and unquestioned exercise of federal criminal jurisdiction seaward of the low-water mark of the ocean which washes the coast.

It is true that the high seas has been defined in other ways in other contexts. But most of the cases cited by defendants are not in the context of federal criminal jurisdiction; indeed, in those other contexts, the definition of "high seas" may be different. *See The Scotland*, 105

U.S. 24, 29 (1881) (addressing choice of law question in civil dispute arising out of collision of vessels); *American Banana Co. v. United Fruit Co.*, 213 U.S. 347, 355 (1909) (civil complaint concerning anti-competitive practices); *Cunard S.S. Co. v. Mellon*, 262 U.S. 100, 122-24 (1923) (civil suit requesting injunction in context of Prohibition); *The Hamilton*, 207 U.S. 398 (1907) (addressing power of state to legislate civil torts committed at sea).

Even the cases cited from the criminal context are not on point. In *United States v. Marin*, this Court was construing the phrase "vessel without nationality" in the Maritime Drug Law Enforcement Act ("MDLEA"), where the crime occurred about 655 nautical miles west of the Galapagos Islands in Ecuador; the Court was not construing the meaning of "high seas." 90 F.4th 1235, 1239-40 (9th Cir. 2024). In *United States v. Lei Shi*, this Court was considering Congress's authority to define various crimes under 18 U.S.C. § 2280, which prohibits acts of violence that endanger maritime navigation. 525 F.3d 709, 719-21 (9th Cir. 2008). In the course of that consideration, the Court stated that because Congress had the power to define felonies committed on "the high seas," Congress had the power "to apply federal

law beyond the borders of the United States." *Id.* at 720. The Court was *not* considering the question whether the high seas were limited to areas outside a state's jurisdiction.

Similarly, in *United States v. Davis*, this Court held that Congress had the power to give extraterritorial effect to the MDLEA because of Congress's power to define offenses on the high seas; the Court was not construing the limits of the high seas. 905 F.2d 245, 248 (9th Cir. 1990). Finally, in *United States v. Rubies*, this Court cited a definition of high seas explicitly taken from "international law." 612 F.2d 397, 402 n.2 (9th Cir 1979). More important, in *Rubies*, the Court was again not deciding the inner limit of the high seas, but rather deciding, under 14 U.S.C. § 89(a), the United States Coast Guard's authority to board a vessel about 150 miles off the coast of Washington. *Id.* at 400-03.

Indeed, none of defendant's cited cases hold that the high seas starts at three nautical miles from the California coast in a murder case. Even accepting *arguendo* the relevance of judicial language within the wholly different context these cases present, none of these cases actually hold that the high seas do not encompass the 3-mile band along the California coast. To the contrary, they simply refer to the

high seas as being outside the reach of other sovereigns, which is understandable given that the vast majority of the high seas *are* in fact outside the reach of any particular sovereign.

By contrast, the courts in *Murray*, *Thompson*, *Hoopengarner*, and *Smith* addressed the precise question facing this Court and upheld the exercise of federal criminal jurisdiction for a crime that occurred within three miles of shore, specifically finding that the high seas start at the low water mark for purposes of federal criminal jurisdiction. *See Murray*, 61 F.2d at 484; *Thompson*, 608 F. App'x at 728; *Smith*, 27 F.Cas. at 1167. The appropriate resolution here is to follow the courts that have squarely considered the issue of defining the inner limit of the high seas and applied Supreme Court precedent, which have all resolved the matter in favor of finding that the high seas begin at the low-water mark and upholding the exercise of federal criminal jurisdiction for a crime committed in that location.

ii. Congress can confer jurisdiction under its power to define crimes in admiralty.

Moreover, even if Congress's authority under Article I's Define and Punish clause were insufficient to enact § 901(a) of AEDPA, Congress can extend the federal judicial power "to all cases of admiralty

and maritime jurisdiction." U.S. Const., Art. III, § 2, Cl. 1. "[I]t has never been doubted that the grant of admiralty and maritime jurisdiction to the federal government includes the legislative power to define and punish crimes committed upon vessels lying in navigable waters of the United States." *United States v. Flores*, 289 U.S. 137, 151 (1933). The Ninth Circuit has specifically added that the clause reaches the ability to define and punish crimes that occur in waters within the jurisdiction of a state, saying that "this clause does give Congress power to provide for the punishment of offenses committed upon any navigable waters other than those of the high seas, although within the jurisdiction of a state." *Miller*, 88 F.2d at 104; *see also DeLovio v. Boit*, 7 F.Cas. 418, 438 (1815) (admiralty "from the highest antiquity, has exercised a very extensive criminal jurisdiction, and punished offences by fine and imprisonment").

Indeed, as noted above, Congress's power to extend federal criminal jurisdiction to waters also within state jurisdiction was confirmed as early as 1818 in *Bevans*. 16 U.S. at 386-87. There, the Supreme Court considered an indictment for a murder that occurred within Boston Harbor, within the jurisdiction of the state of

Massachusetts. But (unlike here) the statute on which the government erroneously relied for jurisdiction in that case required that the crime have been committed "out of the jurisdiction of any particular state." *Bevans*, 16 U.S. at 386.

The government in *Bevans* argued that the grant of federal judicial power over "all cases of admiralty and maritime jurisdiction" in Article III § 2, by itself, established an exclusive jurisdiction in the federal government to prosecute the murder in Boston Harbor. *Id.* at 387. The Supreme Court disagreed but stated that, while the federal government lacked jurisdiction over the murder, it was only because Congress had not conferred such jurisdiction through statute. *Id.* But it stated in no uncertain terms that Congress could confer jurisdiction over a murder that happened in state waters on the basis of that clause: "Let this be admitted. [That clause] proves the power of [C]ongress to legislate in the case; not that [C]ongress has exercised that power." *Bevans*, 16 U.S. at 387. In § 901(a) of AEDPA, Congress exercised that power, in addition to its power under the Define and Punish clause.

This is not the first time Congress has exercised such power to confer criminal jurisdiction on federal courts in waters otherwise

subject to state criminal jurisdiction. In *United States v. Durkee*, the federal trial court, in the course of giving jury instructions, identified the admiralty and maritime jurisdiction clause of the Constitution as the basis for Congress's power to criminalize piracy occurring, *inter alia*, "in any haven, basin, or bay, or in any river where the sea ebbs and flows"—i.e., within waters otherwise subject to state criminal jurisdiction—which Congress did in a legislative act in 1820." 25 F.Cas. 941, 942 (C.C. N.D. Cal. 1856) (citing *Bevans*, 16 U.S. at 388)). Thus, it deemed state and federal jurisdiction "concurrent." *Id.*

Further, it has long been clear that admiralty jurisdiction allows for jurisdiction over crimes committed anywhere upon the sea, to include the three-mile band along the coast. In particular, as the Supreme Court has said: "There appears to be no question, that the admiralty jurisdiction of England originally extended to all crimes and offences committed upon the sea, and in all ports, rivers, and arms of the sea, as far as the tide ebbs and flows." *Wiltberger*, 18 U.S. at 106 n. *w*. The Supreme Court went on to reject a suggestion that the admiralty did not include any navigable waters within the body of a county. *Id.* It then cited cases that "established the doctrine that the

constitutional admiralty jurisdiction includes ports, arms, and creeks of the sea, as far as the tide ebbs and flows," *id.*, placing the three-mile band along the coast well within the admiralty jurisdiction of the federal courts. *Id.*; *see also DeLovio*, 7 F.Cas. at 419 (Story, J.) ("[A]t a very early period, the admiralty had cognizance . . . of torts and offences, as well in ports within the ebb and flow of the tide, as upon the high seas . . . ."); *The Genesee Chief*, 53 U.S. at 446-47. The extent of admiralty jurisdiction was later observed to be even wider, though that extension is not relevant to this case. *See, e.g., Flores*, 289 U.S. 154 n. 8 (recognizing the reach of admiralty jurisdiction to nontidal waters).

#### *3. The district court also had jurisdiction because the "high seas" begin at the lower-water mark for purposes of federal criminal jurisdiction*

##### i. The "high seas" begins at the low-water mark for purposes of federal criminal jurisdiction.

"The term 'special maritime and territorial jurisdiction of the United States' includes the high seas . . . ." 18 U.S.C. § 7(1) (citation modified). Synthesizing case law on the subject, the Coast Guard issued the following regulation: "For purposes of special maritime and territorial jurisdiction of the United States as defined in 18 U.S.C. 7, high seas means all waters seaward of the territorial sea baseline." 33

C.F.R. § 2.32(a). The territorial sea baseline is the mean low water line along the coast of the United States. 33 C.F.R. § 2.20. Taken together, the regulation states that the high seas, for purposes of special maritime and territorial jurisdiction of the United States under 18 U.S.C. § 7, consist of all water seaward of the low water line along the coast of the United States.

The case law cited above—i.e., the extensive line of cases saying that the high seas begin at the low water mark and extend seaward—is what gave rise to the regulation and stands as good law in defining the "high seas" for purposes of federal criminal jurisdiction specifically. *See Wiltberger*, 18 U.S. at 94; *Ross*, 140 U.S. at 471; *Rodgers*, 150 U.S. at 253; *Murray*, 61 F.2d at 484; *Thompson*, 608 F. App'x at 728, *Smith*, 27 F.Cas. at 1167; *Ross*, 27 F.Cas. at 900; *Seagrist*, 27 F.Cas. at 1003.

Defendants cite other definitions of "high seas" in other contexts, such as international law, where the high seas "means all parts of the sea that are not included in the territorial sea or in the internal waters of a State." Convention on the High Seas, art. 1, *opened for signature* Apr. 29, 1958, 450 U.N.T.S. 82 (entered into force Sept. 30, 1962). The "high seas" has also been used to refer to non-territorial waters in

several other contexts, which has not traditionally been the applicable term for purposes of federal criminal jurisdiction, as described above.

ii. The SLA did not preclude concurrent jurisdiction.

Defendants' argument that the Submerged Lands Act of 1953 means that the federal government cannot have concurrent criminal jurisdiction with the states (*see* Joint AOB 19-21) is incorrect. While the Act declares civil and criminal laws to be the laws of the United States for a certain portion of the subsoil and seabed of the outer continental shelf, *see* 43 U.S.C. § 1313, it does not speak to the issue of whether the United States can exercise concurrent criminal jurisdiction within state-proclaimed sea boundaries. The Submerged Lands Act "has not been found to divest the federal government of criminal jurisdiction over crimes or offenses occurring on what it has declared to be state waters." Lockhart, *Validity, Construction, and Application of Submerged Lands Act of 1953, 43 U.S.C.A. §§ 1301 et seq.*, 68 A.L.R. Fed. 2d 363 (2012).

Defendants' reliance on the SLA in support of their claim that California enjoys exclusive jurisdiction over the murder at issue is misplaced, as that statute deals with mineral rights. The SLA was

enacted in 1953, in response to litigation that effectively transferred ownership of the first three miles of a state's coastal submerged lands to the federal government. In *United States v. California*, the United States had successfully argued that the three nautical miles seaward of California belonged to the federal government, primarily finding that the federal government's responsibility for the defense of the marginal seas and the conduct of foreign relations outweighed the interests of the individual states. 436 U.S. 32, 39 (1947).

In response, Congress passed the SLA, under which states enjoy a presumption of title to submerged lands beneath inland navigable waters within their boundaries. *See Alaska v. United States*, 545 U.S. 75, 78-79, 1255 S.Ct. 2137, 2143-44 (2005). The SLA has also been interpreted to give the states concurrent jurisdiction over the waters above the submerged lands. *See United States v. California*, 436 U.S. at 39, 98 S.Ct. at 1666 (1978); *Barber v. State of Hawaii*, 42 F.3d 1185, 1190 (9th Cir. 1994) (noting SLA provides states and the United States with "concurrent jurisdiction over the waters above the submerged lands" for purposes of commerce, navigation, national defense, and international affairs). Nothing in the statute itself, its legislative

history, or interpreting case law suggests that the SLA, which was enacted to address mineral rights issues, divested federal courts of jurisdiction to try a murder committed in an area of concurrent state and federal jurisdiction. Accordingly, whether based on AEDPA or the correct definition of "high seas," jurisdiction existed over defendants' murder of Dao at sea.

## B. The Government's Unobjected-To Statements During Rebuttal During Le's Case Were Not Plainly Erroneous

### *1. Standard of review*

Where there is no objection to any alleged misstatement during closing argument, this Court reviews for plain error. *United States v. Segna*, 555 F.2d 226, 231 (9th Cir. 1977). Under plain error review, this Court may reverse only when (1) there is error, (2) that was plain, (3) that affected the appellant's substantial rights, and (4) that "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 736-37 (1993).

### *2. The government's statement of the law was correct*

The government's statement regarding self-defense in its closing rebuttal was not erroneous, let alone clear or obvious error affecting Le's substantial rights or the fairness of the proceedings.

First, the statements were made in light of the instruction on self-defense that "a person must use no more force than appears reasonably necessary under the circumstances." (2-LER-0154.) In leaving Dao in the water in the state he was in, Le was using more force than was necessary under the circumstances. This was the import of the government's statement to the jury that "[b]y turning the boat around and going back to shore and leaving the wounded man in the water, that is not reasonable force." (1-LER-0017.)

Indeed, the statement to the jury went to more than that. It also went to defeat an additional requirement of self-defense—that of a person "reasonably believ[ing] that [the] force [likely to cause death] is necessary to prevent death or great bodily harm." (2-LER-0154.) When the government said "[i]f you've got the gun, you're no longer facing deadly force from a man floundering in the water . . . the threat is gone," the government was saying that this requirement of self-defense—that Le reasonably believed that the force he used was necessary to prevent great harm—was defeated.

The government's statements were also correct when viewed through the lens of the instruction on "imperfect self-defense," which

does not yield a full acquittal but reduces the crime from murder to manslaughter. (2-LER-0157.) That provides that a defendant does "not act with malice aforethought if he believed that he was in imminent danger . . . and the immediate use of deadly force was necessary to defend against the danger, *even if his belief was unreasonable and his use of force was greater than appears reasonably necessary under the circumstances*." (2-LER-0157 (emphasis added).) During the government's rebuttal, the prosecutor was merely pointing out to the jury that, even according to Le's rendition of what happened on the boat, Le himself did not actually "believe[ ] that he was in imminent danger" (2-LER-0157) at the time that he took the final action that killed Dao—leaving him in the ocean.

This was the import of the government's statement that "if you accept [Le's word] and accept his whole description of it, it still falls apart because he has the gun when James Dao is in the water." (1-LER-0018.) The government was saying the same thing—i.e., that Le did not believe he was in imminent danger by the time he had the gun and a badly injured Dao was in the water—when the prosecutor said, "Because once he's in the water and you have the gun, those precepts

stop." (1-LER-0019.) While Le's testimony involved assertions that he still felt "scared" once Dao was in the water (10-LER-2119, 2137), he admitted on cross-examination that Dao no longer had the gun after he went in the water and Dao could no longer shoot Le. (11-LER-2240.) Thus, Le is also wrong to argue on appeal that "if the jury accepted [his] whole description of it, [he] was not guilty." (Le AOB 30.)

Contrary to Le's assertion, the government did not argue "that Le's failure to save Dao's life defeated self-defense." (Le AOB 30.) The government instead argued that Le committed murder through his affirmative act of leaving Dao in the water, depriving Dao of his ability to get back on the boat. (*See* 1-LER-0015 (government describing Le's act as "[a]bandoning someone in the open ocean"); 1-LER-0017 (government describing Le's act as "turning the boat around and going back to shore").) This was a correct statement of the law.

Finally, in saying that this was a "clear misstatement of the law," and then citing to the Model Penal Code provision (Le AOB 30), Le misses an entire area of substantive criminal legal doctrine to the effect that a failure to act—or an omission—*can* be the basis for criminal liability where the defendant owes the victim a duty to act based on

certain factors, such as creation of peril by the defendant or a special relationship between defendant and victim. "The clearest case of such a duty is that in which the defendant is himself at fault in creating the danger." *Substantive Criminal Law*, Wayne R. LaFave, § 6.2(a)(5), Duty based upon creation of the peril, (3d ed.) (Oct. 2024 Update). "But there may perhaps be a duty to act even if the defendant innocently creates the situation of danger." *Id.* Here, even accepting Le's testimony, because he had created the situation of danger that Dao found himself in, Le had a duty to safeguard Dao from the danger he created.

Le also had a duty to act based on his and Dao's relationship. In particular, "[t]he common law imposes affirmative duties upon persons standing in certain personal relationships to other persons . . . [including] upon ship captains to aid their crews." LaFave, § 6.2(a)(1), Duty based upon relationship. "Thus . . . a ship captain [may be guilty of criminal homicide] for failure to pick up a seaman or passenger fallen overboard." *Id.* "Action may be required to thwart the threatened perils of nature." *Id.* (also giving example of two mountain climbers owing each other a duty to extricate the other if imperiled, based on

"the nature of their joint enterprise, involving a relationship of mutual reliance"). Ritze at a minimum bore this relationship to Dao, that carried with it a duty to safeguard him if he fell overboard, and Le's prevailing upon Ritze to take the boat back to shore—thereby killing Dao—constituted an abdication of that duty.

For all these reason, the government's statement in rebuttal, then, was by no means a misstatement, let alone a clear or obvious one.

The cases cited by Le on appeal (Le AOB 29) do not compel a different result, as they merely stand for general propositions relating to self-defense, and in this case, the district court gave proper self-defense instructions. *See Brown v. United States*, 256 U.S. 335 (1921) (a person need not retreat before acting in self-defense); *Alberty v. United States*, 162 U.S. 499, 508 (1896) (same); *United States v. Morsette*, 622 F.3d 1200, 1202 (9th Cir. 2010) (circuit's model jury instruction on self-defense sufficient); *United States v. Keiser*, 57 F.3d 847, 850-52 (9th Cir. 1995) (same); *United States v. Britt*, 79 F.4th 1280, 1286 (10th Cir. 2023) (stating law of self-defense and imperfect self-defense). And Le has cited no case expressly holding that the government's statement in rebuttal was improper. At a minimum,

"there is no controlling authority on point," and "the most closely analogous precedent leads to conflicting results." *United States v. Gonzalez Becerra*, 784 F.3d 514, 518 (9th Cir. 2015). Accordingly, any error necessarily cannot have been clear or obvious. *Id.*

### *3. Any error did not affect Le's substantial rights or the fairness of the proceedings*

Even if there were somehow error in the government's comments in rebuttal, this Court will reverse for plain error "only in those very exceptional circumstances where reversal is necessary in order to prevent a miscarriage of justice or to preserve the integrity and reputation of the judicial process." *Segna*, 555 F.2d at 231 (citing cases). "The prejudicial nature of unobjected-to error must be determined by reference to the whole case." *Id.* This Court looks at whether "the probability is high that the error materially affected [the] verdict." *Id.*

Here, Le does not dispute that the jury was properly instructed regarding self-defense. And the evidence against Le was overwhelming; the district court noted in a post-trial decision that "the Government had a strong case against [Le]," and that "the case for [Le's] motive was very strong." (4-SER-1030-31.)

Specifically, the evidence on the contested issue of whether, on the one hand, Le acted with premeditation or deliberation, or, on the other hand, acted in self-defense, was overwhelmingly in favor of the jury's ultimate verdict that he acted with premeditation or deliberation. In particular, as recounted above, the evidence establishing that Le acted with premeditation or deliberation included his statements to multiple witnesses that he would be killing Dao and his motive to kill him (*supra* Section III.B.1.b), post-murder statements to multiple witnesses that he had committed a premeditated murder (*supra* Section III.B.1.d.i), the location of the murder in a place where others were unlikely to intrude, evidence of his possession of the murder weapon, a .38 caliber gun (*supra* Section III.B.1.c), evidence of his lies to Dao's family and the Coast Guard (*supra* Section III.B.1.d.i), and evidence of his tracking of Dao's partner, Nguyen, after the murder (*supra* Section III.B.1.d.ii). In addition, Le's own testimony was not credible given the inconsistencies between it and the government's other evidence. *Supra* Section III.B.3.a. Le cannot show that, absent the argument that Le objects to here, the jury would have acquitted him.

The jury was unlikely to have credited Le's story in any event, because of the conviction for Conspiracy to Murder. If the jury had credited Le's testimony that he acted in self-defense but convicted him of First Degree Murder anyway on the basis of any misstatement by the government in rebuttal, they would not have also found that Le agreed with Ritze to kill Dao. In reviewing the "whole case," *Segna*, 555 F.2d at 231, then, the probability that any error affected the jury's verdict is low.

The cases cited by Le in this regard do not compel a different result. In *Segna*, the government, unlike here, both (1) clearly misstated the law, and (2) shifted the burden to the defense on a key point and "deprive[d] [defendant] of the benefits of the reasonable doubt standard" on a point that was "extremely close." 555 F.2d at 230. That was not the case here.

Moreover, here, the government's "words were not in isolation, they were in a context." *United States v. Navarro*, 608 F.3d 529, 535 (9th Cir. 2010) (distinguishing *Segna*). The context here was in part the response to a defense argument that the FBI agent had tainted all the government's witnesses and in part a response to the assumption

underlying the defense argument that Le had had no intent to kill Dao at all. (*See* 1-LER-0017-18 (government arguing that Le's failure to stay there, call the Coast Guard, radio Harbor Patrol, throw him a life preserver, or radio in or tell anyone when they got back to shore "evinces an intent to kill James Dao").)

*Deck v. Jenkins* is distinguishable on multiple significant grounds. First, in that case, based on jury notes to the district court submitted during deliberations, it was clear that the jury was focused on the specific misstatement of law by the prosecutor that was the subject of the appeal, which rendered the likelihood that the verdict was materially affected much higher than here, where there is zero indication that the jury focused on this issue at all. 814 F.3d 954, 976, 9983 (9th Cir. 2016) (appellate court "need not engage in speculative Monday morning quarterbacking to know the rebuttal argument may have seriously misled the jury" because of the jury note); *see also id.* at 985 (Ninth Circuit further citing the jury's note). Second, in *Deck*, unlike here, it was beyond dispute that the prosecutor made a misstatement of law. *Id.* at 977 (explaining that the appellate court does not review that issue given particular habeas posture). Third, the

evidence on the central issue in question in *Deck* was equivocal, 814 F.3d at 984, unlike here, where the evidence that Le's testimony was perjured was overwhelming.

Finally, Le cannot establish the fourth prong of plain-error review given the magnitude of his crime and the overwhelming evidence. *See United States v. Fuchs*, 218 F.3d 957, 963 (9th Cir. 2000) (citing *Johnson v. United States*, 520 U.S. 461, 470 (1997)). Accordingly, even if there were obvious error—and there was not—no miscarriage of justice would result from affirmance.

### C. Le Waived the Right to Challenge Dismissal of the Juror Undergoing a Mental-Health Crisis, and Dismissal Was Proper Anyway

#### *1. Standard of review*

This Court typically reviews a district court's dismissal of a juror for abuse of discretion. *United States v. Depue*, 879 F.3d 1021, 1027-28 (9th Cir. 2018). But this Court cannot review an issue that is waived. Waiver "is the intentional relinquishment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993). The law does not "permit an accused to elect to pursue one course at the trial and then, when that has proved to be unprofitable, to insist on appeal that the course which

he rejected at the trial be reopened to him." *Johnson v. United States*, 318 U.S. 189, 201 (1943). When a district court "follow[s] the course which [the defendant] himself helped to chart and in which he acquiesced until the case was argued on appeal," a challenge to the district court's decision is "plainly waived." *Id.*

If a decision is not waived but rather only forfeited by a defendant's lack of objection, then review is for plain error. *United States v. Depue*, 912 F.3d 1227, 1232 (9th Cir. 2019) (en banc).

#### *2. Le waived any challenge to the dismissal of the juror*

Because Le supported the dismissal of Juror 2, he waived his right to object to that dismissal. There was no question that the right to be asserted here—that of a potential mistrial if the juror's dismissal was based on her doubts about the sufficiency of the evidence—was known to Le. Indeed, he contemporaneously cited *Symington*, 195 F.3d at 1087 to the district court. (2-LER-0216-17.) But upon receiving additional information from the jury about Juror 2's mental distress and inability to continue to deliberate—after initially being sent back by the district court to deliberate further—the parties then came to a consensus about posing two more questions to the juror and decided that if the answer

were "yes" to both questions, they would agree to stipulate to the dismissal of Juror 2. (2-LER-0245-0246.) Juror 2 answered yes to both questions, and, though the defense was asked if they wanted further inquiry, they declined. (2-LER-0248.) The defense did not move for a mistrial or object to the dismissal of Juror 2. Far from it, instead, the defense then supported Juror 2's dismissal on the record, saying, "I believe there's independent grounds to excuse her despite her earlier answer that, I think, caused us some pause, um, and I think the Court would be within its . . . discretion to excuse her, replace her with a randomly selected alternate." (2-LER-0249.) In these circumstances, Le intentionally relinquished his known right to object to dismissal of Juror 2 or move for a mistrial. *Perez*, 116 F.3d at 845. "[A] litigant takes the risk a judge will rule in a manner consistent with the litigant's request"; they cannot later complain when their request leads to an unfavorable result. *United States v. Berberian*, 851 F.2d 236, 240 (9th Cir. 1988).

Finding waiver here would be consistent with other circuits' precedent in similar circumstances. For instance, a defendant cannot learn of juror misconduct during trial, gamble on a favorable verdict by

remaining silent, and then complain in a post-verdict motion that the verdict was influenced by that misconduct. *See United States v. Bollinger*, 837 F.2d 436 (11th Cir. 1988); *see also United States v. Jones*, 597 F.2d 485, 588 n.3 (5th Cir. 1979) (defendant cannot gamble on a favorable verdict and then complain in a post-verdict motion about the verdict); *United States v. Gootee*, 34 F.3d 475, 479 (7th Cir. 1994) (upholding district court's finding that defendant had waived claim regarding juror misconduct first brought in motion for new trial).

That Le was gambling on a favorable verdict through agreeing to the seating of the alternate is clear from the record, including counsel's statement at the hearing on the motion for new trial, in which counsel made clear his regret at agreeing to the dismissal of Juror 2, saying, "in hindsight, I regret that . . . hindsight's 20-20." (3-LER-0371; *see also* 3-LER-0375 ("in hindsight, absolutely" regret not moving for a mistrial); 3-LER-0394-95 (district court noting "some very good tactical reasons" and "some very good reasons that there's no request for a mistrial here"); 3-LER-0433 (district court noting defense decision not to request a mistrial could have been "an excellent decision . . . with [simply] a bad

consequence," as "nobody knew what was happening with . . . the jury back at the time"); 3-LER-0440 (similar).)

Le argues on appeal that he cannot waive his right to a unanimous verdict. That is correct. *United States v. Lopez*, 581 F.2d 1338, 1342 (9th Cir. 1978). But Le did not waive his right to a unanimous verdict. To the contrary, he received a unanimous verdict of guilty. He simply waived his right to challenge the dismissal of a particular juror. And stipulation to removal of a juror does not constitute a prohibited agreement to less than a unanimous verdict. In fact, this Court has explicitly held that "a defendant may waive the rule which forbids substitution of an alternate juror after the jury has begun its deliberations" and may even proceed with a jury consisting of fewer than twelve people, as long as the verdict is unanimous *United States v. Lopez*, 581 F.2d 1338, 1343 (9th Cir. 1978) (citing *United States v. Leser*, 358 F.2d 313 (9th Cir. 1966)); *see United States v. Murphy*, 483 F.3d 639, 642-44 (9th Cir. 2007).

Also instructive is the Sixth Circuit's decision in *United States v. Street*, where the defendant consented to the substitution of a juror and then complained on appeal about the substitution of the juror. 614 F.3d

228, 234 (6th Cir. 2010). The Sixth Circuit said a defendant "cannot agree in open court with the judge's proposed course of conduct and then charge the court with error in following that course," *id.* at 234 (citation modified), which is exactly what Le did here.

This case is distinguishable from all the cases Le cites in support of his argument that a unanimous verdict cannot be waived. *Ramos* and *Erlinger* merely stand for the proposition that verdicts must be unanimous and have nothing to do with the dismissal of jurors or even whether the right can be waived. *See Ramos v. Louisiana*, 590 U.S. 83 (2020); *Erlinger v. United States*, 602 U.S. 821 (2024). The other three cases cited by Le in this regard stand for the proposition that the right to a unanimous verdict cannot be waived, but in none of those cases did this Court say that the right to object to the dismissal of a juror cannot be waived. *See, e.g., United States v. Alarcon-Simi*, 300 F.3d 1172, 1176-77 (9th Cir. 2002) (not addressing any issue relating to juror dismissal). More important, in those cases where this Court has said a defendant cannot waive his right to a unanimous verdict, this Court was addressing situations in which a defendant truly waived their right to a unanimous verdict, by agreeing to a verdict by a vote of 12 to 2, as

in *United States v. Ullah*, 976 F.2d 509, 510-11 (9th Cir. 1992), or a verdict by a vote of 10 to 2, as in *Lopez*, 581 F.2d 1338. These cases have no application here, where Le received a unanimous verdict from his twelve-member jury.

#### *3. The district court applied the correct legal standard*

Even if this Court could review this issue, Le cannot show error. To begin with, the district court applied the correct legal standard. Even in its initial comments on the bench immediately upon receipt of the first note from the jury on the topic of the distressed juror, the district court displayed its sensitivity to the proper legal standard, saying: "The issue is how are we going to treat this fairly so that if this is a minority juror, she is not being cast aside because of pressure, if they're 11 to 1 or 10 to 2. That's not appropriate." (2-LER-0204.) The district court acknowledged that the parties might have tactical decisions to make based on speculation about what was occurring during jury deliberations but said, "My job, as a judge, is just to make certain it's fair." (2-LER-0207.)

During consideration of how to proceed, the district court itself read into the record the legal standard from *Symington*. (2-LER-

0222-23.) The district court then formulated questions to pose to Juror 2, with "language follow[ing] *Symington* more than the Court's initial [suggested language for the questions]." (2-LER-0223.) After posing the questions to Juror 2 and getting her responses, the district court declined to dismiss Juror 2 and sent Juror 2 back to deliberate. (2-LER-0236-37.) The district court then only dismissed Juror 2 once the parties had more information about her inability to deliberate and when invited to do so by the defense. (2-LER-0248-0249.)

In the district court's written order denying the motion for new trial, the district court also cited and quoted *Symington*. (1-LER-0026, 0037-38.) The district court's additional citation of *Perez v. Marshall*, 119 F.3d 1422 (9th Cir 1997) and *United States v. Leahy*, 82 F.3d 624, 629 (5th Cir. 1996), did not detract from the district court's application of the correct legal standard. Those cases stand for the correct proposition that a district court may dismiss a juror where there are independent grounds supporting dismissal that are not because the juror harbors doubts about the sufficiency of the evidence. Indeed, in *United States v. Christensen*, a case that post-dates *Symington*, this Court found that "independent grounds" may justify the dismissal of a

juror, even where there is some indication that the juror "disagreed with the majority of the jurors." 828 F.3d 763, 809 n.24 (9th Cir. 2015). Additionally, this Court in *Litwin* itself left open the possibility for such independent grounds, only reversing the district court where it found that those independent grounds lacked support in the record. *Litwin*, 972 F.3d at 1177.

Indeed, *Perez* is particularly apt because of its discussion of the role of both the problematic juror's mental health and suggestions that the problematic juror could be a holdout juror. As in *Perez*, so here: "the record shows that the district court was forced to act, not because of [the juror's] status as a holdout juror, but because of [the juror's] emotional inability to continue performing the essential function of a juror—deliberation." *Perez*, 119 F.3d at 1427. The district court altered its decision to keep Juror 2 on the jury only when she said she had thoughts of hurting herself to remove herself from the process and that she could not further deliberate. (2-LER-0248-0249.) That was consistent with *Symington*. Indeed, the *Symington* court itself favorably cited a case that both *Perez* and *Leahy* relied on, *United States v. Huntress*, 956 F.2d 1309, 1312 (5th Cir. 1992), as an example

of "dismissal [being] proper where [a] juror [was] diagnosed by [a] doctor as suicidal and paranoid." *Symington*, 195 F.3d at 1085.

#### ***4. Juror 2 was dismissed because of her mental health condition, not because of her views of the evidence, which were unknown to all parties***

The dismissal was also not an abuse of discretion. The request for dismissal of the juror, jointly made by both the government and Le, was based on the juror's inability to continue deliberating and the apparently serious threat to her mental health. (2-LER-0244 ("She presents clearly as distressed and in crisis.").) Accordingly, the district court's actions were perfectly consistent with the direction of *Symington*, which stands for the proposition that "a court may not dismiss a juror during deliberations if the request for discharge stems from doubts the juror harbors about the sufficiency of the evidence." 195 F.3d at 1085.

Considering the position of the district court at the time Juror 2 was dismissed, it was wholly unclear what Juror 2's position was in deliberations. At the time the defense and government were considering whether to request dismissal of Juror 2, the parties and the district court could only speculate about what Juror 2's position was.

The district court even noted that fact at the time. (*See* 2-LER-0203-0204 (district court's statement that "*if* this is a holdout juror… *you don't know* what that juror's holding out for" and referring to the parties' potential need to make a "tactical decision" based on the parties' speculation of what was happening in the jury deliberations) (emphasis added)); *see also* 3-LER-0372 (defense counsel agreeing that "[f]or all we knew, it could have been 11 [to] one for not guilty . . . we didn't know. Nobody did."); 3-LER-0375-0377 (government and district court agreeing that no one knew which among "an infinite amount of permutations" of intra-jury disagreement could have been occurring).)

Accordingly, the request for discharge did *not* stem from doubts the juror harbored about the sufficiency of the evidence, because no one had any idea what Juror 2's view of the evidence—if, indeed, she harbored any in light of the foreperson's representation that "she cannot make a decision." (2-LER-0199). *See Litwin*, 972 F.3d at 1168-69.

*Litwin* and *Symington* are not to the contrary, and nothing in those opinions requires reversal here. In *Symington*, for example, the juror in question "stated that she was prepared to continue

deliberating," and "was willing to discuss elements of the case with the other jurors," 195 F.3d at 1084, whereas Juror 2 here stated in no uncertain terms that she could not continue deliberating. (2-LER-0248.) Additionally, there was no identified mental health issue present in *Symington*. And the defendant there also moved for a mistrial at the appropriate time, 195 F.3d at 1084, not trying to gamble on a favorable verdict, as Le did here. In *Litwin*, this Court based its decision on a set of "uncommon" and "unique combination of circumstances." 972 F.3d at 1159. Like in *Symington*, the juror was willing and able to continue deliberating, *id.* at 1166, and, this Court found, had in fact been deliberating, contrary to the district court's conclusion, *id.* at 1176-77. Additionally, the district court formed its own conclusion that the juror was "sending a message to this Court about the inconvenience that she has suffered" from jury service, 972 F.3d at 1164-65, which this Court found "lacks support in the record." *Id.* at 1172-73. Those facts are different than the ones in this case, where the record shows Juror 2 was unable to deliberate and was thinking of harming herself to get excused.

"[T]here are various reasons why a district court may properly, and in its discretion, remove a juror from service once the jury has begun deliberating." *Litwin*, 972 F.3d at 1158. "Determining whether such a dismissal was a violation of the defendant's constitutional right to a unanimous jury verdict, or instead a permissible response to a juror's recalcitrance, bias, or incapacity, is a sensitive task" on which district courts "are accorded considerable deference" because they "observe jurors first-hand." *Id.* "There are, of course, many situations where this core Sixth Amendment right is not implicated because the juror is removable for reasons that have nothing to do with her views on the case." *Id.* "In addition, courts have also found just cause to dismiss jurors who, although available and physically capable of serving, are nonetheless found to be *unable to perform their duties properly*." *Id.* (emphasis added) (citation modified). This Court in *Symington* emphasized that "[c]ases subject to this rule [finding dismissal improper] . . . are infrequent," *Symington*, 195 F.3d at 1087, n.6, and this Court said the same thing again in *Litwin*, calling the "specific circumstances" of that case "uncommon." *Litwin*, 972 F.3d at 1159.

This case does not present one of the rare cases where reversal is warranted. At a minimum, assuming Le did not waive this issue, he has not established plain error. "[T]here is no controlling authority on point" and "the most closely analogous precedent leads to conflicting results." *Gonzalez Becerra*, 784 F.3d at 518. Nor has he carried his burden to establish the final two prongs of plain error. Thus, Le's claim must be rejected.

#### ***5. The district court properly rejected Juror 2's post-verdict statements under Federal Rule of Evidence 606(b)***

"The prohibition on admitting juror testimony to challenge the validity of a verdict is longstanding." *United States v. Leung*, 796 F.3d 1032, 1033 (9th Cir. 2015) (citing *Warger v. Shauers*, 574 U.S. 40 (2014)). "[T]he plain text and history of Rule 606(b) dictate that a party seeking to impeach a verdict cannot resort to juror testimony about any statement made or incident that occurred 'during deliberations.'" *Id.* at 1036 (quoting *Warger*, 574 U.S. at 52-53). This prohibition "exists for good reason—it protects jurors from harassment and maintains the integrity and finality of jury verdicts." *Id.* "While persistent inquiry into internal jury processes could 'in some instances lead to the

invalidation of verdicts reached after irresponsible or improper jury behavior,' our very system of trial by jury might not 'survive such efforts to perfect it.'" *Id.* (quoting *Tanner v. United States*, 483 U.S. 107, 120 (1987)). "Once a jury has pronounced its judgment, Rule 606(b) helps ensure jurors' ability to separate and melt anonymously into the community from which they came." *Id.* at 1038 (citation modified).

The district court was correct to reject the post-verdict statements from Juror 2 because they fall within the prohibition on receiving them laid out in Federal Rule of Evidence 606. "During an inquiry into the validity of a verdict . . . a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment." Fed. R. Evid. 606(b)(1). Paragraphs 3 through 7 of the declaration recounting statements from Juror 2 clearly rest on a juror's testimony about statements made and incidents that occurred during the jury's deliberations, and on the jurors' mental processes. (3-LER-0346-47.)

Indeed, every sentence of every one of those paragraphs constitutes juror testimony about statements made and incidents that

occurred during the jury's deliberations. Accordingly, as in *Leung*, Le's complaint in his motion for new trial "attempt[ed] to shed light on the internal affairs of the jury . . . [b]ut parsing how jurors considered the evidence or their mental states while hearing testimony is exactly what *Tanner* and the plain text of Rule 606(b) seek to prevent." *Leung*, 796 F.3d at 1036.

This Court has said that Rule 606(b) bars the very type of allegations made concerning the dismissed juror here. In a case where a dismissed juror provided information after the verdict, as here, the Ninth Circuit held that "Rule 606(b) clearly bars consideration of the declaration's allegation that the juror said that she was subjected to pressure by other jurors for being a 'holdout for acquittal.'" *United States v. Decoud*, 456 F.3d 996, 1019, n.11 (9th Cir. 2006).

Courts have also specifically held that evidence of intimidation or harassment of one juror by another is within the prohibition of Rule 606 and not competent to impeach a verdict. In a case where a juror alleged threats by the jury foreperson to get the juror to convict, the Third Circuit found the juror testimony to be "so clearly within the rule" and said that "testimony concerning intimidation or harassment of one juror

by another falls squarely within the core prohibition of the Rule." *United States v. Lakhani*, 480 F.3d 171, 185 (3d Cir. 2007) (citation modified).

This is a longstanding rule with support across the circuits. *See, e.g.*, *United States v. Norton*, 867 F.2d 1354, 1366 (11th Cir. 1989) (noting that "alleged harassment or intimidation of one juror by another would not be competent evidence to impeach the guilty verdict"); *United States v. Briggs*, 291 F.3d 958, 961 (7th Cir. 2002) (barring evidence of one juror being "'intimidated' by other jurors into finding [the defendant] guilty"); *United States v. Brito*, 136 F.3d 397, 414 (5th Cir. 1998) (deeming evidence of internal coercion inadmissible per Rule 606(b)); *United States v. Tallman*, 952 F.2d 164, 167 (8th Cir. 1991) ("To admit proof of contentiousness and conflict to impeach a verdict under Rule 606(b) would be to eviscerate the rule."); *Gov't. of the V.I. v. Gereau*, 523 F.2d 140, 150 (3d Cir. 1975) ("Evidence of . . . intimidation or harassment of one juror by another and other *intra*-jury influences on the verdict is *within* the rule, rather than the exception, and is not competent to impeach a verdict") (citation modified)).

Le argues on appeal that Juror 2's statements were not about the verdict, and that Juror 2 was not herself a "juror" within the meaning of Rule 606, because Juror 2 was replaced by an alternate. Le cites no authority—case law, statute, rule, or other source—for these arguments which find no support in the language of the rule itself, which merely refers to "jurors," regardless of whether they are current or former jurors. Additionally, this argument is foreclosed by *Decoud*, in which this Court upheld the rejection of testimony from a dismissed juror "who was not a member of the jury that convicted" under Rule 606. 456 F.3d at 1019-20.

None of the cases that Le cites for his argument that Juror 2 was not a "juror" under Rule 606(b) say that jurors who have been replaced do not count as jurors. *Tanner* says nothing of the sort; it says only that courts can take evidence of juror misconduct from people who are not jurors, like court personnel. 483 U.S. at 127.

The notion that the allegations from Juror 2 recounted in the affidavit are not "about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the

verdict or indictment" is also incorrect. Juror 2's statements here are explicitly about what occurred during the jury's deliberations, and her mental processes concerning the case. Accordingly, they fall within the core of the prohibition in Rule 606.

### D. There Is No Evidence that Le's Jury Failed to Begin Its Deliberations Anew, and the Alternate Was Not Exposed to Extrinsic Evidence

#### *1. Standard of review*

The Ninth Circuit reviews a district court's denial of a motion for a new trial for abuse of discretion. *United States v. Voris*, 964 F.3d 864, 869 (9th Cir. 2020). "The burden is on [the defendant] to show that the district court abused its discretion." *Id.*

On the specific issue of whether to reject juror allegations and conduct an evidentiary hearing under Rule 606(b), sister Circuits have said the standard of review is abuse of discretion. *See United States v. Brown*, 934 F.3d 1278, 1294 (11th Cir. 2019); *United States v. Johnson*, 495 F.3d 951, 981 (8th Cir. 2007).

The Ninth Circuit reviews de novo the "construction or interpretation of . . . the Federal Rules of Evidence, including whether particular evidence falls within the scope of a given rule." *United States*

*v. Wells*, 879 F.3d 900, 914 (9th Cir. 2018). "Once it has been determined that challenged evidence falls within the scope of a given rule, the District Court's decision to admit the evidence is reviewed for abuse of discretion." *United States v. Durham*, 464 F.3d 976, 981 (9th Cir. 2006).

#### ***2. The district court was correct to reject the affidavits regarding post-trial statements of jurors about deliberations***

The district court was correct to reject the portion of the affidavit submitted with the new trial motion that included the alternate juror's statement that "the other jurors had the evidence on a whiteboard that they explained to him," and the other jurors' "belie[f] [that] the timeline did not allow for sufficient time to drop the lobster hoops." (3-LER-0351, 0035.) In particular, the alternate's statement here concerning the use of a whiteboard and particular beliefs about the evidence reflects a "statement made or incident that occurred during the jury's deliberations" and also a "juror's mental processes concerning the verdict." Fed. R. Evid. 606(b)(1). Accordingly, it falls within the core prohibition of the rule.

Le argues that the information concerning the timeline on the whiteboard qualifies as "an outside influence . . . improperly brought to bear" on the jury, so as to qualify this information under an exception in Rule 606(b)(2)(B). But Le is trying to fit a square peg in a round hole here. "The Rule applies in any proceeding that involves an inquiry into 'the validity of the verdict,' however that inquiry is framed by the litigants." *Leung*, 796 F.3d at 1036. "Although an exception to Rule 606(b) permits inquiry into whether 'extraneous influences' tainted the verdict, juror testimony regarding the jury's 'internal processes' is categorically barred." *Id.* at 1035. Because the information concerning the use of the timeline is squarely about "the jury's internal processes," it is "categorically barred" under *Leung*. *Id.*

"Outside influence" is meant to be for "prejudicial extraneous information or influences injected into or brought to bear upon the deliberative process," such as improper "statements by the bailiff or the introduction of a prejudicial newspaper account into the jury room;" Fed. R. Evid. 606, Notes of Advisory Committee on Proposed Rules, Subsection (b). This does not include an intra-jury discussion of the case using a timeline established prior to the alternate being seated.

"Parsing how jurors considered the evidence . . . is exactly what *Tanner* and the plain text of Rule 606(b) seek to prevent." *Leung*, 796 F.3d at 1036 (citation modified).

The cases that Le cites for the proposition that the use of the timeline is an "outside influence" do not support that position. In particular, none of the cases say anything about whether such intra-jury discussion, aided by a timeline created by the other jurors prior the alternate's arrival, qualifies as an "outside influence . . . improperly brought to bear" on the jury. Rather, *United States v. Aguilar* stands only for the unremarkable proposition that the participation of an alternate in deliberations when not properly seated may constitute "outside influence" under Rule 606(b)(2)(B). 743 F.3d 1144, 1150 (9th Cir. 2014).

Finally, construing the timeline as an "outside influence" would be a particularly odd reading of the record in light of the fact that, crediting the post-trial juror affidavit, the timeline was a result of thinking about the case from 11 of the 12 jurors seated there and, as such, would no doubt have found its way into the subsequent discussion

involving the newly seated alternate whether it had been reduced to writing on a whiteboard or not.

### *3. The jury was not exposed to extrinsic evidence*

Even if this Court considers the allegations concerning the timeline in the post-trial affidavit, the jury was not exposed to extrinsic evidence warranting reversal. Le argues that the jury's consideration of the timeline was equivalent to the admission into evidence of a pedagogical device like a chart summarizing evidence, contrary to the dictates of cases prohibiting such admission and use, citing *United States v. Wood*, 943 F.2d 1048, 1053-54 (9th Cir. 1991); *United States v. Soulard*, 730 F.2d 1292, 1300 (9th Cir. 1984); *United States v. Abbas*, 504 F.2d 123, 125 (9th Cir. 1974).

But the point of those cases is not to keep a jury with a newly seated alternate from referring to the work product of the pre-alternate jury—indeed, those cases have nothing to say about alternates. Rather, those cases are concerned with a jury being "unfairly and unduly impressed by the apparent authenticity of a government witness' chart computations, as such, rather than by the truth and accuracy of the underlying facts and figures supporting them." *Abbas*, 504 F.2d at 124.

This concern is inapplicable here, where the alleged timeline bore no such apparent authenticity that accompanies presentation by a government witness or the implicit judicial imprimatur that a jury might infer from its admission into evidence by the judge. Moreover, even both considering and crediting the allegation in the affidavit, there is no indication from the alternate juror that the timeline was particularly important to the verdict. (*See* 3-LER-0351.) Reversal is not warranted on this ground.

### E. Ritze's Post-Arrest Statements Were Properly Admitted During Her Trial

#### *1. Standard of review*

The Court reviews de novo the district court's "decision to admit statements that may have been obtained in violation of *Miranda*." *United States v. Narvaez-Gomez*, 489 F.3d 970, 973 (9th Cir. 2007). The underlying factual findings "are reviewed for clear error." *Id.* Whether a defendant's confession was voluntary is reviewed de novo. *United States v. Doe*, 170 F.3d 1162, 1168 (9th Cir. 1999). The admission of statements made in violation of *Miranda* is reviewed for harmless error. *United States v. Butler*, 249 F.3d 1094, 1098 (9th Cir. 2001).

### 2. *Ritze voluntarily, knowingly, and intelligently waived her* **Miranda** *rights*

"For a waiver [of *Miranda* rights] to be valid it must be voluntarily, knowingly, and intelligently given." *United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1127 (9th Cir. 2005). "Whether there has been a valid waiver depends on the totality of the circumstances, including the background, experience, and conduct of the defendant." *Id.* The government bears the burden of proving a waiver of *Miranda* by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986). An accused's waiver of her *Miranda* rights must be done "knowingly and intelligently" and made with the "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Rodriguez v. McDonald*, 872 F.3d 908, 921 (9th Cir. 2017).

To determine the validity of a *Miranda* waiver, courts consider the following factors: (1) a defendant's mental capacity; (2) whether there was a written waiver; (3) whether the defendant was advised of her rights in her native language or had an interpreter; (4) whether the defendant appeared to understand her rights; (5) whether the defendant's rights were individually and repeatedly explained to her;

and (6) whether the defendant had prior experience with the criminal justice system. *United States v. Crews*, 502 F.3d 1120, 1139-40 (9th Cir. 2007).

These factors and others strongly favor the district court's ruling upholding the *Miranda* waiver and the voluntariness of the statements. At the time of the statements, Ritze was a skilled and intelligent adult who understood her rights—and had, in fact, been advised of her rights by Le prior to her arrest—and had previous, extensive experience in the criminal justice system.

#### *a. Ritze was advised of and waived her* **Miranda** *rights.*

After Ritze was read her *Miranda* rights at the beginning of the first interview, the agent asked, "So does all that make sense to you?" (13-RitzeER-3242.) She replied, "Yes," *id.*, showing she understood her rights. When she did not understand something during the interviews, she did not hesitate to say so. (14-RitzeER-3265, 3266, 3370, 3372.)

Furthermore, as she revealed in her second interview, she understood her *Miranda* rights well but simply chose not to avail herself of them. She told agents about Le telling her that, if law enforcement ever approached, "don't tell them anything" and "just ask

for your attorney." 14-RitzeER-3440. Ritze told the agent, "I don't believe in that . . . I really don't." *Id.* Ritze's own words, then, reveal that she was fully aware of her *Miranda* rights and understood her ability to assert them, but had consciously decided she would not exercise them.

In addition, this was not Ritze's first arrest. Rather, she had extensive experience in the criminal justice system, having been arrested at least seven times. (13-RitzeER-3125-44.) She had even been arrested twice in the four months preceding her arrest in this case. *Id.* Two weeks before her arrest, she demonstrated her legal sophistication in complaining to Le about a search of her vehicle done "without consent." (13-RitzeER-3083, 3086). This establishes Ritze's sophisticated understanding of her legal rights mere weeks before she waived her *Miranda* rights.

Additionally, Ritze's mental capacity is high, and she was deemed to be "of above average intelligence" by a psychologist. (13-RitzeER-3033.) She maintained employment for nearly two decades as a property manager contracting work for homeowners' associations and

was an expert fisher. During the interviews, though evasive, she was articulate and well-spoken.

#### *b. Any intoxication or other circumstances did not undermine the validity of her* **Miranda** *waiver.*

Any intoxication that Ritze was suffering did not undermine the validity of her *Miranda* waiver. First, the arresting agent, and, hours later, the registered nurse who encountered Ritze on the day of her arrest, observed no objective signs of intoxication or alcohol withdrawal in her. (13-RitzeER-3083, 3087.) Second, even if she had been suffering some level of intoxication or alcohol withdrawal, the transcripts, along with the audio and video recordings (Ritze's First Statement and Second Statement Recordings; 4-RitzeER-0899, 0943-44; 3-RitzeER-0651-53, 0672-73), reveal that during both interviews she was alert, coherent, lucid, and perfectly in control of her faculties.

In fact, she was so clear-minded that she thought she could talk her way out of trouble, at first denying she had any idea why they were there, subsequently admitting to being on the boat but having no idea why the murder happened, and lastly, after a harsher interview style, admitting to knowing why it happened, while still holding back extremely significant information. (*Supra* Section III.B.1.e.) She told

several outright lies along the way and generally painted a picture of her relationship with Le that was wholly inconsistent with the other evidence in the case. (5-RitzeER-1182-97.) Her willingness to lie and attempt to manipulate the agents' view of her through her lies—as well as her appeals to her credibility as a mother—show why she knowingly and intelligently waived her *Miranda* rights: to try to talk her way out of trouble. Indeed, she repeatedly stated aloud that she did not want to get in any trouble, revealing her true motive for making the statements she made to the agents. (14-RitzeER-3268, 3330, 3331.)

Ritze's argument on appeal that she was "shivering" and "lacking warm clothing" (Ritze AOB 31, 32), to paint a picture of a defendant unable to waive her *Miranda* rights, is particularly misleading. An agent asked whether she was warm enough, and she responded that she was. (14-RitzeER-3241.) Indeed, far from shivering, she mentioned that the heat in the van made it "really warm" and laughed with the agents when one said, "Yeah, that's why we turned it down . . . I wanted to make sure it was comfortable." (14-RitzeER-3243.)

The minor injury she suffered to her forehead was so minor—as observable on the video of the second interview (*see* Ritze's Second

Statement Recordings; 3-RitzeER-0651-53, 0672-73)—that it could not plausibly have prevented her from providing a knowing, voluntary, and intelligent *Miranda* waiver. *See United States v. Upton*, 512 F.3d 394, 399-400 (7th Cir. 2008) (injury sustained from police action in course of arrest did not render *Miranda* waiver involuntary where defendant was treated between injury and waiver, defendant never requested further medical attention, laceration was still visible during the interview, officers said he had his wits about him in interview, and reasonable person would not interpret the injury "as the opening salvo in an effort to overbear his will"), *overruled on other grounds as recognized by United States v. Miller*, 721 F.3d 435, 437 (7th Cir. 2013).

#### c. *No* **Miranda** *re-advisement was necessary before the second interview.*

There was no need for agents to repeat the *Miranda* advisement to Ritze when they interviewed her again within a short time frame. Courts have routinely held that a *Miranda* readvisement is not necessary in cases where the lapse of time far exceeded the brief period between the interviews here. *Guam v. Dela Pena*, 72 F.3d 767 (9th Cir. 1995) (*Miranda* warning not needed when second interview occurred fifteen hours after the first interview); *United States v. Rodriguez-*

*Preciado*, 399 F.3d 1118, 1129 (9th Cir. 2005) (lapse of 16 hours did not require repeat of *Miranda* advisement).

"[T]he courts have generally rejected a *per se* rule as to when a suspect must be readvised of his rights after the passage of time or a change in questioners." *United States v. Andaverde*, 64 F.3d 1305, 1313 (9th Cir. 1995) (repeat of *Miranda* advisement not needed after lapse of two hours). Whether an accused must be re-read her *Miranda* rights before a succeeding interrogation is a totality of the circumstances evaluation with the key inquiry being whether there were "intervening events which might [give the accused] the impression that h[er] rights had changed in a material way." *United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1129 (9th Cir. 2005).

Here, there were no intervening events which would have given Ritze any impression that her rights had changed. This is particularly true given that she remained in custody. As the Ninth Circuit has stated in considering a much longer interval between interviews, "It is also significant that [the defendant] was in custody continuously from the time warnings were first administered through the second day interview . . . [t]hus, there were no intervening events which might have

given [the defendant] the impression that his rights had changed in a material way." *Id.*

Even so, to ensure Ritze was not under any misimpression about a change in circumstances, she was explicitly advised that there was no such change, when the agent said, at the outset of the second interview: "And, just as a reminder, so, so you're clear, as a reminder, you know, you were read your *Miranda* rights, it's still in play, nothing's changed." (14-RitzeER-3349.) Though Ritze now argues she did not know what that meant, her verbal acquiescence showed that she did know what it meant, especially on a morning where, when she did not understand something during the interviews, she was not shy about saying so.

***3. Ritze's statements were voluntary***

The government must prove a statement voluntary by a preponderance of the evidence. *Connelly*, 479 U.S. at 168 (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972)). "Due process does not bar the use of a confession unless government officials employed coercive interrogation tactics which rendered the defendant's confession 'involuntary' as a matter of law." *United States v. Miller*, 984 F.2d 1028, 1030 (9th Cir. 1993). Courts consider the "totality of the

circumstances" involved and their effect upon the will of the defendant to determine whether a confession was involuntary. *Id.* at 1030.

In considering whether a statement was made voluntarily under the Due Process Clause, courts consider the following factors: "the youth of the accused, his intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep." *United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003). Each of these factors supports the district court's finding that Ritze's statements to agents were voluntary.

As an initial matter, case law in this area is designed to ensure that a defendant's *confession* is not the product of coercion. *Miller*, 984 F.2d at 1030. The fact that Ritze's will was not overborne is evident, at the outset, from the fact that she never confessed to her crime and contradicted facts established by both other evidence and the jury's finding that she was guilty of Second Degree Murder. Here, the court was confronted only with largely self-serving, misleading, evasive, and incomplete statements by Ritze, which by their very nature show that

her will was not overborne. *See United States v. Crawford*, 66 F. Supp. 3d 1311, 1318 (D. Or. 2014) (citing Supreme Court's holding in *Connelly*, 479 U.S. at 164, that in the absence of any causal connection between police conduct and defendant's statements, there is no basis to find a statement involuntary "applies with greater force" where "defendant did not confess to the crimes charged").

***a. All enumerated factors support the voluntariness of her statements.***

Nonetheless, none of the factors support a finding of involuntariness. Ritze was 40 years old at the time of her statements, and had prior extensive experience with the legal system, a brother who was a deputy sheriff and a friend who was a deputy district attorney. Of above average intelligence, Ritze was employed successfully for many years as an account manager at a property management company and was an expert fisher. On the third factor, she was advised of her *Miranda* rights.

The detention was also not long—the initial encounter with agents occurred at 5 a.m., and by 2 p.m. she was in court for her arraignment. This is not a case where Ritze was held in custody for a long period for repeated questioning. *See Haswood*, 350 F.3d at 1028 ("Even if we

assume that the interrogation lasted all day . . . coercion typically involves far more outrageous conduct."); *Haynes v. Washington*, 373 U.S. 503, 510-12 (1963) (invalidating confession where police held suspect for more than five days and never advised him of his rights); *Ashcroft v. Tennessee*, 322 U.S. 143, 149-54 (1944) (invalidating confession because police questioned suspect in relays for 36 hours straight). Finally, there was no physical punishment such as deprivation of food or sleep during the period of interrogation. In sum, none of the *Haswood* factors supports Ritze's argument that her statements were coerced.

#### b. *Nothing about the agents' tactics rendered Ritze's statements involuntary.*

Nothing about the agents' tactics in this case rendered Ritze's statements involuntary. No coercion was used to get Ritze to answer questions. Listening to Ritze on the recordings of her interviews, as the district court did, makes plain that she was answering questions voluntarily.

Ritze primarily complains about the agents' references to her daughter, arguing that this somehow overbore her will. But it was Ritze herself who repeatedly brought up her daughter, and the agent

merely responded to that; and the agent's response to Ritze's mention of her daughter did not occur until midway through the second interview anyway.

*United States v. Tingle*, 658 F.2d 1332 (9th Cir. 1981), is inapposite. (Ritze AOB 38-39.) In Ritze's case, the focus of the interrogation was entirely on the investigation itself and the facts of the murder, unlike in *Tingle*, where it was "clear that the purpose and objective of the interrogation was to cause Tingle to fear that, if she failed to cooperate, she would not see her young child for a long time." *Tingle*, 658 F.2d at 1336. The four references the agent made to Ritze's daughter—brief mentions over the course of two interviews that lasted approximately four hours—did not constitute a "major" or "dominant" theme in the questioning of Ritze. *Cf. Brown v. Horrell*, 644 F.3d 969, 980 (9th Cir. 2011) (statement involuntary where connection between telling the truth and defendant's ability to be with his child "was a major, if not the dominant, theme running throughout [the] interrogation").

Instead, the dominant theme of the more confrontational portions of the interview was not Ritze's daughter, but rather, that Ritze was not

telling the truth because her story did not make sense. (14-RitzeER-3358 ("might as well tell the truth"); 3359 ("that is very hard to believe"); 3364 (confronting Ritze with inconsistency of her statements and her conduct after the murder); 3366 (same); 3367 (same); 3368 (same; "it's not consistent"); 3374 ("what you're saying doesn't make any sense to us"); 3376 (same); 3389 ("I'm a little confused as to why you're minimizing that part"); 3391 ("I don't know why you're protecting Wayne"); 3392 ("you're telling me a story that has no logic whatsoever"); 3397 ("you're telling us … [an] illogical story"); 3403 ("you're trying to hide things"); 3407 ("that's what doesn't make sense"); 3414 ("we're not buying the story"); 3423 ("here you're lying, telling us a story that doesn't make sense"); 3427 ("your narrative is not, not believable"); 3431 ("this story that doesn't make sense").)

The investigators' belief that she was lying was borne out by evidence already available to the agents at the time of the interview, evidence obtained subsequently, and the jury's ultimate verdicts that Ritze both lied during her interview and committed Second Degree Murder. Their expressions of disbelief did not render the questioning coercive, as "an interrogator can legitimately express his disbelief at a

defendant's story in order to elicit further comments or explanations." *United States v. Wolf*, 813 F.2d 970, 975 (9th Cir. 1987); *see also United States v. Amaya-Ruiz*, 121 F.3d 486, 494 (9th Cir. 1997), *overruled on other grounds by United States v. Preston*, 751 F.3d 1008, 1019-20 (9th Cir. 2014) (repeated insistence by agents that defendant not lie not coercive).

Though the agent's language and tone were at times confrontational, this was all in the service of confronting Ritze with evidence of her guilt, which does not violate the Due Process Clause, and, in any event, those times were sporadic in an otherwise polite conversation. *See Makarewicz v. Scafati*, 438 F.2d 474, 478-79 (1st Cir. 1971) (confession voluntary, despite police's allegedly threatening remarks, because resulted from internal pressure on defendant after being confronted with evidence of guilt); *United States v. Guillen*, 995 F.3d 1095, 1110, 1123 (10th Cir. 2021) (confession voluntary, despite officer accusatorily confronting defendant with evidence about bomb, because questioning otherwise in conversational tone without physical threats).

In any event, this particular defendant was more than able to handle it without having her will overborne. Ritze was no mild-mannered, meek, shrinking violet shocked by profanity, which she used regularly herself, including during the first interview with agents and during her psychological evaluation. (*See, e.g.*, 14-RitzeER-3498 (Ritze would say, at work, "Fuck those homeowners"); 3-SER-702-03 ("Fuck with me . . . his ass has been in all kind of freaking shit… if anybody fucks me, they better be careful . . . fuck it . . . ."); 13-RitzeER-3082, 3086 ("I am fucking livid"); 9-RitzeER-2288 (Ritze would "yell a lot, cuss"); 4-SER-779 ("I will drag you out and fuck you up"); 12-RitzeER-2901, 2904, 2912, 2913, 2936 (first interview); 13-RitzeER-3050 (psych eval).)

Ritze also complains that the agents espoused the benefits of cooperation (Ritze AOB 39-40)—a circumstance that happens daily in our legal system and in no way yielded true cooperation from Ritze, anyway. Ritze also complains that the agents "created a false sense of urgency" (Ritze AOB 41), without articulating either (1) what was false about the agent's accurate statement that her time was almost done (because she would be taken for arraignment early that afternoon) and

that her statements were, at that point, entirely unhelpful to the investigation; or (2) even if they did create a false sense of urgency, how that would amount to overbearing her (very strong) will. *Cf. Miller*, 984 F.2d at 1031 (noting "deception does not render a confession involuntary").

#### c. *Any intoxication did not render her statements involuntary.*

Even if Ritze had been suffering some level of inebriation or alcohol withdrawal at the time she waived her *Miranda* rights, "[a] confession is voluntary if it is the product of a rational intellect and a free will, whether or not a confession is the product of physical intimidation or psychological pressure or a drug-alcohol-induced statement." *Medeiros v. Shimoda*, 889 F.2d 819, 823 (9th Cir. 1989) (citation modified). In *Medeiros*, the court concluded that "although [the defendant] was intoxicated, he was not incapacitated," because he was able to drive a car, obey the officers' orders, and cooperate in conversing with officers. *Id.* Similarly here, Ritze acted appropriately, cooperated with officers, and had two long, coherent conversations with them.

Dr. Fillmore's declaration and testimony were largely unhelpful. (AOB 36-37.) Though Dr. Fillmore apparently deigned to ascribe a blood alcohol content level to her, this was in the absence of having examined her in any way. Even if she was intoxicated, she was by no means incapacitated, and it clearly had no bearing on her ability to execute a valid *Miranda* waiver and give a voluntary statement.

#### ***4. Any error in the admission of the statements was harmless, at least with respect to the murder conviction***

Even if Ritze's post-arrest statements were improperly admitted at trial, they were harmless. There was plenty of evidence that Ritze had gone out on the boat with Le and Dao, and only Le and Ritze came back. In particular, the video from the harbor, showing a person consistent with her description and showing her Ford Explorer and her boat, the text messages from Dao to Nguyen identifying the boat, the cell site evidence from Dao, Le's, and Ritze's phones placing them at the docks, and Nguyen's testimony that Dao was going lobster fishing with Le, would have sufficed to identify Ritze as the boat driver for the trip from which Dao never returned. *See supra* Section III.B.1.c.

Indeed, once Ritze's identity on the boat was established, it was primarily the evidence of Dao's body floating in the Pacific, with bullet wounds and blunt force trauma, along with Le and Ritze going about their daily lives in the aftermath of the murder, that truly sank Ritze at trial. Contrary to her assertion on appeal, the factfinder needed nothing further to conclude that Ritze had left Dao's body in the water and drove away; that was obvious from the other evidence the government presented at trial.

Indeed, the government presented evidence that after the murder, instead of going to authorities, Ritze got closer to Le, helped track Dao's widow through joint monitoring of a tracking device Le placed on Dao's widow's vehicle, and discussed Le's desire to get money from Dao's widow. *See supra* Section III.B.1.d.ii-iii.

Finally, Ritze's statements to her mother-in-law Sandra, and the recorded statement to her co-workers, in the immediate lead-up to the murder, about having friends who would kill people on her boat—and, in the case of Sandra, specifically tying this statement to Dao—was enough to convict. (3-SER-702-03; 8-RitzeER-1915, 1924.)

## F. Ritze's Statements to Her Co-Workers Were Properly Admitted

### *1. Standard of review*

"When a trial court's weighing of prejudice versus probative value is challenged on appeal, the trial court's exercise of broad discretion will not be lightly disturbed due to its proximity." *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 898 (9th Cir. 1996) (citation modified).

Whether specific evidence falls within the scope of Federal Rule of Evidence 404(b) is reviewed de novo, while the district court's admission of "other act" evidence under Rules 403 and 404(b) is reviewed for an abuse of discretion. *United States v. Lague*, 971 F.3d 1032, 1037 (9th Cir. 2020). If the district court abuses its discretion under Rule 403, "we ask whether the government successfully bore its burden of proof that the error in admitting the evidence was harmless." *Id.* (citation modified).

### *2. The recording was direct evidence of the crime charged*

The workplace recording was direct evidence of the crime charged, not other act evidence subject to the strictures of Federal Rule of Evidence 404. "One of the key words in determining the scope of Rule 404(b) is 'other': only crimes, wrongs, or acts 'other' than those at issue

under the pleadings are made inadmissible under the general rule." *United States v. Loftis*, 843 F.3d 1173, 1176 (9th Cir. 2016) (citation modified).

Here, it was undeniable that Ritze's reference in the recording to her "friends that will just go kill people in a heartbeat . . . of a total difference race" was a reference to Le. This was clear through (1) her nearly simultaneous similar descriptions of Le and her relationship with him to both Angela Mesa and Noemee Lewis (7-RitzeER-1709, 3-SER-623-25; 9-RitzeER-2167, 2172); (2) her additional statements to co-workers Idania Amaya and Elizabeth Ponce around the same time describing Le (9-RitzeER-2290-91; 2318); (3) her knowledge that Le carried a gun and was capable of violence, as revealed in the restaurant recording from September 17, 2019 (5-RitzeER-1197); (4) a text she got four days later from Le advising her of his violent assault of someone that required cleaning blood off walls and a floor (9-RitzeER-2061-62; 3-SER-662); (5) her statements a week later in Las Vegas specifically saying, along with Le, that they would kill Dao together on her boat (8-RitzeER-1915, 1921-25); and (7) her reference in the video to her friends who kill people having been "on standby" the previous night, combined

with phone records from the previous night showing her in contact with Le. (5-RitzeER-1210.)

Moreover, in the recording, Ritze stated, "I'm gonna take 'em on my boat, they may go on the boat but they are not gonna come back." (3-SER-702-03.) When the co-worker asked her, "You're going to kill people on your boat?" Ritze replied, "Yes." (*Id.*) That is exactly what happened in this case: Dao was taken out to sea on Ritze's boat and did not come back; the link between the statements and the crime charged is made clear in Ritze's own words in the statement. Indeed, a mere week after these statements, Ritze was in Las Vegas telling her mother-in-law that she and Le were planning to kill Dao on her boat, further tying statements of intent to kill Dao to the recorded statement to her co-workers about killing people on her boat.

The statement, then, was one of an intent to kill people on her boat with Le, made only weeks before she and Le killed Dao on her boat. As a statement of intent to commit the murder itself, it is direct evidence of the crime charged, not uncharged misconduct evidence. Because the workplace recording constituted direct evidence of the crime charged, the district court correctly admitted it at trial.

### 3. *Even if subject to Rule 404, the recording proved knowledge, intent, and lack of accident or mistake in Dao's murder*

Even if the workplace recording were not direct evidence of the crime charged, it was probative of whether Dao's murder on Ritze's boat was the result of a mistake or accident, and probative of her knowledge and intent with respect to what happened to Dao and thus was admissible under Rule 404(b). Ritze had stated in her post-arrest interview, and argued at trial, that she was shocked and surprised by Dao's killing on her boat and had no involvement with it whatsoever. But her statement about killing people on her boat little over two weeks earlier rebutted that, to show her intent with respect to the murder, and the lack of mistake or accident in the killing of Dao on her boat. *See* Fed. R. Evid. 404(b)(2).

### 4. *The workplace recording was relevant and probative*

Additionally, the probative value of the workplace recording—either as direct evidence of the murder or as "other act" evidence admissible to show Ritze's state of mind and lack of accident or mistake relating to Dao's murder—far outweighed any undue prejudice, of which there was none. Ritze argues that the workplace recording was not

probative because she was intoxicated when she made the statements recorded, and because her co-workers, Ritze alleges, did not take her seriously and goaded her into making the statements. (Ritze AOB 45-46.) With this argument she ignores that her co-workers in fact took her extremely seriously, evidence of which included contemporaneous texts calling for her firing (4-SER-828-36), as well as multiple co-workers arming themselves and taking other precautions, such as not staying after hours due to the seriousness of her statements. (4-SER-779, 833; 9-RitzeER-2292.) Additionally, these were topics to explore on cross-examination of the co-workers, and arguments to make to the jury for their evaluation, both of which she did (9-RitzeER-2278-82, 2311-13, 2319-22, 11-RitzeER-2785), not reasons to exclude the recording from the jury's consideration.

Ritze also argues that she had a history of making similar statements, which, she argues, undermined their probative value. (Ritze AOB 46.) But the "similar statement" to which she pointed was not particularly similar: there, her husband, having found out about her affair, told Ritze he was going to post it on social media, and Ritze responded by saying she would have him beat up. (8-RitzeER-1849-50).

That is far cry from talking about killing people on her boat, a couple weeks before she killed someone on her boat.

Ritze's cited cases do not compel a contrary result. In both *Ortiz-Sandoval* and *Guerrero*, though the courts referred to a potential unfair prejudice from the introduction of threats, those were both cases where the threats were distinct from the crime itself and occurred after the crime—and the threats were held admissible in those cases, in any event. *Ortiz-Sandoval*, 81 F.3d at 898, *United States v. Guerrero*, 803 F.2d 783, 785-87 (3d Cir. 1986).

#### *5. Any error in the workplace recording's admission under Rule 403 was harmless*

Though the workplace recording was relevant and probative, it was by no means necessary to the verdict. In particular, other evidence easily proved Ritze's guilt, as described *supra*, Section V.E.4.

### G. The Court Properly Denied Ritze's Request to Exclude a Victim of the Crime from the Courtroom During a Proceeding in Open Court

#### *1. Standard of review*

The appropriate standard of review is abuse of discretion. *United States v. Downen*, 496 F.2d 314, 321 (10th Cir. 1974) (whether to send exhibits back to jury room is within trial court's discretion); *United*

*States v. Medina Casteneda*, 511 F.3d 1246, 1249 (9th Cir. 2008) (district court has "great latitude to address requests for readbacks"); *United States v. Frias-Cobos*, 349 F. App'x 171, 173 (9th Cir. 2009) (reviewing for abuse of discretion district court's allowance of reading of stipulation to the jury after the close of evidence).

Ritze asserts that the appropriate standard of review is structural error, framing the alleged error as a violation of Ritze's right to jury deliberations held in secret. (Ritze AOB 49-51.) But the proceeding did not constitute jury deliberation, and thus "structural error" is not the standard of review.

### *2. Ritze tried to exclude the victim's mother from an open court proceeding, not jury deliberation*

The proceeding where the jurors reviewed the exhibits in open court did not constitute deliberations, as alleged by Ritze, an argument she advances with no legal support. (*See* AOB 50.) During the exhibit review, jurors made no comment, engaged in no discussion, and did not speak at all. (1-RitzeER-0128-30.) As the district court said, the jury was simply "not in deliberation." (1-RitzeER-0126.) "They're viewing evidence." (*Id.*) "And it's already evidence that's been seen or viewed in the public." (*Id.*) For the proceeding, the district court instructed the

jury—because Ritze had raised a concern about the jurors seeing the transcript at that stage (1-RitzeER-0127, 11-RitzeER-2860-64)—that the transcript was only an aid to the evidence. (1-RitzeER-0129.) When the proceeding was completed, the district court stated to the jury, "You may resume your deliberations." (1-RitzeER-0130.)

Indeed, this type of playback of evidence has long been a typical practice, as noted by the district court when he said that was how it was always done in his career "in the last 23 years." (1-SER-191-92; *see also* 1-SER-204.) This finds support in the cases of this Court, too. This procedure—when held in open court—is "properly viewed as a stage of the trial at which the presence of the defendant is required." *United States v. Kupau*, 781 F.2d 740, 742 (9th Cir. 1986) (noting that instead of allowing an agent to play back the exhibit for the jury in a closed session, "[i]n hindsight it would have been better to have run the machine in open court with the reporter, the judge, counsel, and the defendant present"). Indeed, if Ritze's presence for this type of playback is required, it cannot constitute deliberations, from which a defendant is, of course, excluded.

To the extent Ritze complains that the district court should have sent the exhibits to the jury room, a permissible—but not mandatory—procedure, *United States v. Chadwell*, 793 F.3d 910, 915 (9th Cir. 2015), she both ignores her earlier specific objection to that procedure so that the jury could be instructed that the transcript was only an aid (1-RitzeER-0127), and the fact that that was what the district court ultimately did after hearing from the parties. (1-SER-195-97, 202-05.) In any event, the district court's latitude is wide here. "The decision as to whether exhibits should be sent to the jury room rests within the sound discretion of the Trial Court." *Dowen*, 496 F.2d at 321.

### *3. The victim's mother had a statutory right to be present at all open court proceedings*

The victim's mother, as a "family member" of the deceased victim, is a "crime victim" under the Crime Victims' Rights Act. 18 U.S.C. § 3771(e)(2)(B). Accordingly, she had a statutory right to be present at all proceedings in the case. The Crime Victims' Rights Act provides that a crime victim has the right to notice "of any public court proceeding . . . involving the crime . . . [and] [t]he right not to be excluded from any such public court proceeding." 18 U.S.C. §§ 3771(a)(2), (3). The only exception to this right is in cases where the

victim is also a witness in the case, and "the court, after receiving clear and convincing evidence, determines that testimony by the victim would be materially altered if the victim heard other testimony at the proceeding." *Id.*

The victim's mother was not a witness in the case. There was thus no basis under the statute to deny her right to be present at all public proceedings in the case, including jury readbacks, exhibit playbacks, or instructions.

#### *4. In any event, there was no prejudice*

Even if the issue is analyzed in the framework of whether there was any impermissible intrusion upon the secrecy of the jury's deliberations, the Supreme Court has stated that it generally "analyze[s] outside intrusions upon the jury for prejudicial impact." *United States v. Olano*, 507 U.S. 725, 738 (1993) (citation modified). Because the primary "purpose of jury privacy and secrecy is to protect the jury's deliberations from improper influence," if "no harm resulted from the intrusion," then "reversal would be pointless." *Id.* The "ultimate inquiry" is: "Did the intrusion affect the jury's deliberations and thereby its verdict?" *Id.* at 739.

Here, there is zero evidence of any harm done by allowing the playback of the exhibits to occur in open court—a procedure formulated, in any event, to comply with Ritze's request that the jurors be instructed about the transcript's only being an aid. Ritze only speculates about the mere possibility that a juror saw the victim's mother in the courtroom, somehow knew who she was even though she was never identified during trial, also saw her crying (despite a lack of any reliable evidence that she ever was), and had their decision affected by any of that, despite the juror's oath to render a fair verdict according to the law and evidence. (*See* 1-SER-41); *Pena-Rodriguez v. Colorado*, 580 U.S. 206, 224 (2017) ("Jurors are presumed to follow their oath."). That chain of speculation upon speculation is insufficient to show prejudice.

Ritze's statement on appeal that Dao's mother had been "visibly upset and noticeably sobbing" throughout the trial (Ritze AOB 51) is particularly misleading. The victim's mother was, indeed, present at every proceeding, but she had not been identified during the proceedings (1-RitzeER-0126, 0128), and the Court stated at the time of Ritze's request to close the courtroom, of the victim's mother, "she

hasn't cried out," and "there hasn't been any inappropriate conduct." (1-RitzeER-0126.) The only contrary indication in the record is a statement from defense counsel that his wife—who, according to defense counsel, was seated "right in front of [Dao's] mother" during closing, heard Dao's mother crying (1-RitzeER-0126-0127), which must have been very soft crying (if it occurred at all), and likely imperceptible to the jury who was much further away from Dao's mother, because it did not remotely interrupt the proceedings.

Yet the record belies even this assertion from defense counsel about what his wife perceived. The district court felt it necessary to correct the record by noting its disagreement with the representations made by defense counsel as to observations by his wife, stating that he was "quite frankly, disagreeing" with defense counsel's wife's observations as reported by defense counsel. (1-SER-213.) The district court stated, "I've been watching very carefully to make certain that there was no outcry of any kind." (*Id.*) "I've never seen that from her in this entire trial." (*Id.*) Ritze cannot show that this factual finding was clearly erroneous, as she must, particularly since the district court was

uniquely positioned to make that determination. And that finding nullifies any possibility of prejudice.

## H. The District Court Properly Denied Defendant's Motion for Judgment of Acquittal Because the Evidence Was Sufficient to Prove Defendant Committed Second Degree Murder

### *1. Standard of review*

The Court "review[s] a district court's denial of a Rule 29 motion for judgment of acquittal de novo." *United States v. Zavala-Mendez*, 411 F.3d 1116, 1118 (9th Cir. 2005).

### *2. Applicable law*

A motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 is governed by the two-step process set forth in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) and *United States v. Nevils*, 598 F.3d 1158, 1161, 1164 (9th Cir. 2010) (en banc).

First, the court "construe[s] the evidence in the light most favorable to the prosecution." *Nevils*, 598 F.3d at 1161 (citation omitted). In performing this first step, "[t]he government is entitled to all reasonable inferences that can be drawn from the evidence." *United States v. Lucas*, 963 F.2d 243, 247 (9th Cir. 1992).

Second, the court must evaluate whether the evidence "is adequate to allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *United States v. Richter*, 782 F.3d 498, 501 (9th Cir. 2015) (citation modified). This Court has explained, "[t]he hurdle to overturn a jury's conviction based on a sufficiency of the evidence challenge is high," *United States v. Rocha*, 598 F.3d 1144, 1153 (9th Cir. 2010), and "any conflicts in the evidence [must] be resolved in favor of the jury's verdict," *United States v. Alvarez-Valenzuela*, 231 F.3d 1198, 1201-02 (9th Cir. 2000). In short, the jury's verdict must stand if, "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Reed*, 575 F.3d 900, 923 (9th Cir. 2009) (citation modified).

#### *3. The evidence amply supported the jury's conclusion that Ritze acted with the intent necessary to commit Second Degree Murder*

The evidence here amply supported the jury's conclusion that Ritze acted either deliberately and intentionally, or recklessly, in killing Dao, and that she killed him or aided in his killing. The following amounted to sufficient evidence to support such conclusions:

- Ritze, Le, and Dao went out on her boat, and Dao never came back, but instead was found dead, floating in the Pacific Ocean the next day, with bullet wounds, head injuries indicative of the application of repeated blunt force, and having died of drowning;
- Weeks before, Ritze had told her co-workers that she had friends (Le) who would kill people on her boat;
- Ten days before, Ritze had told her mother-in-law that she and Le would be killing Dao;
- During the trip, the boat traveled three miles offshore, despite evidence that Ritze would never have traveled so far offshore for a legitimate lobster fishing trip;
- After the trip, Ritze remained in close contact with Le, and bragged about how he was a "gangster" in the days following the murder;
- Ritze provided Le a tracking device, helped him get a second tracking device, knew about Le placing a tracking device on Dao's widow's car after the murder, forwarded Le updates about the location of that device, and discussed Le's desire to

get money from the widow in connection with their joint monitoring of the tracking device; and

- When approached by law enforcement, Ritze told lie after lie about the boat trip.

*Supra* Section III.B.1.b-e. All of this evidence tended to show both that (1) Ritze aided Le with respect to at least one element of Second Degree Murder—to wit, killing him; and (2) Ritze acted with the intent to facilitate Second Degree Murder, i.e., either facilitate the deliberate and intentional killing of Dao, or to facilitate killing him recklessly with extreme disregard for human life.

Moreover, the forensic evidence of Dao's body—which, with its repeated head trauma and multiple bullet wounds, showed a great effort to kill Dao—also tended to show that Dao was deliberately and intentionally killed by the people who left him in the ocean to drown. Those people were undisputedly Ritze and Le. Ritze's continued relationship of infatuation with Le and his gangster lifestyle also allowed the jury to infer that she had acted with the intent to facilitate Second Degree Murder, because her post-murder conduct made no sense if she had not been acting with that intent. Her repeated lies to

the agents in her post-arrest statements provided additional evidence of her consciousness of guilt for her involvement in committing Second Degree Murder.

Against this overwhelming evidence of Ritze's involvement in the deliberate and intentional killing of Dao, or, at the very least, the killing of Dao with reckless disregard for human life, Ritze argues on appeal that one of the witnesses was not credible (Ritze AOB 55-56), despite the fact that at this stage the evidence is to be viewed in the light most favorable to the prosecution, and despite the district court's finding that both juries rejected the cross-examination of that witness. (1-RitzeER-0115.) Ritze also complains of "very little evidence of what actually transpired offshore" (Ritze AOB 56) where, naturally enough, the government did not present percipient witness testimony to a murder where the only uninvolved person present was murdered by Ritze and Le. Ritze then recycles the closing argument to the jury (Ritze AOB 56-57), asking why the murder was not carried out with more skill, ignoring all the evidence she herself elicited at trial about how she was an out-of-control alcoholic who was abusing prescription pills at the time of the murder. Where all inferences must be drawn in

the government's favor, none of Ritze's arguments warrants a finding that no reasonable juror could have concluded she acted deliberately and intentionally, or recklessly with extreme disregard for human life, in killing Dao.

Ritze's argument that there was insufficient evidence of her causing Dao's death, or aiding and abetting the death, again ignores all the evidence recounted above. The jurors were entitled to infer from her pre-offense statements, her post-offense conduct, and her lies to law enforcement, that she had assisted Le in getting Dao out to sea, to a position where he could be shot, in inflicting blunt force trauma to Dao, and in leaving Dao in the ocean, all of which caused Dao's death.

## I. The District Court Properly Denied Defendant's Motion for a New Trial

### *1. Standard of review*

The Ninth Circuit has stated that its role, in reviewing a district court's denial of a motion for new trial, "is limited to determining whether the district court clearly and manifestly abused its discretion." *United States v. Alston*, 974 F.2d 1206, 1211-12 (9th Cir. 1992) (citation modified). "The decision is within the sound discretion of the district court, and the appellant carries a significant burden to show an abuse

of discretion." *Id.* at 1212 (citation modified). The Ninth Circuit only grants the motion for new trial "in exceptional circumstances in which the evidence weighs heavily against the verdict." *United States v. Del-Toro-Barboza*, 673 F.3d 1136, 1153 (9th Cir. 2012).

#### 2. *The defense request to hold a new trial so Ritze can make different tactical decisions at trial was properly denied*

Under Federal Rule of Criminal Procedure 33(a), a court "may vacate any judgment and grant a new trial if the interest of justice so requires." The burden of justifying a new trial rests with the defendant. *United States v. Endicott*, 869 F.2d 452, 454 (9th Cir. 1989).

The district court properly denied Ritze's motion for a new trial, because the evidence amply established the murder conviction, the custodial interrogations were properly admitted, and the victim's mother's presence during open court was entirely appropriate. Ritze's main contention on appeal is that she should be granted a trial at which she would present a defense specific to second-degree murder. (Ritze AOB 64-65.) But she was perfectly free to present that defense during the trial that occurred. She does not cite any authority that a

defendant's tactical decision not to present evidence known to her at trial is grounds for a new trial.

To the contrary, the opposite is true. "One cannot withhold such evidence at the trial and, being convicted, seek a second chance before another jury by then producing it." *Brandon v. United States*, 190 F.2d 175, 178 (9th Cir. 1951); *see also United States v. Munoz*, 409 F. App'x. 117, 121 (9th Cir. 2010) (new trial motion cannot be premised on post-conviction testimony of a co-defendant who could have testified at trial but did not). Virtually every defendant would be entitled to a new trial based on calculations made by her and her lawyer during trial that, in hindsight, may have been decided differently.

## J. There Were No Errors at Sentencing and, In Any Event, the Sentence Was Substantively Reasonable

### *1. Standard of review*

The Ninth Circuit "reviews a district court's interpretation of the federal Sentencing Guidelines de novo, its factual determinations for clear error, and its application of the Sentencing Guidelines to the facts as it has found them for abuse of discretion." *United States v. Rising Sun*, 522 F.3d 989, 993 (9th Cir. 2008). The Court reviews the

reasonableness of a sentence for abuse of discretion. *United States v. Jaycox*, 962 F.3d 1066, 1068 (9th Cir. 2020).

#### 2. *The district court properly rejected Ritze's request to apply a minor role adjustment at sentencing*

To receive a minor role adjustment under U.S.S.G. § 3B1.2, "the defendant must prove that he was 'substantially less culpable than the average participant in the charged criminal activity.'" *United States v. Klensch*, 87 F.4th 1159, 1163 (9th Cir. 2023).

The district court must proceed in three steps to make the determination. *Id.* First, it must identify all individuals for whom there is sufficient evidence of their existence and participation in the overall scheme. *Id.* Then, it must calculate a rough average level of culpability for these individuals, taking into consideration the five factors in comment 3(C) to the Mitigating Role Guideline. *Id.* Those five factors are: (1) "the degree to which the defendant understood the scope and structure of the criminal activity;" (2) "the degree to which the defendant participated in planning or organizing the criminal activity;" (3) "the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;" (4) "the nature and extent of the defendant's participation in

the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;" and (5) "the degree to which the defendant stood to benefit from the criminal activity." U.S.S.G. § 3B1.2, App. Note 3(C)(i)-(v). Third, the district court must compare the defendant's culpability to that average. *Klensch*, 87 F.4th at 1164. "If this calculation shows that the defendant is substantially less culpable than that average and meets the other criteria, he should be granted a mitigating role adjustment." *Id.*

Contrary to Ritze's assertion on appeal (Ritze AOB 68), the district court "[i]s not required to mechanically analyze each factor or reference them verbatim on the record," but rather provide an explanation "in general terms, of how the considerations embodied in the factors apply in this case." *Klensch*, 87 F.4th at 1164.

That is exactly what the district court did here. Faced with the defense request for a minor role reduction, the district court did not make a cursory statement as in *Klensch*. *See* 87 F.4th at 1162 (district court only stated that "Klensch was the one transporting the individuals" and the evidence did not show "his role was minor"). To

the contrary, the district court gave a fulsome explanation, over four pages of transcript, of the considerations embodied in the factors articulated in *Klensch* and the Application Note to the Guideline. (1-RitzeER-0069-72.)

On the "nature and extent of defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts," U.S.S.G. § 3B1.2, App. Note 3(C)(iv), the district court noted that Ritze did not stop, displaying great callousness. (1-RitzeER-0070.)

On "the degree to which the defendant understood the scope and structure of the criminal activity," *id.* at 3(C)(i), the district court noted Ritze's pre-murder statements to the mother-in-law that Dao is "not going to be here." (1-RitzeER-0071.)

On "the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts," *id.* at 3(C)(iv), and potentially the degree to which the defendant stood to benefit from the criminal activity," *id.* at

3(C)(5), the district court noted Ritze's involvement in the tracking of Dao's wife, discussion of monitoring it when it went to Arizona, and discussion with Le about the "pursuit of the $100,000." (1-RitzeER-0071.) In assessing her level of involvement, the district court also noted that objective, video evidence showed that she just went and got the boat, drove it home, "and went forward with [her] relationship [with Le]" (1-RitzeER-0071), showing how she was no unwitting minor role player here. The district court ultimately found her conduct "callous . . . horrific and horrendous." (1-RitzeER-0082.)

All the evidence showed that Ritze was not remotely a person who was easily led around by the nose, but rather "very headstrong," "bossy," "a bully," and "impossible" to persuade to do something she did not want to do. (8-RitzeER-1775, 2003, 2021; 9-RitzeER-2288-89.) In making the minor-role comparison, as required at the third step under *Klensch*, the district court stated, "I agree, you're one step lower than [Le] in this" (1-RitzeER-82), acknowledging that she did not pull the trigger, but it did not conclude that she was "*substantially* less culpable" than the average participant (1-RitzeER-69-72), as required under the language of the commentary to the Guideline itself. U.S.S.G.

§ 3B1.2, Comm., App. Note 3(A). Because the district court functionally carried out the three-step analysis, it adequately explained its denial of the minor role adjustment.

### 3. *Ritze's sentence was substantively reasonable*

A district court is required to consider the § 3553(a) factors in issuing a sentence. *United States v. Trujillo*, 713 F.3d 1003, 1009 (9 Cir. 2013). Indeed, the district court referred aloud to § 3553(a). (1-RitzeER-0081.) The district court also stated that it had "very carefully considered the circumstances of the offense, and the history and characteristics of the defendant." (1-RitzeER-0082.) The district court indicated that the "need for the sentence reflects the seriousness of the offense, uppermost respect for the law, and provides just punishment." (1-RitzeER-0082.) Further, it "affords adequate deterrence, and it protects the public from further crimes." (1-RitzeER-0082.) Even so, "there is no mechanical requirement that a sentencing court discuss every factor." (*Id.*)

Ritze complains on appeal that the district court inadequately accounted for her arguments concerning her troubled background and model behavior while in custody. (Ritze AOB 69.) But the district court

did address her behavior in custody, saying, "I do recognize your efforts at rehabilitation." (1-RitzeER-0077.) "I want you to clearly hear that I'm aware of that, but the callousness of this far outweighs and outbalances those efforts." (1-RitzeER-0077.) These statements justified the district court's rejecting her request for a variance based on her troubled background—as did the district court's other, repeated statements relating to the callousness of the crime (1-RitzeER-0059-60, 61, 69-72, 73), as well as the obvious fact that Ritze stood convicted of a murder of a man with two children, with a mother asking the sentencing court for a life sentence for someone she rightly perceived based on the evidence as having acted "cold-blooded" (1-RitzeER-0054), and whose "life will never truly be happy or the same again" (1-RitzeER-0055).

In light of her conduct that the district court called "horrific," "horrendous," and "extraordinarily callous," even a life sentence—what the victim's family wanted (1-RitzeER-0059)—would not have been substantively unreasonable. But the Guidelines provided for a significantly lower range of incarceration. Probation found the

Guidelines range to be 324 to 405 months, based on an offense level of 38 and a Criminal History category of IV. (1-SER-53.)

While this was a reasonable range, the district court decided to remove six points from her criminal history, not because they did not technically apply under the Guidelines, but because of (1) an argument that the criminal history category was overstated because Ritze got sentenced for a probation violation relating to one crime at the same time she got sentenced on a new crime, which resulted in, "in some sense, double counting" (1-RitzeER-0031-34), and (2) the district court's decision not to count a drunk driving crime because it was not violent, which also removed two points for committing the crime while on supervision. (1-RitzeER-0075.) Given the district court's reduction, her criminal history category functionally fell from category IV to category II, yielding a much lower Guideline range of 262 to 327 months.

Though the government did not seek application of the 2-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1, her blatant lies to law enforcement warranted a higher sentence. "Some types of conduct ordinarily do not warrant application of this adjustment [for obstruction] but may warrant a greater sentence within

the otherwise applicable guideline range." U.S.S.G. § 3C1.1, Comm., App. Note 5. "[E]xamples of the types of conduct to which this application note applies" includes "making false statements, not under oath, to law enforcement officers," *id.* at 5(B), which is exactly what Ritze did here. This supported a higher sentence within the applicable Guideline range, and yet Ritze still got a sentence at the low end of an already-reduced Guideline range.

In these circumstances, where there were no material errors in the sentencing, *Rising Sun*, 522 F.3d at 993, this Court should easily conclude that the sentence at the low end of a significantly reduced range, for a defendant convicted of murder, was substantively reasonable.

## VI

## CONCLUSION

Defendants' convictions and sentences should be affirmed.

DATED: August 18, 2025

Respectfully submitted,

BILAL A. ESSAYLI
Acting United States Attorney

CHRISTINA T. SHAY
Assistant United States Attorney
Chief, Criminal Division

*s/ Gregory S. Scally*

GREGORY S. SCALLY
Assistant United States Attorney
Deputy Chief, Orange County Office

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

## STATEMENT OF RELATED CASES

The government states, pursuant to Ninth Circuit Rule 28-2.6, that it is unaware of any cases related to this appeal.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Numbers 23-1814 and 23-784**

I am the attorney or self-represented party.

**This brief contains 30,656 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  [ ] it is a joint brief submitted by separately represented parties.
  [ ] a party or parties are filing a single brief in response to multiple briefs.
  [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated ______________.

[X] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** *s/ Gregory S. Scally* **Date** August 18, 2025
*(use "*s/[typed name]*" to sign electronically-filed documents)*